# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SHARON BOBBITT, Individually and On
Behalf of All Others Similarly Situated,

                          Plaintiff,

      vs.

ANDREW J. FILIPOWSKI, et al.,

                      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

No. 04-12263-PBS

**SECOND CONSOLIDATED CLASS
ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAW**

**JURY TRIAL DEMANDED**

**PART 1 PAGES 1-28**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SHARON BOBBITT, Individually and On
Behalf of All Others Similarly Situated,

             Plaintiff,

    vs.

ANDREW J. FILIPOWSKI, et al.,

             Defendants.

No. 04-12263-PBS

**SECOND CONSOLIDATED CLASS
ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAW**

**JURY TRIAL DEMANDED**

Lead Plaintiffs James Tito and Frank Waddell (the "Lead Plaintiffs") and plaintiffs Jeffrey A. Hoover and Patricia Diamantouros (collectively with the Lead Plaintiffs, the "Plaintiffs") allege the following based upon the investigation of their counsel which included, *inter alia*, a review of divine, inc. ("divine" or the "Company") regulatory filings and reports, securities analysts' reports and advisories about the Company, the complaint filed by the Examiner in a related Bankruptcy proceeding in the United States Bankruptcy Court for the District of Massachusetts, Eastern Division captioned *In re Enivid, Inc., Stewart Grossman Examiner of In re Enivid v. Filipowski, et al.*, Case No. 03-011472-JNF, press releases and other public statements issued by the Company, and interviews with former employees of the Company. Plaintiffs believe that additional substantial evidentiary support will exist for the allegations set forth after a reasonable opportunity for discovery.

### NATURE OF THE CLAIMS

1.     This is a federal securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of divine between September 17, 2001, and including February 14, 2003 (the "Class Period").

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act")[15 U.S.C. §78aa] and 28 U.S.C. §§1331, 1337 and 1367 and under Section 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77v. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5] and under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77(o).

3.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) and (c) and pursuant to Section 22 of the Securities Act and 28 U.S.C. §§1391(b) and 1391(c)). Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District and the bankruptcy proceeding concerning the debtor divine is before the United States District Bankruptcy Court in this District. The bankruptcy action is captioned *In re Enivid, Inc., Stewart Grossman Examiner of In re Enivid v. Filipowski, et al.*, Case No. 03-011472-JNF.

4.      In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PARTIES

5.      (a)      Lead Plaintiff James Tito ("Tito") purchased shares of divine securities during the Class Period, as set forth in his certification, which has been previously filed with this Court and is incorporated herein by reference, and was damaged thereby. As set forth in his certification, Tito exchanged his shares of eShare Communications Inc. ("eShare") for shares of divine in connection with divine's acquisition of eShare, as detailed herein.

(b)     Lead Plaintiff Frank Waddell purchased shares of divine securities during the Class Period, as set forth in his certification, which has been previously filed with this Court and is incorporated herein by reference, and was damaged thereby.

(c)     Plaintiff Jeffrey A. Hoover ("Hoover") purchased shares of divine securities during the Class Period, as set forth in his certification, which has been previously filed with this Court and is incorporated herein by reference, and was damaged thereby.  As set forth in his certification, Hoover exchanged his shares of Data Return Corporation ("Data Return") for shares of divine in connection with divine's acquisition of Data Return, as detailed herein.

(d)     Plaintiff Patricia Diamantouros ("Diamantouros") purchased shares of divine securities during the Class Period, as set forth in her certification, which has been previously filed with this Court and is incorporated herein by reference, and was damaged thereby.  As set forth in her certification, Diamantouros exchanged her shares of Delano Technology for shares of divine in connection with divine's acquisition of Delano Technology, as detailed herein.

6.     Divine is a Delaware corporation with its principal place of business located in Chicago, Illinois. divine has filed bankruptcy and for that reason is not named as a defendant in this action.

7.     The defendants listed below served, at all times relevant to this complaint, as senior officers and/or directors of divine:

(a)     Defendant Andrew J. Filipowski ("Filipowski") was, at all times relevant to the allegations raised herein, Chairman of the Board, Chief Executive Officer and a Director of divine. Defendant Filipowski signed each of the registration statements referenced herein.

(b)      Defendant Michael P. Cullinane ("Cullinane") was, at all times relevant to the allegations raised herein, Executive Vice President, Chief Financial Officer and a Director of divine. Defendant Cullinane signed each of the registration statements referenced herein.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

8.      Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure Rule 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased divine securities on the open market during the Class Period and who suffered damages thereby (the "Class") seeking to pursue remedies under the Exchange Act.  In addition, the following subclasses are alleged:

(a)      Lead Plaintiff Tito also brings this action on behalf of all persons or entities who exchanged their shares of eShare for shares of divine in connection with divine's acquisition of eShare seeking to pursue remedies under the Securities Act (the "eShare SubClass");

(b)      Plaintiff Hoover also brings this action on behalf of all persons or entities who exchanged their shares of Data Return, Inc. ("Data Return") for shares of divine in connection with divine's acquisition of Data Return seeking to pursue remedies under the Securities Act (the "Data Return SubClass"); and

(c)      Plaintiff Patricia Diamantouros also brings this action on behalf of all persons or entities who exchanged their shares of Delano Technology ("Delano") for shares of divine in connection with divine's acquisition of Delano seeking to pursue remedies under the Securities Act (the "Delano Technology SubClass", together with the eShare SubClass and the Data Return SubClass, the "SubClasses").

9.      Excluded from the Class and SubClasses are the defendants, members of their families, any entity in which any defendant is trustee or has a controlling interest, and any of their

parent, subsidiaries, officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns.

10.    The members of the Class and SubClasses are so numerous that joinder of all members is impracticable. Throughout the Class Period, divine common shares were actively traded on the NASDAQ. While the exact number of Class members and SubClass members is unknown at this time and can only be ascertained through appropriate discovery, at a minimum, Plaintiffs believe that there are hundreds or thousands of persons who purchased divine stock during the Class Period. Record owners and other members of the Class and SubClass may be identified from records maintained by divine or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

11.    Plaintiffs' claims are typical of the claims of other Class members and SubClasses members, all of whom have sustained damages arising out of the defendants' wrongful conduct alleged in this complaint.

12.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and SubClasses and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class or SubClasses.

13.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether defendants violated the federal securities laws by making material misrepresentations or by omitting to state material facts necessary to render statements made not misleading;

(b)    Whether defendants acted with knowledge or with reckless disregard for the truth in misrepresenting or omitting to state such material facts;

(c)    Whether market prices for the Company's publicly traded securities during the Class Period were artificially inflated due to statements made by defendants to the investing public during the Class Period, which misrepresented material facts about the businesses, operations and management of the Company; and

(d)    Whether the members of the Class have sustained damages and, if so, the proper measure of those damages.

14.    Common questions of law and fact exist as to all members of the respective SubClasses and predominate over any questions solely affecting individual members of the SubClasses. Among the questions of law and fact common to each of the SubClasses are:

(a)    Whether defendants violated the federal securities laws by making material misrepresentations or by omitting to state material facts necessary to render statements made not misleading;

(b)    Whether the registration statements and prospectuses issued in connection with divine's issuance of shares to the SubClasses were materially false and misleading; and

(c)    Whether the members of the SubClasses have sustained damages and, if so, the proper measure of those damages.

15.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class and SubClasses is impracticable. Furthermore, because the damages suffered by the individual Class and SubClass members may be relatively small, the expense and burden of individual litigation make it impossible

for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

16.    divine, originally named divine InterVentures, Inc., was founded by Defendant Filipowski in 1999 as an Internet-holding company engaged in business-to-business e-commerce through a community of associated companies. divine described itself in its public filings as having an "expertise in consulting, collaboration, interaction, hosting and knowledge solutions that enlighten, empower and extend enterprise systems."

17.    In July 2000, divine raised over $100 million through its initial public offering. divine's initial business strategy was to purchase small start up tech companies and to act as an "incubator" for these companies. This strategy was abandoned after the market for initial public offerings went dormant with the bursting of the Internet bubble.

18.    Then, in February 2001, at the direction of defendant Filipowski, divine initiated a new business strategy to focus on enterprise web solutions. In its public filings, the Company described this strategy as follows:

> Our business strategy includes the acquisition of other businesses that are complementary to ours, including other providers of enterprise software products or professional services.

In this regard, divine further announced that it would acquire companies engaged in the so-called "Enterprise web solutions" business and then integrate the acquired company and its products/services into the portfolio of existing divine products. According to defendants, as detailed herein, the "Extended Enterprise" market space was a growing sector of the information technology ("IT") market and divine, through its acquisition strategy, was positioning itself to capture a large slice of that market opportunity.

{00004344.DOC ; 1}

- 7 -

19.    At this time, divine divided its operations into three principal business units, or "spheres":

- <u>"divine Managed Services" ("DMS" or "MSO")</u>:  DMS built, hosted, managed, monitored and secured clients' critical applications by offering design and engineering of managed hosting solutions; installation, configuration and testing of hardware and software systems; facilitated hardware sales from hardware suppliers to customers; maintenance, back-ups and upgrades; performance and security monitoring; and technical support.

- <u>"divine Software Services" ("Software Services" or "SSO")</u>:  Software Services developed and deployed software solutions that focused on content management, customer interaction management and enterprise collaboration. Product capabilities included products for enterprise content management, contact center automation (including integrated voice, email, fax, and web-based communications), marketing automation, automated email response, web-based self service and assisted service, secure enterprise messaging and rich media deployment.

- <u>"divine Professional Services" ("DPS" or "PSO")</u>:  PSO provided technology consulting services.

20.    Following defendants' announcement of divine's new strategy, the Company went on an acquisition binge.  In virtually all instances, divine used its common stock as currency for the acquisitions.  The fully acquired companies were then purportedly integrated under one management team and the products from the newly acquired company were added to divine's existing suite of products.

21.    From February 2001 through October 2001 divine acquired 16 companies, including:

- Web Design Group, Inc.        February 2001

- Sagemaker, Inc.        March 2001

- Westbound Consulting, Ltd.   March 2001

- Emicom        March 2000

- marchFIRST, Inc.     April 2001

- LiveOnTheNet, Inc.   April 2001

- Opinionware.com, Inc.        April 2001

- MindWrap, Inc.        May 2001

- Databites, Inc. May 2001

- Intira Corp.        July 2001

- Fracta Networks, Inc. August 2001

- Parlano, Inc.    September 2001

- OpenMarket, Inc.        October 2001

- eShare Communications, Inc. October 2001

- HostOne        October 2001

- Synchrony Communications, Inc.        October 2001

22.    In sum, in calendar year 2001, divine acquired 20 companies by issuing 233,884,109 shares of divine common stock, spending $20,950,000 in cash, and assuming $86,599,122 of the acquired companies' debt. divine's growth-by-acquisition strategy was saddling the Company with ever-increasing costs.

23.    As detailed herein, divine's growth-by-acquisition business strategy ultimately doomed the Company as it was unable to successfully integrate its myriad of acquisitions and its debt obligations, which grew with each acquisition, quickly exceeding its ability to service that debt in a timely manner.  Although Filipowski, as detailed herein, made many of these acquisitions to acquire more cash because divine was burning through cash at an alarming rate, this strategy failed since in numerous instances as the acquired businesses quickly ate up more cash than they provided, even on a short term basis.

**Unbeknownst To Investors, divine's Growth-By-Acquisition**
**Strategy Was Failing and Weakening Its Financial Condition**

24.    By the start of the Class Period, divine's growth-by-acquisition strategy was failing. Furthermore, the Company was suffering from a host of undisclosed adverse factors, as detailed below, which were created, in material part, by its acquisition strategy and which were negatively impacting its business and causing its financial condition to weaken substantially. As the Class Period progressed, these adverse factors continued to materially erode divine's financial condition and eventually forced the Company to file for bankruptcy and liquidate its assets in an attempt to pay its debts.

25.    Prior to the start of the Class Period, divine's management internally expressed a very pessimistic view of its prospects. In a PowerPoint presentation to the Board, management noted:

> Looking with the external realities overlaid on divine you find that there are many significant challenges that confront divine. The most significant is the Internet Depression. The almost lack of liquidity in the market for Internet IPO's and our inability to predict when liquidity will return to the market make for a significant obstacle to overcome.... There are no positive signs visible including the fact that all these factors more than likely will further deteriorate in the short term before they get better.... The situation is simply put – ugly. This basic fact permeates the entire divine effort and has an impact on the core emotions and morale of the organization. It is simply something that we have to deal with, outlast the cycle and defeat the perceptions with eventual success. There are no magic solutions to this reality.

26.    Paul Humenansky ("Humenansky") was the President and Chief Operating Officer of divine from October 19, 2000, to May 23, 2003 and also a member of the Board during the relevant period. Humenansky, in strictly internal emails and memoranda, repeatedly noted many of the obstacles confronting divine as the Company embarked on its new acquisition strategy. On February 15, 2001, Humenansky wrote an email to Defendants Filipowski and Cullinane regarding his "Thoughts on going forward." ("Humenansky's February 21st email"). In this email, Humenansky acknowledged that the Company's acquisition strategy was creating problems which would persist and intensify as the Class Period progressed. He stated:

I wanted to write to you and convey my thoughts on the organization and structure going forward. I'm excited about the possibilities this new strategy presents to divine and myself, and I want to congratulate you on getting this change approved by [Computer Associates], the board, and creating a comprehensive story so quickly.

We have a lot a work going forward, which includes a new corporate message, new web site, new organization, building a sales/sales support/marketing, huge technical integration and focus issues, and a corporate support organization. As I've mentioned before, I'm primarily concerned about three issues going forward: 1.) I don't want this new strategy to become the *dumping grounds* for companies with no other options. In my opinion, [LiveOnTheNet] fits this scenario, and I know your arguments of why it fits, but I'm concerned about absorbing [$15 million] in cash burn this year. I don't want to debate these issues here, it's just an overall concern on absorbing expense with only the promise of revenue sometime in the future. I feel strongly that each of these properties needs to be discussed, and understand their affect on the operating plan, before it becomes a "done deal." 2.) We are going to *run out of money* if we don't control the burn from building a sales force (domestic as well as international), services, and support organization. We need to have a pro-forma operating statement every step of the way that shows the affect on our overall cash flow and income statements for every expansion we do, otherwise it's being done blindly. I don't think any expansion or acquisition should be done without understanding this affect on the operating plan. 3.) *Too much, too fast.* **I'm concerned when I hear discussions concerning acquiring some of the companies on the list (some pretty large ones) because we have no infrastructure, integration services, even HR services, in place to handle a vast acquisition strategy. I don't have an "organization" to really help with these companies as they are acquired and they will thrash without the right controls and support organization in place. I will work very hard to get this in place as soon as feasible.** [Emphasis added.]

27.    Despite Humenansky's comments and the significant operational and integrative challenges divine faced as noted in Humenansky's February 21st email, the Company proceeded to hastily acquire new companies before completing the integration of companies it had already acquired.

28.    By the start of the Class Period, as foreshadowed by Humenansky's February 21st email, divine was experiencing material problems with its growth-by-acquisition strategy as follows:

(a)    **Poorly Trained Sales Staff:** As detailed herein, and as repeatedly highlighted by defendants throughout the Class Period one of the purported benefits from divine's strategy was that its sales force was integrated company-wide and, as an acquisition was completed the

products/services from the newly acquired company would be added to the product portfolio of divine and then sold by its sales force – referred to sometimes as "cross-selling." Throughout the Class Period, as acquisitions were announced and completed defendants repeatedly highlighted the benefits of divine's growing portfolio of products and expanding customer base, which presumably would create cross-selling opportunities. As detailed by numerous former employees of divine, however, divine's sales force was poorly trained, not provided with any meaningful training on new products and, therefore, unable to successfully cross-sell the Company's products. For example:

- According to a former employee of divine who was the Director of Training at divine from February 2001 to November 2001, divine's sales force was "poorly trained" and "extremely ineffective in acquiring new customers."

- According to a former employee of divine who was a Sales executive from February 2002 to November 2002, said that divine's sales force did not even know what products divine and its acquired companies owned and that divine had 50 or 60 products and the sales representatives did not have enough information about the products to properly sell them.

- According to a former employee of divine who was a Director of Sales Engineering of divine until December 2002, with respect to divine's sales force "there was a lot of confusion" as "sales reps were trying to learn the" extended enterprise "story and divine's entire suite of products." Further, because the sales reps were concerned with making their quotas, they focused on selling only the limited divine products they understood and failed to spend time trying to learn about other divine products. However, there was still a lot of pressure on the sales reps to sell the entire suite of divine products. According to this former employee, most of the sales reps in the Southeast were not making their quotas and were doing "very poorly."

- According to a former employee of divine who was an executive in Customer Relationship Management Solutions ("CRM") until December 2001, divine sales people were not adequately trained on the products they were supposed to sell. According to this former employee, there were a lot of products about which he was not trained, so he did not know how to sell the products he was being increasingly tasked to sell as part of the CRM solutions. For example, according to this former employee, after divine acquired eShare which sold software related to a predictive dialer, which was used by telemarketers to contact individuals' names and numbers on a database, he did not know enough about this product in order to properly sell it to customers. According to this former employee, this was just one example of defendant Filipowski buying companies that specialized in call center products while failing to train the salesmen on how to sell them. According to this former employee, divine salesmen's lack of training was "the same across the board." There

was virtually no training and no mandatory training seminars, and they only received some new product information via email from the corporate offices and web casts.

- According to a former employee of divine who was employed as a CIM Telephony Sales Manager until June 2002, divine sales people "simply did not know the products that they were supposed to be selling" and divine sales personnel were "ill-trained and ill-prepared" to sell the diverse products in divine's product portfolio.

Thus, the Company was not generating any meaningful cross-selling opportunities and one of the benefits the Company was publicly touting as a purported benefit of its acquisition strategy was not being realized.

(b)    **Integration Problems.**  Adding to and exacerbating the sales problems at the Company, the Company was struggling to integrate the operations of the newly-acquired companies into its existing operations in an efficient and cost-effective manner.  As demonstrated herein, Humenansky repeatedly complained to Filipowski that the acquired companies needed to be integrated and operated rather than continuing the frenzied pace of acquisitions. Instead, Filipowski stressed the need to acquire additional cash by making these acquisitions.  In October 2001, in response to a Humenansky email advising of divine's cash position, Filipowski dismissed Humenansky's concerns and said "Thanks. It highlights the need to acquire cash from the Eprises [a December 2001 acquisition] of the world. We must be over 200 million by the end of the 4th quarter. Frankly I need it to be well over 200." Ironically, in addition to the operation and integration of these companies failing, Filipowski's craving for cash which was intended primarily to obfuscate the Company's true financial condition actually created minus cash flows and cash deficiencies.  For instance, in October 2001, right before the start of the Class Period, Filipowski stated in discussions with Cullinane and Humenansky that "we need to acquire cash even at drill bit prices" and "the only other acquisition that should be considered is a company that has significant cash or is being acquired primarily for cash." These problems distracted divine management and further weakened the Company's ability to generate any meaningful synergies from its acquisitions.

{00004344.DOC ; 1}

(c)    **Real Estate Debt.** Unbeknownst to investors, divine's growth-by-acquisition strategy was saddling the Company with ever-increasing real estate costs. Given the declining state of the U.S. economy during the Class Period, the Company was experiencing increasing difficulty in ridding itself of these obligations by either selling properties or subletting leases. According to a former employee of divine, who was a Director of Data Center Operations, the Company's real estate obligations negatively impacted the Company and had the effect of "sucking divine dry of cash." In sum, the Company was unsuccessful in marketing and selling its real estate properties.

29.    As described in detail herein, as the Class Period progressed, the adverse factors enumerated above, in addition to other factors, caused divine to experience declining revenues and earnings and drained the Company of cash. Nonetheless, throughout this time period, Defendants failed to disclose the true operational condition of the Company and, in fact, repeatedly represented that divine was on the path to profitability and that it was positioning itself to be major player in the so-called Extended Enterprise market space.

### divine Acquires Rowecom And Puts Itself On The Path To Insolvency

30.    The Class Period begins on September 17, 2001. On that date, divine filed a registration statement and merger proxy/prospectus (collectively the "RoweCom Prospectus") in connection with the Company's acquisition of RoweCom. divine and RoweCom had previously announced the transaction. According to the RoweCom Prospectus, RoweCom stockholders will receive 0.75 of a share of divine common stock for each share of RoweCom stock. The RoweCom Prospectus described the Company's growth strategy in highly positive terms stating, in pertinent part, as follows:

> Our objective is to become the leading provider of enterprise Web solutions that
> offer global businesses the ability to improve collaboration, workflow and business
> relationships by delivering a powerful combination of technology, software, services
> and managed applications capabilities. As the flow of information becomes more
> liberated and more complex, we believe that a new type of solution provider is

{00004344.DOC ; 1}

- 14 -

required to unite all of the skills and emerging technologies needed to create advance enterprise Web solutions that position companies to go beyond the processing of transactions and operate at the leading edge of their industries. In order to achieve this objective, we have adopted the following key elements of our strategy:

- *Become a recognized leader in advanced enterprise solutions.* We currently have over 500 customers consisting of predominantly Global 2000 companies and high-growth middle-market companies. These customers are serviced by one or more of our four principal business units. By expanding our relationships with these customers, we can enhance our reputation and visibility and capitalize on cross-selling opportunities with their customers, suppliers, partners and distributors.

- *Develop, acquire and integrate offerings and solutions.* We plan to focus on the development, acquisition and integration of components that can be combined to form a powerful set of services, technology and hosting capabilities that can advance and extend our customers' businesses to include external and internal business communities.

- *Target a specific customer base.* We plan to target customers whom we believe can benefit most readily from greater collaboration, more efficient workflow and better management of business relationships between their customers, employees, partners, suppliers, prospects and sources of information. We believe that these customers are primarily concentrated in information-intensive businesses such as the financial services, insurance, energy, pharmaceutical, biotechnology and telecommunications industries.

- *Support and complement our solutions through alliances with business partners.* We intend to establish strategic alliances with a number of companies like our strategic alliance with Computer Associates International, Inc. ("CA"), which is also one of our strategic investors. CA's professional expertise enhances the range and quality of our Professional Services and CA's Jasmineii Portal Software is a key component of our Enterprise Solutions Portal. We believe that strategic alliances will enable us to improve our ability to attract and retain customers who prefer to deal with larger, more stable solutions providers, provide additional channels for our products, and enable us to build industry-specific solutions for our customers.

{00004344.DOC ; 1}

- *Position divine as a technology owner and solutions integrator.* We plan to differentiate divine from other solutions delivery organizations by positioning divine as a technology owner and solutions integrator. We intend to gain a strategic advantage by acquiring and developing innovative technologies and making these part of our broader solutions in order to leverage their full potential.

31.    The statements referenced above in ¶30 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts which were then in existence and known by Defendants or recklessly disregarded by them as follows:

(a)    that the Company's growth by acquisition campaign was a failure as the Company was not able to integrate its myriad acquisitions, its sales force was ill-equipped and poorly trained and unable to sell the Company's ever-increasing portfolio of products and the Company was experiencing an ever increasing cash burn rate which was growing with each acquisition. The statements about the Company's growth strategy created a duty to disclose the problems attendant to that strategy that were then impacting the Company;

(b)    that the so-called "Enterprise Solutions" market was contracting such that the Company was experiencing and would continue to experience declining demand for its products and services. As detailed further herein, the Company's internal projections forecast declining revenues in the Company's POS division, among others. This negative trend was not disclosed;

(c)    that the Company was experiencing significant cash flow problems such that the Company's COO, Humenansky, was internally projecting that the Company would soon run out of cash should the Company continue to acquire additional companies;

(d)    that the Company was struggling to pay its real estate obligations which were increasing with every acquisition that the Company was completing; and

(e)    that the Company was materially overstating its financial condition through a variety of improper accounting practices as detailed herein in ¶¶ 146-183. These improper

{00004344.DOC ; 1}

- 16 -

accounting practices further enabled Defendants to conceal the true financial and operational condition of the Company from investors.

32.    In addition, the Rowecom Prospectus was materially false and misleading because it failed to disclose the true operational and financial condition of Rowecom as detailed below:

(a)    RoweCom was a "content aggregator," whose primary function was not only to obtain and aggregate libraries' orders for publications and to place those orders with publishers, but also to provide customer and ancillary services for those libraries.  While this type of business failed to fit within any of divine's business spheres, the addition of RoweCom significantly enhanced the appearance of divine's gross revenues;

(b)    RoweCom had operated at a loss for several years, including losing $66.2 million in 2000.  During 2001, RoweCom's outside auditors had expressed "substantial doubt" in RoweCom's SEC filings about RoweCom's ability to continue as a going concern.

(c)    RoweCom's dire financial condition, as well as the lack of any synergies between divine and RoweCom's existing business led many within divine to question this acquisition.

(d)    In a memorandum dated May 8, 2001, regarding preliminary due diligence of RoweCom, Doug States ("States"), divine's Software Finance Manager, wrote "I ended up with a number of questions about the business, and with serious doubts about its strategic fit within divine." He concluded by writing "Unless there exist compelling strategic reasons why we should complete this deal, I recommend we decline, based on my current understanding of the business case."

(e)    On August 17, 2001, after additional information obtained during divine's due diligence efforts, Humenansky wrote to Filipowski stating "I become less and less sure of this acquisition every day that goes by, since I just don't see a lot of benefit versus a lot of work.  All

others are right on, but this one I have a really bad feeling about. We are losing lots of customers

and this continues and a bad Q and…."

      (f)     Moreover, on October 30, 2001, shortly before the RoweCom closing,

Sullivan wrote an email to Filipowski, Humenansky and Cullinane, with copies to States, Tricia

Graff ("Graff"), divine's Treasury/Stock Service Manager, Ken Mueller ("Mueller"), divine's

Controller, and Alex Walker ("Walker"), divine's Senior Vice President of Mergers and

Acquisitions, stating:

> I may not do this justice from the financial modeling perspective, *but the Cliff's Notes version is that RoweCom's financial position has deteriorated to a much worse position than I believe any of us were aware of,* and since last Thursday we have been trying to get a handle on exactly how bad the situation is so that a reasonably informative report of the situation can be presented to Flip, Mike Cullinane and Paul Humenansky before we close this deal.

> On the highlight reel:

> 1.     By RoweCom's own calculations for 9/30/01, RoweCom has current assets of $88 million and current liabilities of $142 million. *That is a $54 million hole between current assets and current liabilities by RoweCom's calculations,* and even if you back out $22 million of more or less fixed debt ($9.0 million publishers, which is due 12/31/01; $6 million friends and family; and $7.0 million France medium term note), RoweCom has a current asset/current liability hole of $32 million. This balance sheet problem will generate an even worse cash flow problem at the end of the year, when the publishers will likely call the $9.0 million debt.

> 2.     RoweCom has collected $42 million in cash customer advance payments for which a corresponding payment has not yet been made to the publishers (the publishers will be owed about $38.2 million on these orders), and has only $23 million in cash, and RoweCom also owes $8.7 million in bank overdrafts ($7.2 million in France, $1.5 million domestically).

> 3.     I thought it was our understanding that we might need $30 million in working capital available for the fourth quarter of this year, but that from a balance sheet perspective RoweCom was in pretty good shape other than the $22.0 million in debt, and that RoweCom would generate enough money in the first quarter of next year to comfortably pay down the $20.0 million Fleet line (if we go that way) and maybe pay down the $15.0 million working capital line divine had earmarked for RoweCom. Since RoweCom can't "make" more than $36.0 million on $400 million in receivables, and since we haven't modeled RoweCom burn at less than $3.0 million/month, we will not be able to pay off the Fleet line or the publisher debt from

cash flow generated from the RoweCom operations. *In other words, RoweCom needs a capital contribution of about $30 million ($52 million if we wanted to true up the debt as well) before we even get to the cash flow/cash management issues this business presents.*

I don't know if we care about 3, but this was certainly not my understanding of the way we looked at RoweCom when we decided to acquire it, so I would like Flip, Mike and Paul to get a reasonable presentation of RoweCom's prospects before we pull the trigger on closing.

33.    Also on September 18, 2001, divine filed a registration statement and merger proxy/prospectus (collectively the "eShare Prospectus") in connection with the Company's acquisition of eShare. divine and eShare had previously announced the transaction. According to the eShare Prospectus, eShare stockholders will receive shares of divine common stock for each share of eShare stock based on a formula related to the market price of divine prior to the closing of the acquisition. The eShare Prospectus contained statements identical to those in the RoweCom Prospectus. The eShare Prospectus was materially false and misleading for the reasons set forth above in ¶ 31. In addition, the eShare Prospectus contained the following statements concerning Rowecom and other acquisitions made by the Company:

Our overall performance and quarterly operating results may fluctuate and will be affected by the revenues generated from eshare's, Open Market's and RoweCom's products and services and will be affected by fluctuations in the sales of these products and services.

*           *           *

Because RoweCom's revenue flow is seasonal in nature, RoweCom periodically will have to rely on financing from divine or third parties to support its needs for working capital. RoweCom has an established practice of paying publishers 30 to 60 days before receipt of its customers' funds. Consequently, RoweCom anticipates making substantial additional expenditures in the fourth quarter of each year, while receiving the majority of its cash receipts relating to those purchases late in the first quarter of the following year. Given these seasonal cash flow imbalances, if RoweCom has an unexpected demand for liquid capital, or does not have financing available on commercially reasonable terms, or at all, when needed, it could have a material adverse effect on our future results of operations and financial condition.

These statements were materially false and misleading because they failed to disclose that at the very time that Defendants were warning that the Company's financial results might fluctuate the Company was then experiencing declining financial results and was not performing according to internal expectations.

34.    On September 18, 2001, divine issued a press release announcing that it had agreed to acquire Eprise Corporation. According to the press release, divine will acquire all outstanding Eprise common stock for 54 million shares of divine stock with each share of Eprise stock being exchanged for 2.4233 shares of divine stock.

35.    On October 19, 2001, divine announced in a press release that it had received shareholder approval to complete its planned merger with eShare and that this acquisition was expected to close on October 23, 2001. The Company also announced that it had completed its acquisition of Open Market.

36.    On October 30, 2001, divine filed a registration statement and merger proxy/prospectus (collectively the "Eprise Prospectus") in connection with the Company's acquisition of Eprise. According to the Eprise Prospectus, Eprise stockholders will receive 2.4233 shares of divine common stock for each share of Eprise stock. The Eprise Prospectus contained the identical statements as the RoweCom Prospectus concerning the Company's growth strategy. The Eprise Prospectus was materially false and misleading for the reasons set forth in ¶ 31.

37.    On November 2, 2001, divine issued a press release announcing that it had agreed to acquire Data Return Corporation ("Data Return"). According to the press release, pursuant to the merger agreement between the companies, each share of Data Return stock is to be exchanged for 1.9876 shares of Data Return common stock.

38.    With regard to the Data Return acquisition, prior to the public announcement of the Data Return acquisition, on October 5, 2001, in connection with discussions regarding the acquisition of Data Return, Cullinane wrote to Filipowski, Humenansky and Alex Walker stating "68 million [f***ing] shares for a company running out of cash, losing $5 million per month historically and has lost a few key customers recently. What am I missing?" Despite Cullinane's comments, divine acquired 100% of Data Return and, in fact, divine exchanged 74,437,043 shares of its class A common stock, issued 15,070,454 options, and provided $6.75 million in bridge financing to Data Return.

39.    A dialogue ensued upon this comment by Cullinane which demonstrates that the deteriorating operational and financial condition of the Company was known to Defendants but concealed from investors. Humenansky wrote to Filipowski stating:

> I need to review with you where we are from an operating standpoint, because we burned cash like whores in the last quarter, and it looks worse going forward. We are going to need huge expense reductions to meet the revenue numbers. This will burn more cash. All these guys need "bridge loans" and there goes another [$15 million]. *So the solution is buy companies with more cash with a stock price that is a drill bit value. That's no different than paying one credit card's interest with another credit card.*
>
> *We are running out of cash and we have an expense model that is way out of line with the revenue forecasts.* Those are the facts. [Emphasis added.].

Again maintaining focus on acquisitions, and not the operational aspects of running the business, Filipowski responded to Humenansky stating:

> We are going to go down the course we have set and the two options are it will either kill us or we will succeed. I know we have a 70% [chance] going down our current path. I will not tolerate a strategy that gives us 0 chance of succeeding and just kills us over a longer period of time.... We need to acquire cash even at drill bit prices because we will fix the dilution issue as time goes by, one way or another. What we can not fix is having a business that requires us to sell into success over 5 years.

Humenansky responded stating:

*We are [$25 million] short on our cash from Q3, that is a huge amount to be short in one quarter. The current forecast is short from our last estimate on software revenue by [$100 million] from 2002,* that is a huge number that currently is not reflected in the projected cash flow, which now goes down to [$60-90 million] (that includes ePrise, a lot different then the [$150 million] before, and all this in ONE quarter). If you factor in the shortfall in revenue ([$100 million] alone in PSO revenue next year from what was forecasted just last quarter), and you are out of cash. We do these acquisitions (like Data Return), that all consume cash from bridge loans and 'short term' financing.

You are the CEO, and you will decide whatever you deem is best for the company. I'm not going to go down that road with you ever again (fighting). I'm not going to argue with you, but if I feel differently enough from your views, I also cannot blindly follow something I don't believe in. I will not be destructive or subversive, of course, and will hand the reigns over.... I guess if I'm screaming anything, it's this: We spent a lot more fricking cash then anyone thought, *our revenue has changed by [$200 million]*, and we need to look at these numbers carefully before we sign up for more cash burn. There are a lot of good things happening from getting traction, the right message, etc., but there is also years of work in front of us (not complaining here).

Having said all of this, I do recognize you've got us here, and am respectful of that, *but am shocked at the state of the financial picture going forward.* I've screamed about this in the past, and usually have been right, unfortunately. I'm not there yet because I need one more time to look and review revised expense and revenue forecasts, *but I'm very concerned given the changes in just ONE quarter.*

Yes, I'm concerned about the cash needed in the managed application space when I look at the rest of our expense structure along side revenue forecasts. You don't have this information, and I need to get it to you, but I'm still massaging the numbers.

When I think of all the acquisitions still on your lists, I really go nuts.

[Emphasis added.].

40.     Humenansky also voiced concerns to other executive officers of divine. For example, on December 5, 2001, Humenansky told Matt Roszak ("Roszak") in divine's Mergers & Acquisitions Unit, "When we look at any services business, we have to factor in the kind of decline we have seen in PSO.... Very little NEW business has been sold by the sales team, and this is my greatest worry going forward with services." Humenansky went on to state:

As far as toughing it out, that's OK as long as we don't run out of cash. *If we drop below [\$100 million] in second quarter, which I think we will do even without the RoweCom financing issues (which Flip likes to say we then have [\$130 million] in cash, which is BS, plus we have missed the cash burn numbers EVERY quarter this year)*, then we will have a hard time making financial due-diligence of our potential customers, and then it will become a self-fulfilling prophecy. [Emphasis added.].

41.    On November 6, 2001, divine issued a press release that it had completed the acquisition of RoweCom.

42.    On November 12, 2001, divine issued a press release announcing its financial results for the third quarter of 2001, the period ending September 30, 2001. The Company reported \$48 million in revenues for the third quarter. With respect to the Company's acquisition campaign, the press release stated, in pertinent part, as follows:

Within the last year, divine has acquired 29 companies. These include, most recently, publicly traded eshare communications, Open Market and RoweCom, as well as the European operations of the former marchFIRST GmbH, privately held Synchrony Communications and Fracta Networks and the asset purchases of Intira and HostOne.

Moreover, the press release reported that the Company's completed acquisitions increased the Company's revenue base to "more than \$700 million" and that "according to Software Magazine, divine is ranked among the 100 largest global software/services firms on the basis of annual revenue." Defendant Cullinane commented on the announcement of third quarter earnings stating, in pertinent part, as follows:

With \$176 million in cash and cash equivalents at September 30, we believe we have adequate resources to fund divine and execute its business plan until we achieve our profitability target in the last half of 2002…. In less than one year, we have built a more than \$700 million pro forma revenue base and positioned ourselves to offer a comprehensive range of extended enterprise solutions.

Defendant Filipowski commented on the announcement stating, in pertinent part, as follows:

We have acquired 29 companies and are pleased to welcome all our newest team members to the divine family…. During the next decade those enterprises seeking success will be deploying extended enterprise solutions. The size of this opportunity is a compelling argument for divine to build through consolidation a dominant

technology company in the extended enterprise space. We believe this opportunity dwarfs the Sales Force Automation and Customer Relationship Management initiatives of the last decade.

43.    The statements referenced above in ¶ 42 were each materially false and misleading for the reasons set forth in ¶31. In addition, the statement referenced above in ¶ 42 that "we believe we have adequate resources to fund divine and execute its business plan until we achieve our profitability target in the last half of 2002" was lacking in a reasonable basis and, therefore, materially false and misleading because Defendants knew that the Company was burning through cash at an alarming rate as projected cash flow was down to $60-90 million versus internal projections of $150 million in only one quarter and internal revenue forecasts were down.

44.    On December 5, 2001, divine issued a press release announcing that it had closed the acquisition of Eprise Corporation. Pursuant to the merger agreement, each stockholder of Eprise will receive 2.4233 shares of divine Class a common stock for each share of Eprise common stock.

45.    On December 5, 2001, divine filed a registration statement and merger proxy/prospectus (collectively the "Data Return Prospectus") in connection with the Company's acquisition of Data Return. According to the Data Return Prospectus, Data Return stockholders will receive 1.9876 shares of divine common stock for each share of Data Return stock. The Data Return Prospectus contained the identical statements as the RoweCom Prospectus concerning the Company's growth strategy. The Data Return Prospectus was materially false and misleading for the reasons set forth in ¶ 31. In addition, the Prospectus concealed the fact that the CFO of the Company believed it was a poor acquisition that was losing $68 million a year and burning cash at a very high rate as set forth in ¶¶ 38-40 above.

46.    On January 9, 2002, divine issued a press release announcing that it had completed its acquisition of Data Return Corporation. Pursuant to the merger agreement, each outstanding share

of Data Return will be converted into the right to receive 1.9876 shares of divine's Class A Common Stock.

47.    On January 18, 2002, Humenansky again wrote Filipowski regarding the operations of divine and noted that the Company was quickly running out of cash. In this email, Humenansky stated:

> I cannot do this anymore, nor do I have the desire. We have our hands full trying to operate what we have, and we are NOT doing a good job at it. Now we have Northern Light, Viant, Delano, and then I find out some Korean and FileTRUST acquisition…. We are running out of cash and are all ready down under [$50 million] without Viant. Viant won't help, because it will just get spent like a sailor in a whore house.
>
> We have enough to be successful. We don't need to keep adding.

Humenansky went on to state:

> I think we are being anything but careful. Not with the volume of acquisitions, each (except Viant) burning cash I do not have. Do we really need to do a Korean deal right now with [$1.8 million] of cash burn for divine to be successful this year? I just added [$10 million] of cash burn from Northern Light. This is not even considering the other deals. I have cut people's salaries, my attrition is going up, cut benefits, 400+ people on the bench with a [$11 million] cash burn this quarter within PSO if we don't do something, a development organization that has been cut so far down that I really doubt our ability to get product releases out and integrated, and we continue to do deals that dilute…and burn cash. I really can't support these deals with these circumstances, nor get on the board calls to support them. **I don't understand how we can do deals when we have cash going down below 70, then 50+ in our current operating plan with ALL cuts already in place. We will lose money all year.** We will not break even in Q3. Viant will not change the operating metrics, just the cash. [Emphasis added.].

48.    Then, on January 24, 2002, Humenansky told Filipowski that PSO revenues were "going down EVERY week." (Emphasis in original). He also said software revenue was "down."

49.    On or around February 5, 2002, Humenansky wrote to Filipowski that, inter alia, "our revenue forecasts have gone down by around [$90-100 million] across all three spheres [the entire Company]." PSO revenue, Humenansky continued, had been going down every week "since April" and "a six month trend is a pretty good trend."

50.    On February 11, 2002, divine issued a press release announcing that it had acquired Softmetric, Inc. in an all stock transaction.

51.    Also, on February 11, 2002, divine issued a press release announcing that it intended to acquire the balance of the equity ownership in Perpetual Robotics, Inc.

52.    On February 22, 2002, Humenansky further stated to Filipowski that, in addition to revenue being down, software expenses were up by $12 million.  By the end of February, the consensus among members of divine's financial group was that the Company would run out of available cash after the last payroll payment in April 2002.

53.    On February 27, 2002, divine issued a press release announcing its intent to acquire the balance of the equity ownership in Net Unlimited, Inc.  The terms of the all stock transaction were not disclosed.

54.    On March 7, 2002, divine issued a press release announcing its financial results for the fourth quarter of 2001 and fiscal year 2001, the period ending December 31, 2001.  The Company reported revenues of $80.5 million for the quarter.  With respect to the Company's acquisition strategy, the press release stated, in pertinent part, as follows:

> Over the past year, divine has made a number of acquisitions and significantly rounded out its offering of products and services to position itself as a leader in the extended enterprise space.  divine's completed transactions have increased the combined organization's annual 2001 revenue base to more than $650 million. divine is now positioned to deliver extended enterprise solutions to a diversified customer base exceeding 21,600 clients with a focus on Global 5000, high-growth middle market companies, academic and government organizations.

Defendant Filipowski commented on the results stating, in pertinent part, as follows:

> During the course of the past year, we have transformed divine from a small, unknown player in the extended enterprise market to a leader in the space. Throughout strategic acquisitions we have assembled a powerhouse combination of professional services, software services and managed services.

*      *      *

The current consolidation cycle has afforded divine the opportunity to execute a disciplined acquisition strategy enabling us to acquire market-leading technology, significant intellectual property and world-class talent that round out our extended enterprise solutions.... We are already demonstrating the value of our comprehensive solution approach to the extended enterprise, as many of our customers are now leveraging multiple divine technology offerings and services. Customers tell us that our ability to support them with deep consulting expertise, our own best-of breed technologies and the ability to host and manage these technologies clearly differentiates us in the marketplace.

Defendant Cullinane commented on the announcement of financial results stating, in pertinent part, as follows:

We ended 2001 with $140.7 million in cash and securities and a strong balance sheet.... The acquisitions we made this year, as well as our ability to integrate the products, development teams, management and financial systems of the acquired companies position divine for achieving its profitability goal by the fourth quarter of 2002.

55.    The statements referenced above in ¶ 54 were each materially false and misleading for the same reasons set forth in ¶ 31. In addition, Filipowski's statement referenced above in ¶ 54 that divine's 2001 revenue base increased to $650 million was materially false and misleading because he concealed that revenues were declining in all three spheres of divine's business and the PSO business was in a steady and constant state of decline. Furthermore, the statement by Defendant Cullinane referenced above in ¶ 54 that the Company ended the year with $140.7 million in cash and securities and a "strong balance sheet" was materially misleading and false because divine's cash position was weakening and internally divine management believed that the Company would run out of cash by April 2002. Therefore, Defendant Cullinane lacked a reasonable basis for his statement characterizing divine's balance sheet as "strong". Finally, the statement referenced above in ¶ 54 that "the acquisitions we made this year, as well as our ability to integrate the products, development teams, management and financial systems of the acquired companies position divine for achieving its profitability goal by the fourth quarter of 2002" was materially false and

misleading because it was not true – the Company was unable to integrate its acquisitions, its products, management or development teams, as detailed herein.

56.    On March 13, 2002, divine issued a press release announcing that it signed a definitive agreement to acquire Delano Technology Corporation ("Delano"). According to the press release, divine is to issue 51.55 million shares of stock for all of the outstanding stock of Delano.

57.    That same day, divine held a conference call with investors and analysts to discuss the announcement of the Delano acquisition. During that conference call, defendant Filipowski described divine as "extraordinarily well positioned to become the emerging company; perhaps the dominate player in this extended enterprise space." This statement was materially false and misleading because divine was struggling to survive, as detailed herein, and Defendant Filipowski was privy to internal information which directly contradicted his characterization of the Company as "extraordinarily well positioned." Defendant Filipowski also represented that divine had a good balance sheet and was moving towards "profitability" stating, in pertinent part, as follows:

> Now, we believe that divine is extraordinarily well positioned to become the emerging company; perhaps the dominant player in this extended enterprise space. We feel we will have to contest this with many of the existing players, but we have also found that, in this economic climate with the kind of lack liquidity that is in the marketplace, it has been less likely that we will have as robust a set of competitors from the venture-backed community, simply because that money -- that liquidity has dried up. And we feel that, although there are plenty of competitors there, and certainly many of the established players stretching, divine has positioned itself extremely well.

*    *    *

> Delano not only had the technology, but they had a good balance sheet. Delano is a company in a -- in a position where the last two quarters were very near breakeven. We believe that the cost savings of the combination could probably accelerate the path to profitability. If we can maintain the top line, or grow the top line through the geographic distribution that we have and the worldwide capabilities that were not there with Delano, obviously, we would accelerate tremendously the profitability of this unit of divine.