# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SHARON BOBBITT, Individually and On
Behalf of All Others Similarly Situated,

      Plaintiff,

  vs.

ANDREW J. FILIPOWSKI, et al.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 04-12263-PBS

**SECOND CONSOLIDATED CLASS
ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAW**

**JURY TRIAL DEMANDED**

**PART 2 PAGES 29-58**

One of the things that I would like to emphasize is that this is a segment, that by itself, is probably a two or $3-billion segment in the very near future if you listen to the various industry analysts. It's very, very significant. **That, added to the multi-billion-dollar opportunity that we have at divine, generally, I think you can why we are as excited about this as we are; a company that is near profitability, and for the last two quarters, have basically been there; a company in which we can save some costs in the combination; a company in which we can accelerate the entrance into the marketplace; a company with a good balance sheet that brings cash to the table combined with the cash that divine has, which we have in our recent conference call indicated that at the end of the year we had $140 million. We have the ability to take this company and move it through the rest of this year into profitability, and certainly the cash-flow-positive sector that we believe we will achieve in the second half of this fiscal year.** So we believe we have combined a huge and very strong balance sheet. We have a great distribution capability on a worldwide basis. We have 700 individuals in the sales organization including inside sales, and full-cycle inside sales, telemarketing, as well as the 400 or so people both domestically and internationally in our sales organization. When you add all that together it only accelerates our ability to succeed this year as divine and our ability to be defined as the dominant player in the extended enterprise.  [Emphasis added.]

58.    The statements referenced above in ¶ 57 that the Company was "near profitability" and "for the last few quarters have basically been there" were materially false and misleading because it was not true as Defendant Filipowski knew or recklessly disregarded the Company was losing money, revenues were declining in all three of its business segments and divine management was internally forecasting that the Company would run out of cash by April 2002.  In addition, the statement referenced above in ¶ 57 that the Company had a "strong balance sheet" was materially false and misleading because Defendant Filipowski lacked a reasonable basis for his characterization of divine's balance sheet as "strong" as he knew or recklessly disregarded that the Company was losing money, revenues were declining in all three of its business segments and divine management was internally forecasting that the Company would run out of cash by April 2002.

59.    During the question and answer part of the conference call, defendant Filipowski represented that he was purchasing divine stock stating, in pertinent part, as follows:

...But anytime we issue share of divine we are extremely sensitive to the issue, not only for our shareholders but, frankly, to our own well-being. Frankly, every time I

look at this kind of a decision from my own personal perspective, which I try to keep secondary to the -- to the benefit of the general shareholders -- you know, I own 16-17 million shares. I continue to buy shares on the open market and private transactions. I'm a real believer that what we have here is an extraordinary opportunity. And, yeah, I hate it every time that we issue shares just on the general principal that I'd like to own as much personally of this company as I possibly could.

Finally, with respect to questions concerning investor concerns that divine common stock might be

delisted from NASDAQ due to its price level, defendant Filipowski stated, in pertinent part, as

follows:

Yeah. I find that issue to be a relatively easy issue to solve. I wish all my business problems were as easy to solve as that one because, frankly, we have an appeal process that we won't have to initiate until -- I don't know if it's July or August. We have every characteristic that complies with Nasdaq other than the share price itself. In other words, we have more market cap, more everything of all the other characteristics. We will probably end up with getting -- at least we believe we'll get several extensions on that. We believe that by the time we're displaying what our third and fourth quarter are our stock will be significantly above a dollar. And if it isn't we have a simple mathematical maneuver of a reverse split that would solve the problem. And it certainly doesn't change the credibility nor the valuation of divine. It's purely mathematical and solves the problem. So it's -- I consider it a trivial part of a business issue from the divine standpoint since we can solve it with almost no effort.

### Filipowski Inflates Projections Provided To The
### Board of Directors And The Company's Auditors

60.    In March 2002, Defendants presented materially inflated earnings projections to the

divine Board of Directors and the Company's auditors, as detailed below.

61.    In March 2002, Filipowski reviewed a draft of a presentation to be made to the divine

Board of Directors on the Company's year-end financial results.  In reviewing and revising the

presentation materials,  Filipowski insisted that the presentation should describe "the pipe[line]

getting stronger and bigger and that revenue could spike up from here." He also suggested adding to

the numbers without having any basis to do so.  He insisted on using the "original" revenue

projections for software even though it was no longer the operational forecast.  Furthermore,

although he was considering 10% pay cuts across the board, he wanted to conceal that from the
directors of the Company:

> We are not considering 10% pay cuts across the board, *or at least I would never tell*
> *the Directors that especially in a slide.* We will tell them when we decide and never
> before unless we want the Directors to make the decision for us. [Emphasis added.].

62.     Although many of the officers such as Humenansky protested Filipowski's cavalierly
re-writing divine's financial projections, in the end Humenansky deferred to Filipowski, stating "I
will still be surprised if we hit the Q1 software forecast."

63.     Filipowski knew that revenue forecasts across all three spheres of divine's business
had decreased by "around [$90 million - 100 million]" and he was also aware that software revenue
was down, the pipeline for Open Market was "almost zero" and the contributions from other
businesses were "less than expected." Despite this information, the projections Filipowski insisted
on presenting to the Board included significant revenue increases each quarter for all of divine's
business units, as well as year end revenues for the Company that exceeded $700 million.

64.     In addition to lying to the Board, the Company was trying to deceive its own auditors.
To avoid a "Going Concern" qualification in March 2002 in connection with the 2001 audit, divine
provided the same knowingly inflated projections, and a write up which stated:

> Please find attached our latest 2002 QTD Results and 2002 forecast which we have
> sent to our Directors. The information includes our forecasted P&L, revenue growth
> rates and cash forecast. Flip and Mike have assured our Directors that we will stay
> on target to get to our external goal of EBITDA breakeven by the end of the year.

> \*          \*          \*

> In summary, we believe that we will have enough cash to accomplish our goal of
> being breakeven by the end of the year. If our revenue forecast declines, we will
> continue to take the necessary expense action to get back on track. We may also
> consider additional cash from various investors or acquisitions to have additional
> cash reserves. We have acquired cash from acquisitions in the past. The most
> significant was Eprise for $40 million.

{00004344.DOC ; 1}

65.    Thus, Defendant Filipowski, with the knowledge of Defendant Cullinane, presented materially misleading projections to both the public investors in divine common shares, his own Board of Directors and the Company's auditors.

66.    In fact, Defendants were keeping two sets of books. Even as these projections were being provided to the Board, the divines business segments were continuing to indicate that the projections would not be met. For example, on March 27, 2002, Schnack wrote to Steve Armond ("Armond"), divine's Vice President of Finance and Administration, and Sunny Vanderbeck ("Vanderbeck"), divine's Head of Managed Services, copying Mueller and Humenansky, stating "We all agree that the important number is EBITDA. Your new plan is over $4.2 million off the EBITDA plan we sent to the Directors both back in January and earlier this week…. Bottom line is we have to get back to EBITDA (and ideally revenue) plan we sent the Directors."

67.    In response, Armond wrote "I understand the concern about presenting a plan consistent with [Board of Directors] expectations from several weeks ago. If this is a priority for external purposes then I suggest we run with dual versions of the plan – one for external use and one we truly operate against. From an operational perspective, I see little value in creating a plan greater than [$75 million] topline. We started the year short in our run rate by [$300,000] MRR. In addition, the ESM pipe simply has not materialized to the level originally planned. This lost revenue is not recoverable in [calendar year 2002]."

### Defendants Conceal the Company's Weakening
### Financial Condition by Defrauding RoweCom's Customers

68.    By April 2002, the financial condition of divine had deteriorated to such an extent that Defendants embarked on a fraudulent scheme to defraud RoweCom's customers. As detailed further herein, in order to generate cash for divine's operations, Defendants orchestrated a scheme whereby RoweCom customers pre-paid for periodical subscriptions ostensibly because they would

{00004344.DOC ; 1}

- 32 -

receive a discount from RoweCom for doing so. In this regard, from April 2002 to November 2002, RoweCom collected more than $70 million. Those monies, however, were not used by RoweCom to pay for periodical subscriptions, as RoweCom's customers expected and as RoweCom had traditionally done. Instead, the monies were utilized by divine for its ongoing operations because divine was unable to secure other traditional means of financing. Unfortunately when the time came for RoweCom to pay publishers for the periodicals they had ordered, RoweCom did not have the funds and divine was unable to pay either. Thus, in essence, divine used RoweCom to help it generate sorely-needed capital knowing or recklessly disregarding the fact that it would be unable to satisfy RoweCom's obligations to the publishers and its customers when the time came.

69.    By way of background, RoweCom was engaged in, among other things, the business of periodical subscription fulfillment for libraries, universities and other companies. The benefit to RoweCom's customers of utilizing RoweCom's services was that a library might have hundreds or even thousands of subscriptions to different periodicals. By using RoweCom, the library customer would only have to write one check to RoweCom who would then handle all of the dealings with the publishers. RoweCom would require payment from the customer for the subscription and also charged the customer a variable service charge that was a percentage of the overall subscription. RoweCom was then responsible for ensuring that the publisher received payment.

70.    RoweCom sales personnel would encourage customers to "pre-pay" for a portion of their subscriptions  In essence, say it was January and a customer was not due to renew their subscription until October of that year, a RoweCom sales person would encourage that customer to pay a portion – perhaps 10% – of the subscription renewal in advance. By doing this, the customer would not only receive a discount on the actual renewal of the periodical, but would also apparently receive interest on these monies that had been pre-paid.

71.    RoweCom processed customer orders by entering them into its information system which was known internally as "Source." Once an order was entered into Source the payment was generated by the computer. Prior to October 2002, as detailed further herein, RoweCom did not require a customer to pre-pay in order to place an order for a subscription. In order to pay for subscriptions if it had not received payment from its customers, RoweCom would either borrow monies from lenders or draw on monies from pre-payments.

72.    Historically, RoweCom had utilized a $60 million credit line from FleetBank for use in paying publishers in order to fulfill customer orders. However, following divine's acquisition of RoweCom, defendants told RoweCom that the Company had the cash and did not need the credit line. Furthermore, according to a former employee of divine, who was a senior manager at RoweCom during the Class Period, following the acquisition, divine controlled the monies collected by RoweCom.

73.    In the Spring of 2002, by at least April 2002, defendants began to divert monies collected by RoweCom as prepayments from customers to use for divine's general operating purposes. In total, divine diverted at least $73 million from Rowecom to divine.

74.    Then in November 2002, defendants instructed RoweCom sales people to offer substantial discounts to customers if they paid for their subscriptions early and in cash. This deviated from RoweCom's operating procedure as historically, RoweCom placed the bulk of its orders in the September-November timeframe and then collected payment from customers in either the fourth quarter or in the first quarter of the following year. Thus, RoweCom was seeking customer monies several months in advance of when they would have to order the periodicals and many months in advance of when they generally received payment from their customers.

Unbeknownst to RoweCom customers, these monies were being used to fund ongoing divine operations as opposed to be used to pay for the periodicals that they had ordered.

**Defendants Continue to Conceal The True Financial Condition Of divine**

75.    By April 1, 2002, divine was technically insolvent.

76.    On April 1, 2002, divine filed its Form 10-K for the fiscal year ended December 31, 2001 (the "2001 Form 10-K"), with the SEC which confirmed the previously announced financial results and was signed by the Individual Defendants, among others.  The 2001 Form 10-K also contained audited financial statements from the Company for fiscal year 2001 which were purportedly prepared in accordance with Generally Accepted Accounting Principles ("GAAP").  The 2001 Form 10-K highlighted the importance of RoweCom to the Company, stating, in pertinent part, as follows:

> We expect the revenues of businesses we acquire to comprise a significant portion of our revenues in the future.  **In particular, we expect the revenues of RoweCom Inc., a provider of knowledge resources which we recently acquired, to represent a significant portion of our revenues because RoweCom historically has recognized as revenue its cost of the knowledge resource it sells plus the fee retained by RoweCom.  Fluctuations in the revenues generated from our offering of customer interaction management ("CIM") solutions, content management, knowledge resources, and professional services will likely impact our overall performance, and risks relating to our CIM solutions, content management, knowledge resources, and professional services may affect our success as a whole.**

> Because RoweCom's cash flow is seasonal in nature, RoweCom periodically will have to rely on financing from us or third parties to support its needs for working capital.  **RoweCom has an established practice of paying publishers 30 to 60 days before receipt of its customers' funds.  Consequently, RoweCom anticipates making substantial additional expenditures in the fourth quarter of each year, while receiving the majority of its cash receipts relating to those purchases late in the first quarter of the following year.  Given these seasonal cash flow imbalances, if RoweCom has an unexpected demand for liquid capital, or does not have financing available on commercially reasonable terms, or at all, when needed, it could have a material adverse effect on or future results of operations and financial condition.**  [Emphasis added.]

77.     The statements referenced above in ¶ 76 were materially false and misleading for the reasons set forth in ¶ 31. In addition, the statements referenced above in ¶ 76 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts which were then in existence and known by Defendants or recklessly disregarded by them:

(a)     that the Company was running out of cash and was utilizing monies that RoweCom had collected from its customers for periodical subscriptions for its ordinary operating expenses;

(b)     that given the deteriorating financial condition of the Company it was highly unlikely that RoweCom would be able to satisfy its obligations to the publishers, particularly in the fourth quarter when traditionally the heaviest demands for payment to publishers fell on RoweCom;

(c)     that divine was technically insolvent; and

(d)     as set forth in detail ¶¶ 146-183, divine was overstating its financial condition through a variety of improper accounting practices which were violative of GAAP. Accordingly, divine's financial statements were not prepared in accordance with GAAP.

78.     The 2001 Form 10-K also characterized the Company's acquisition strategy as "disciplined" stating, in pertinent part, as follows:

> We have executed a disciplined acquisition strategy enabling us to acquire market-leading technology, significant intellectual property, and world-class talent that round out our extended enterprise solutions. We have acquired companies providing professional services, Web-based technology, and managed services, positioning us to provide comprehensive solutions and a single point of accountability to our customers.

Defendants' characterization of the Company's acquisition strategy as "disciplined" was materially false and misleading because the Company's acquisition strategy was not disciplined as the Company was acquiring companies whose businesses were in steady decline after these acquisitions

by divine and the Company was continuing to make acquisitions when it was unable to effectively integrate any of its prior acquisitions.

79.    On April 5, 2002, divine issued a press release announcing that it had signed a definitive agreement to acquire Viant. According to the press release, divine will acquire Viant in a stock-for-stock transaction in which divine will acquire all of the outstanding shares of Viant common stock for approximately 200 million shares of divine's Class A common stock.

80.    The press release announcing the Viant acquisition set forth above in ¶ 79 was materially false and misleading because it failed to disclose was that divine's preliminary agreement with Viant required divine to have at least $52 million in cash at the end of June 2002 and that in order to ensure that the Company had this level of cash, Defendants eliminated $45 million in expenses by cutting approximately 800 employees and reducing salaries by 15% for employees with a base salary greater than $200,000. divine also sought to save an additional $10 million by "furloughing" one half of two consecutive payroll payments for employees with an annual salary greater than $60,000.

81.    At the same time as the Viant acquisition, Ron Bienvenu, divine's Head of Enterprise Portals dated April 5, 2002, stated in an email to Humenansky that "we have a bunch of loosely coupled products that are not any closer to being integrated than they were a year ago, all being run as mini-fiefdoms."

82.    In response, Humenansky could only highlight all of the operational issues he was forced to tackle as a result of divine's acquisition pace. "I have been working very hard the last month on getting [$45 million] of cost out. Just running a budget that has a [$12 millon] payroll every two weeks is daunting. It's not easy even running a valid cash flow analysis with the size of

{00004344.DOC ; 1}

- 37 -

this company and how fast it was put together. Our International operations alone is [$67 million] and we are still struggling on getting worldwide reporting and cash flow analysis."

83.    Humenansky went on to state, "[w]e are down to [$10 million] of cash in Mid-May (non-restricted). That is very serious and that is what I've been trying to fix. Mike [Cullinane] and myself have been losing a lot of sleep and our Directors have not been shy on warning us of the liquidity situation we are heading towards."

84.    On April 10, 2002, Humenansky wrote an email to Filipowski saying:

So, why are we continuing to lose money in PSO if [our] bench is so low? Ken ran reports, and found out that of the 959 consultants available, 856 are billing less than 40 hours a week. 752 less than 35/week. So, managers are putting multiple people, part time, on projects to make the bench look less, but of course, we are then losing money on those projects versus a "billing rate" problem. I'm also running a report on fixed bid projects that we have exceeded the hours, but still have people on those projects for "free," but they don't show up on the bench report. Then we have the SAP instance where the whole group that was billing on the side had a utilization rate of zero for six months, but Mike kept them on board. This is why we are having such a hard time making money. So, let's not beat ourselves up on the cuts so much when you look at these kinds of statistics and realize the games being played in the field.

85.    The tone of Humenansky's communications with Filipowski became more and more urgent. On April 16, 2002, Humenansky wrote Filipowski stating:

I think you have a hard time letting people go, and I never believe that it ends up the way it's planned.

This is the fifth time I've been [down] this road of *warning way ahead of time of impending cash problems* and then [ending] up there.

*So, I'm ready to transition out of divine. I don't know how important it is for me to be here until Viant closes or Oak, but let's decide and start a transition for me. I just disagree with way too much anymore to support this going forward.*

[Emphasis added.].

86.    On May 1, 2002, divine issued a press release announcing its financial results for the first quarter of 2002, the period ending March 31, 2002. The Company reported consolidated

revenues of $146.3 million. Defendant Filipowski publicly commented on the results stating, in pertinent part, as follows:

> The first quarter was an exciting one for divine as we closed 14 million-dollar plus deals, compared with ten in the fourth quarter of 2001. In addition, an increasing number of customers bought multiple divine products and services, further validating our cross-sell strategy. We are particularly pleased by the strength of our international operations, which represented 30 percent of revenue during the quarter. At the same time, we have developed the business systems needed to manage our global organization and support profitable growth for the future.

Defendant Cullinane commented on the announcement stating, in pertinent part, as follows:

> We are committed to reducing our cash burn and to achieving profitability by the fourth quarter. To that end, we eliminated approximately $45 million in annual expenses late in the first quarter and early in the second quarter.

87.  The statements referenced above in ¶ 86 were each materially false and misleading for the reasons set forth above in ¶¶ 31 and 77. In addition, the statement referenced above in ¶ 86 that "We are particularly pleased by the strength of our international operations, which represented 30 percent of revenue during the quarter" was lacking in a reasonable basis and therefore materially false and misleading because as Defendants knew or recklessly disregarded the Company's international operations were not performing according to internal expectations and lacked the necessary internal controls to assess and manage their cash flow. Furthermore, the statement referenced above in ¶ 86 that "we have developed the business systems needed to manage our global organization and support profitable growth for the future" was materially false and misleading as it was not true – as Defendant Filipowski was aware from the countless emails and communications from Humenansky, the Company's "business systems" were in complete disarray .

88.  That same day of May 1, 2002, divine held a conference call with investors and analysts to discuss the announcement of its first quarter financial results. During that conference call, defendant Cullinane represented that the Company's software sales were increasing stating, in pertinent part, as follows:

{00004344.DOC ; 1}

So, from a software-booking standpoint, we think we have definitely exceeded what our competitors have been doing with the growth rate. We are also up on a quarter-over quarter basis, if all the deals, you know we have a fourth quarter on, on quarter four of 01, we would have been up 6.5 percent. And, again I think our competitors suffered on a quarterly standpoint as well. *So, software we are looking very strong.* [Emphasis added.].

Defendant Filipowski also represented that the Company was performing well, repeatedly and erroneously to give the impression that everything was "on plan," stating, in pertinent part, as follows:

I think the importance is that we feel that we are on the exact plan that we have relayed to the street and to the folks since about a period of time, coincident with about the fourth quarter of 2001.

We in our prior conference calls have projected that we would be approximately where we are today. **I think the revenues as well as the cash position is identical to what we have forecasted.** And, we believe that we have made the necessary progress to achieve our objectives for third and fourth quarter of this year. Even though we are only providing guidance for the second at this time.

We believe that market place is very difficult and yet that difficult market place is in the calculation and in the factoring of the way that we are running our business. **We have taken, as what we believe is some very positive steps and making sure that the expenses proceed down the path, that they are and culminate in a profitable fourth quarter.** We believe that we are not counting on a significant amount of up tick in our revenue even though we have been growing and that is relatively unique in this market place. When we look at all of the software revenue competitors, their revenues quarter comparison from quarter one of 2001 to quarter one of 2002 average a negative 50 percent, whereas we have been taking market share and growing primarily in areas such as content management where many of our competitors are down anywhere from 80 as a high to 61 percent.

In terms of revenue decreases, we have actually increased our revenue and we believe it is because we have been taking significant market share out of the market place. We do have the freshest to newest technology, the best of (inaudible) products and many of the categories including collaboration in our action content, content management and that is reflected and I think the success that we are slowly materializing here in reporting in the first quarter. Mike mentioned the number of multi million dollar transactions, I think all of those have proved positively to divine not only because of the varied broad base of existing customers that we have, but the cross selling opportunities that we have and in some ways because the extended enterprise space is materializing as a very important space for our customers even in relatively dire economic times. **What dollars are being spent are being spent apparently by our customers and reaching out to their customers and making**

**sure that they have is (inaudible) basic customers as well as the opportunity to expand the revenue utilizing the infrastructure currently available in technology world especially the internet. So from that standpoint we feel that we just accomplished the first quarter that is exactly on plan in terms of the revenue, exactly on plan in terms of the consolidation integration that we are going through. And, we believe it is exactly on plan in terms of the cash balances that we have.** [Emphasis added].

89.    The statements referenced above in ¶ 88 were each materially false and misleading for the reasons set forth above in ¶¶ 31 and 77. In addition, Defendant Filipowski's statement that "I think the revenues as well as the cash position is identical to what we have forecasted" was materially false and misleading because in truth and in fact as detailed herein and as set forth in communications from Humenansky to Filipowski, the Company was not meeting its cash flow projections and was having to divert funds from Rowecom in order to help pay expenses. Furthermore, the statement referenced above in ¶ 88 that the Company was "on plan" was lacking in a reasonable basis and therefore materially false and misleading because the Company was technically insolvent, was struggling to integrate its acquisitions and was, in truth and in fact, not meeting its internal projections.

90.    On the same day as the earnings conference call in an internal memo from Humenansky to Filipowski contained in an email entitled "Major Concerns", Humenansky informed Filipowski that highly touted divine consulting arm, divine Professional Services was imploding. The memo stated in pertinent part as follows:

> PSO Consultants – We are losing good people every day, and are losing some major customer interfaces. We have major issues at Miller, Johnson & Johnson, etc.

*    *    *

> PSO Leadership – Joe Bingen and Quinn are both resigning. This is not public knowledge, and cannot be disclosed. A big reason is lack of faith in the sales force and the continued belittlement of them by the sales force…. I think we are also at real risk of losing Mike and Eric and watching the Value Chain business implode. **At this point, with points 1 & 2, we are very close to watching PSO collapse. We pretty much will lose the whole management team.**

*     *     *

I feel we need to cut all products, services, and customers to what is profitable now. This will be a massive cut, and means we well some of our less successful products and service offerings. We are too close on cash, and I know Mike [Cullinane] was going to talk to you about our cash condition. We have major pressure on our payables, and Viant is slipping due to the erosion of our stock price.

*     *     *

**I feel the company is in a tailspin, and we need to make major changes.**

[Emphasis added.].

91.    On May 18, 2002, Humenansky wrote to Filipowski saying:

I do think we are at the point where it's going to be hard to get out of this mess.

*     *     *

I also have a PSO organization that is basically fractured with over 10 leaders leaving last week alone. Really, it's a mess....

92.    On May 22, 2002, Humenansky wrote to Filipowski saying:

I can't run the business going forward. Since I've been at divine, it's all been about laying people off. I've had to kill the whole venture team, take out over 1200 people in PSO, watch leaders leave on a daily basis, and there is zero fun in that kind of existence. Revenue continues to trend downwards, and I'm truly at a loss anymore of where to even find people to terminate. We need a more senior turn-around guy in here, because I'm truly at a loss. I cannot cut every two weeks because revenue goes down every two weeks.

I would take 20 accounts and give them to PSO. How much worse can it get? Revenue has been going down every quarter by [$4-5 million].

I can't run a business, nor can Brian or Ed, in which it's nothing except cutting, replacing management talent that leaves, and watching customers continue to get pissed because we continue to cut their people.

I continue to take criticism on running PSO, on losing money in that business, etc. I'm not sleeping, and more important, I am not happy doing this at all. It's a grind every day. I hate coming to work, because it's never about building the business, just Oak, Ken, Mike, and the Directors saying "take out more fricking expenses." Now, we are almost out of money and we can now add our creditors to the list of pissed off people.

Maybe there is someone in Viant or Delano (Vikas) or an outside person that we can bring in, but I'm not qualified nor have what it takes anymore to continue along this route.

It's been three fricking years of doing this, every month, Greenfields (700 people), Investments (stopped investing in any of them and the associated grief), Venture Group (from 75 people to zero), and now SSO, PSO, and DMS. Every month, laying off people, arguing over revenue numbers, cash position, etc., etc., etc.

I have incredible loyalty to you and have been one of the few that stuck it out the whole time, even though I really didn't want to start in the first place. But, I'm at the end of my rope now. I'm going to get my ass handed to me tomorrow, and they are all going to say the same fricking theng, "cut more expenses out, and Oak **won't do the deal without us doing that, but I don't even know where to get those expenses anymore without just closing down PSO.**

And at the same time, we are going to talk about paying Alek all this money (with my total [1.5 million] shares for all three years) and do another acquisition.

[Emphasis added.]. The last paragraph above refers to Filipowski's decision to give Alek Szlam, the former Chief Executive Officer of eShare, put options worth $6.2 million on divine shares he owned. Szlam exercised these put options but Filipowski and Cullinane did not inform the Board of this occurrence, causing the resignation of at least one outside director. The exercise of this put had a substantial adverse impact on divine's cash flow.

93.    On May 23, 2002, in order to remain listed on NASDAQ, divine announced that its "board of directors has authorized a reverse stock split at a ratio of one-for-twenty-five (1:25), and has set May 29, 2002 as the date for the reverse stock split. divine is taking this action in order to satisfy the Nasdaq minimum bid price requirement. divine's stockholders, by a significant majority, approved the reverse stock split during divine's annual meeting of stockholders held on Tuesday, May 21, 2002." The press release stated, in pertinent part, as follows:

"We have made significant progress in executing our business plan during the past year, aggressively building out our extended enterprise offerings through organic growth and acquisitions while working diligently to eliminate excess costs as we strive to reach profitability by the end of the year," said Andrew "Flip" Filipowski, chairman and chief executive officer of divine.

94.     The statements referenced above in ¶ 93 were each materially false and misleading for the reasons set forth in ¶¶ 31 and 77. In addition, the statement referenced above in ¶ 93 that there had been "significant progress in executing our business plan during the past year" was materially false and misleading because as Defendants knew or recklessly disregarded the Company was technically insolvent, it was unable to integrate its acquisitions and it was ready to shut down one of the Company's major divisions, PSO, because of a loss of personnel.

95.     Further exacerbating the deteriorating operational and financial, in May 2004, divine became unable to ascertain the cash position of its international operations. For example, on May 24, 2002, Brian Burke, one of divine's Financial Analysts, commented:

> Whether *[international operations]* are ignoring the request [for cash position updates] or have been too busy for the past month isn't really the issue. **The issue is that we have no insight into where they stand.** That is my concern. If we miss our cash numbers significantly or even slightly I want [it] known **that I warned everyone in May that we don't have visibility into the cash forecast.** There is no way I'm accepting any blame if we miss our expected numbers. If I screw up I'd take full responsibility, but without information I can't be accountable.
>
> Basically, **I'm covering my ass for when we get sued for pissing away $1 billion over a three year period.** I don't want anyone in management claiming they didn't know what was going on....

[Emphasis added.].

96.     On May 30, 2002, divine announced that it had "secured equity financing totaling more than $61 million from a group led by Oak Investment Partners, one of American's oldest and largest venture capital firms. This investment, in combination with ongoing expense reduction efforts, positions divine to achieve its goal of profitability by the fourth quarter with substantial cash reserves." The press release stated, in pertinent part, as follows:

> Oak Investment Partners and other investors have agreed to purchase over $61 million of preferred divine stock, which is convertible into common stock at a conversion price of $6 per share.... Assuming the conversion of the convertible preferred stock and warrants into divine common stock and the completion of divine's one-for-twenty-five reverse stock split, the investors will acquire

> approximately 3,823,000 divine common shares in the first purchase, up to approximately 6,333,000 shares in the second purchase, and will have the right to purchase 1,583,000 shares by exercising the warrant.

The press release also provided additional details with respect to divine's success in integrating its acquired businesses, in pertinent part, as follows:

> "We have committed all along to reducing our cash burn by reducing overhead associated with our acquisitions and through ongoing expense reductions. As a result of these actions, we will have eliminated approximately $85 million in additional annual expenses by the second quarter, representing a significant step toward achieving profitability by the fourth quarter," said Chief Financial Officer Michael Cullinane. **"We believe that, with the cash received in this investment combined with the cash we anticipate receiving at the close of our acquisitions of Viant Corporation and Delano Technology, we will have in excess of $180 million in cash in July.  This level of cash reserves is well above our operational requirements but required in this market to assure customers."** [Emphasis added.]

97.    The statements referenced above in ¶96 were each materially false and misleading for the reasons set forth in ¶ 31 and 77.  In addition, the statements referenced above in ¶96 were each materially false and misleading for the following additional reasons:

(a)    that contrary to Defendants' statements, the Company was running out of cash and was struggling to fund its daily operations and was illicitly taking money from RoweCom's customers and failing to pay the publishers as required.  Accordingly, it was not true that the Company had sufficient funding for its "operational requirements;"

(b)    that divine could make no prediction of its future cash reserves with any degree of precision because it had, as set forth above, no visibility as to its cash position and had, in fact,  according to one of divine's financial analysts "pissed away $1 billion" over the prior three years; and

(c)    the claim that by reducing cash burn by reducing overhead was misleading because in reality Filipowski was shutting down one of the three spheres of divine's business, the PSO division.

{00004344.DOC ; 1}

- 45 -

98.    On July 17, 2002, divine announced that it had modified the terms for the Oak Equity capital infusion.  The press release stated, in pertinent part, as follows:

> Under the modified investment agreement with divine, Oak Investment Partners and other investors will complete the previously announced second closing of $38.6 million in convertible referred stock of divine at an effective conversion price equal to the volume weighted average rice for the 10-day trading period ending on the third trading day prior to the date that divine's stockholders approve the transaction, which is expected to be on or about August 5.  The conversion price will be no less than $1.50 per share of divine common stock and no greater than $5 per share.

The press release also continued to emphasize divine's "progress" to a goal of achieving operating profitability by year-end, in pertinent part, as follows:

> **"divine continued to make progress during the second quarter toward our goal of achieving operating profitability by year-end, increasing top-line revenue, while controlling spending,"** said divine Chairman and Chief Executive Officer Andrew "Flip" Filipowski.  [Emphasis added.]

99.    The statements referenced above in ¶98 were each materially false and misleading for the reasons set forth in ¶¶ 31, 77 and 96.  Additionally, this statement is materially false and misleading because divine's revenues were, in fact, falling precipitously short of projections.  Thus, achieving profitability by year end was not attainable.  Just a week prior to the above press release, on July 8, 2002, Humenansky advised Filipowski via email that "Software came in at [$12.5 million], which is really going to make us short on revenue for the next six months, projecting forward."

100.    On July 30, 2002, Humenansky forwarded an email to Filipowski regarding email discussions resulting from a sales meeting earlier in the day.  In particular, Humenansky noted "We are dying on our pipeline, and based on our pipeline, we are going to be constantly laying off people until we have nothing left.  I'm already afraid we are about to lose our SAP practice."

101.    On July 23, 2002, in PRNewswire-FirstCall, Filipowski is quoted as stating:

> We believe in the fundamental soundness of this combination with Viant for its complimentary skill base, geographic reach and vertical expertise, as well as its top-

> flight client base and financial strength.   The completion of this acquisition is
> consistent with divine's goal to achieve profitability by the fourth quarter of this year
> and is in the best interests of all the shareholders.

Contrary to Filipowski's statements, Viant had "no business," was losing money, and divine was

going to be forced to fire "3/4 of [Viant's] work force," More importantly, divine had no expectation

to achieve profitability by the fourth quarter of 2002.  Thus, defendant Filipowski's statements

concerning the Viant acquisition were materially false and misleading when made.

102.   On July 30, 2002, divine issued a press release announcing its financial results for the

second quarter of 2002, the period ending June 30, 2002. The Company reported consolidated

revenues of $163.6 million for the second quarter of 2002.  The press release stated, in pertinent part,

as follows:

> divine continued to gain traction in the extended enterprise market during the second
> quarter, demonstrating growth in both its revenue and customer base.  The company
> reduced its quarterly operating loss by $20.0 million from the first quarter to the
> second quarter, and expects to continue to significantly reduce its operating losses
> over the next two quarters.

Defendant Filipowski commented on the announcement stating, in pertinent part, as follows:

> divine is on track to generate revenue of more than $650 million this year with a
> global customer base of over 20,000 customers.  As the economy improves, we
> believe divine is well positioned for strong growth and to solidify our leadership in
> the extended enterprise space.

103.   The statements referenced above in ¶ 102 were each materially false and misleading

for the reasons set forth above in ¶¶ 31, 77 and 96.  In addition, the statements referenced above in

¶ 102 that the Company "continued to gain traction" and is "well positioned" were lacking in a

reasonable basis and therefore materially false and misleading as detailed herein the internal

condition of divine was steadily deteriorating and the Company was technically insolvent.

104.   That same day, divine held a conference call with investors and analysts to discuss the

announcement of its second quarter financial results.  During that conference call, Defendant

Cullinane materially misrepresented that the Company was performing well stating, in pertinent part, as follows:

> The interesting thing to note in this is that in virtually everyone of our businesses, consulting, software and managed services, we had a sequential increase in revenue.

Defendant Filipowski also represented that despite a difficult economic environment, the Company was "growing" its revenues stating, in pertinent part, as follows:

> So that being said, I suppose I could conclude by saying that in a horrific environment divine is standing out as one of the only companies capable of growing its revenue, and one of the only companies that I can foresee being able to achieve profitability within the context of a very, very significant new marketplace via extended enterprise. And I believe that somewhere down the road we will emerge as the dominant player in a space that will be very coveted.

105.    The statements referenced above in ¶ 104 were each materially false and misleading for the reasons set forth in ¶¶ 31, 77 and 96.  During the conference call, Defendants Filipowski and Cullinane represented that  there were across the board increases in revenue when, in fact, in all three spheres of business revenue numbers were declining.

106.    On or about July 31, 2002, divine filed a registration statement and merger proxy/prospectus (collectively the "Delano Prospectus") in connection with the Company's acquisition of Delano.  According to the Delano Prospectus, Delano stockholders will receive shares of divine common stock for each share of Delano stock.  The Delano Prospectus contained the identical statements as the RoweCom Prospectus concerning the Company's growth strategy.  The Delano Prospectus also incorporated by reference divine's Form 10-K for fiscal 2001 and Form 10-Q for the First Quarter of 2001.  The Delano Prospectus was materially false and misleading for the reasons set forth in ¶¶ 31, 77 and 96.

107.    The very next day on August 1, 2002, Humenansky again wrote to Filipowski about the "PSO Business" stating:

*      *      *

1..    Pipeline: The pipeline has gone down by [$40 million] in the past 8 weeks. We dropped another [$2 million] last week to a pipeline of [$134 million]. Based on our close ratio, this is not enough business to sustain Q4 and we will have to continue to make cuts, which erodes branches down below critical mass as well as is demoralizing to the troops. Just as a side note, [$11 million] of the pipeline is beyond its close date, and the PSO team has looked at these accounts and most of those will not close. They project that 90% of that [$11 million] past the close date is lost business. We will not see this show up in decreasing pipeline and revenue. The one thing I can be consistent about is that we have been very predictable on the revenue, regardless of the optimism in sales on the pipeline.

2.    SAP: This practice's revenue number has dropped to [$4.7 million]. At this number, they are breakeven, ONLY at a direct level. This does not include their operations overhead like Mike Kerrigan, Darcy, sales specialists, etc.

*        *        *

3.    3rd Quarter Revenue: Has dropped by [$700,000] to [$31.3 million]. [$1.5 million] of the miss (not just this weeks) is due to lack of SAP business. One reason for this is that SAP resources are now plentiful and cheap, and people are now hiring their own resources.

108.    On August 3, 2002, Humenansky continued saying "I'm very worried about the pipeline in PSO. I think we are going to have some big problems in Q4.... I think it's more than making numbers. I think it's about leadership and visiting customers, and yes, in the end, making the numbers. I'm very concerned about the [$14 million] software booking numbers for this quarter, since we only have [$1 million] in the door. If we miss this number by a lot, I have no fricking idea where to cut anymore. I do think the economy is very difficult, but we have decreased the revenue number quarter over quarter, every quarter, and last quarter, by more than 2/3rd's for this quarter, and he only has [$1 million] in the door."

109.    On September 5, 2002, Humenansky wrote an email to Filipowski about PSO stating "We are really missing the Q3 number, which makes the Q4 number a miss by a long shot, especially with a 10% increase in Q4, and there is no chance now based on pipeline, only [$9 million] booked in Q4, and the holiday season. We are looking at additional cuts and other options. This is an additional [$2 million] decrease in revenue over what we told the Directors."

110.    Before the end of September 2002, unbeknownst to investors, divine was assessing the impairment the Company was going to take for goodwill and developed technology. divine's analysis of goodwill and developed technology as of July 31, 2002, indicated that the Company would take an impairment of more than $100 million.

111.    On August 1, 2002, divine announced that it had completed its acquisition of Delano. divine announced that it issued more than 2 million shares as consideration in the acquisition.

112.    On August 14, 2002, divine filed its Quarterly Report on Form 10-Q for the three-months ended June 30, 2002 which was signed by defendant Cullinane and confirmed the previously announced financial results. The Form 10-Q represented that the Company had enough capital to fund its operations stating, in pertinent part, as follows:

> During April, May and June 2002, we used net cash of $4,590,000 million, $15,128,000 million, and $5,154,000 million, respectively. These amounts are exclusive of an increase of $22,941,000 from the private placement of our Series B convertible preferred stock and a decrease of $23,630,000 principally from payoffs of our RoweCom debt obligations of $15,350,000 and a payment to Mr. Szlam of $6,241,000 related to his put option. In addition, our working capital, net of deferred publisher costs and deferred revenue, decreased to $22,865,000 at June 30, 2002 from $55,762,000 at March 31, 2002....

> Our operating plan depends on us achieving increases in revenue and cash receipts and decreases in expenses. We intend to decrease our operating costs, primarily through workforce and payroll reductions, as we continue to integrate acquired companies into our operations. **Based on these forecasts, we believe that our existing unrestricted cash and cash equivalents, accounts receivable, proceeds from the second round of the Oak private placement, and new cash generated from our customers will be sufficient to fund our operations and capital requirements....** [Emphasis added.]

113.    The statements referenced above in ¶ 112 were each materially false and misleading for the reasons set forth in ¶¶ 31, 77 and 96.

114.    On August 27, 2002, divine filed a registration statement and merger proxy/prospectus (collectively the "Viant Prospectus") in connection with the Company's acquisition of Viant. According to the Viant Prospectus, Viant stockholders would receive shares of

{00004344.DOC ; 1}

divine common stock for each share of Viant stock. The Viant Prospectus contained the identical statements as the RoweCom Prospectus concerning the Company's growth strategy. The Viant Prospectus also incorporated by reference divine's Form 10-K for fiscal 2001 and Form 10-Qs for the First and Second Quarters of 2001. The Viant Prospectus was materially false and misleading for the reasons set forth above in ¶¶ 31, 77 and 96.

115.    On August 28, 2002, divine announced that it had "closed the second financing placement led by Oak Investment Partners.... With this action, divine has completed the $61.6 million Oak-led equity investment." The press release stated, in pertinent part, as follows:

> "This investment by Oak, as well as our ability to achieve organic revenue growth quarter over quarter during this challenging economic climate, underscores the market demand for our solutions that support companies' extended enterprise initiatives," said divine Chairman and Chief Executive Officer Andrew "Flip" Filipowski. **"With the momentum we are seeing in the market place and the additional financial resources that this investment provides, we believe we have the right mix of offerings and the solid financial footing to achieve our business and financial goals."** [Emphasis added.]

116.    The statements referenced above in ¶ 115 were each materially false and misleading for the reasons set forth in ¶ 31, 77 and 96.

117.    On September 27, 2002, divine issued a press release announcing that it had "completed its acquisition of Boston-based Viant Corporation, a pioneer provider of digital business solutions."

118.    On October 17, 2002, divine issued a press release announcing that it had been:

> named a Rising Star on the 2002 Deloitte & Touche Technology Fast 500, a ranking of the 500 fastest-growing technology companies in North America. A special category of 25 Rising Star winners, companies in business less than five years, but at least three years, are ranked based on percentage of growth in revenues over three years (1999 to 2001). **divine's three-year revenue growth of 19,148 percent gave it a first-place ranking in the Fast 50 'Rising Star' category for Chicago and a second-place ranking among companies in North America."** [Emphasis added.]

Defendant Filipowski commented on the announcement stating, in pertinent part, as follows:

> We at divine are very proud to be recognized among the fastest-growing technology
> companies in North America.... We identified early on the market need for solutions
> that help companies better interact and collaborate through their value chain, and
> attribute our rapid growth to our ability to acquire, interact and grow the leading
> technologies and services that enable Extended Enterprise solutions and serve our
> 20,000-plus customer base. We expect to see growing demand for our solutions as
> companies embrace Extended Enterprise strategies that demonstrate a real impact on
> the bottom line.

119.    The statements referenced above in ¶ 118 were each materially false and misleading

for the reasons set forth in ¶¶ 31, 77 and 96.

120.    On this same day, Humenansky wrote an email to Filipowski regarding divine's

international operations stating, "They are now coming in around [$6 million] on a 11.2 number.

The German PSO for Q4 is only [$1.5 million] with a cost basis of [$2.4 million], that cannot be

removed in this quarter due to severance. This is killing the margin in PSO. They will be lucky to

come in at [$12 million on a $16 million] software number in Q4. They are going to cost us [$12

million] in 2 quarters in lost revenue and margin. It's a fricking disaster. Paul [Tatro] should have

watched this more closely. There is no way to recover from this at an expense level."

121.    On November 7, 2002, divine issued a press release announcing its financial results

for the third quarter of 2002, the period ending September 30, 2002. The Company reported

revenues of $162.2 million. Defendant Filipowski commented on the announcement stating, in

pertinent part, as follows:

> We closed ten deals valued at $1 million or more, and had numerous competitive
> successes around the world. In addition, we made further progress integrating our
> portfolio of products, as well as selling multiple solutions to our customers.... **As a**
> **result, we believe divine is well-positioned for profitable growth as we advance**
> **our leadership in the Extended Enterprise space."** [Emphasis added.]

122.    The statements referenced above in ¶ 121 were each materially false and misleading

for the reasons set forth in ¶¶ 31, 77 and 96. In addition, the statement referenced above in ¶ 121

that the Company was "well positioned" was lacking in a reasonable basis and therefore materially

false and misleading as internal reports indicated that the Company was losing money and not performing to internal expectations as detailed herein.

123.    By mid-November 2002, divine was projecting that it would have $44.7 million in cash on hand at the end of the year. However, of that amount $16 million was restricted cash and at the same time divine had $21 million in accounts payable, leaving it with only $8 million in unrestricted cash where earlier Filipowski had said that the Company "needed" at least $200 million in cash by year end. This $8 million was the equivalent of one payroll.

124.    By mid-November 2002, divine was told that absent a definite operating plan for 2003, KPMG's 2002 audit would include a "Going Concern" qualification.

125.    On November 12, 2002, Humenansky wrote to Filipowski stating "I also feel that the revenue numbers have come down so much that the expense number just cannot be made. We are burning more cash per week than we even forecasted two weeks ago. I really believe we should start selling DMS and maybe even PSO."

126.    That same day Humenansky forwarded an email to Filipowski regarding the "Hoofdorp office space" which indicated that divine was losing a number of employees due to divine's efforts to cut expenses. Humenansky stated "Flip, we are dying on the expense cuts. I've gotten countless messages like this today from marketing, etc. We are reaching the point of destroying the business, and if that means we need to sell DMS or PSO, then maybe that's the answer. Because otherwise, this will be a death spiral."

127.    Filipowski responded to Humenansky's email stating "We will only accelerate the spiral and get nothing for the businesses. We have got to draw the line and go for it. Can't keep doing this over and over."

{00004344.DOC ; 1}

128.    On November 14, 2002, divine filed its Quarterly Report on Form 10-Q for the three-months ended September 30, 2002 which was signed by defendant Cullinane and confirmed the previously announced financial results. The Form 10-Q represented that the Company had enough capital to fund its operations stating, in pertinent part, as follows:

> During July, August and September 2002, we used net cash of $4,118,000, $10,710,000, and $12,504,000, respectively. These amounts are exclusive of an increase in $73,844,000, net of issuance costs, from our convertible preferred stock financing and cash acquired through acquisitions, as well as a decrease of $7,540,000 principally related to RoweCom debt paydowns. Our working capital (current assets minus current liabilities), net of deferred publisher costs and deferred revenue, increased from $22,865,000 at June 30, 2002 to $56,509,000 at September 30, 2002.
>
> *        *        *
>
> Our operating plan depends on us achieving increases in revenue and cash receipts and decreases in expenses. We intend to decrease our operating costs, primarily through workforce and payroll reductions, as we continue to integrate acquired companies into our operations. **Based on our plan forecast, we believe that our existing unrestricted cash and cash equivalents, accounts receivable, and new cash generated from our customers will be sufficient to fund our operations and capital requirements....** [Emphasis added.]

129.    The statements referenced above in ¶ 128 were each materially false and misleading for the reasons set forth in ¶¶ 31, 77 and 96.

130.    Through much of the fourth quarter of 2002, divine was engaged in negotiations to sell RoweCom. In October 2002, divine entered into substantive negotiations with EBSCO Industries, Inc. ("EBSCO"), to divest itself of RoweCom. These negotiations progressed to the point where offers had been extended pending further due diligence of RoweCom's domestic and foreign operations. Unfortunately, as due diligence progressed, EBSCO reduced its offer for RoweCom to an amount that would not have allowed RoweCom to satisfy its obligations.

131.    While divine continued its negotiations with EBSCO, divine was also having to deal with the issue of how to address publisher payments. The Board had previously been advised that if no deal could be negotiated for the sale of RoweCom, then divine and RoweCom would have to find

an alternative means for financing the RoweCom publisher obligations due at the end of the year. Given divine's own financial problems, no realistic means of financing existed.

132.    By mid-December 2002, without a viable solution to address this problem, and based on divine's financial situation at the time, the Board determined that divine was not in a position to continue to support RoweCom, "a material subsidiary" business, and was not in a position to finance the RoweCom year-end publisher payments with receivables financing secured by divine's non-RoweCom receivables.  RoweCom was directed to retain insolvency counsel, as well as not to collect and retain any more money from customers except in specifically defined circumstances.

133.    On December 20, 2002, divine issued a press release announced that it was aligning the Company  into three solution areas that "streamline the organization and enhance its ability to address specific business problems…"The Company also reported that it  intended to "divest the content subscription business delivered through its RoweCom, Inc. subsidiary and focus on digital content delivery."  The press release stated, in pertinent part, as follows:

> "divine's solutions represent a unique blend of capabilities that help our customers create more meaningful connections with their customers, employees, partners and markets. Our evolving organizational model reflects the progress we have made in the last year at integrating numerous products and services and delivering them as whole solutions to customers through our field delivery team," said divine Chairman and Chief Executive Officer Andrew "Flip" Filipowski, "divine stands out as the only company that brings together unified extended enterprise solutions from a single vendor and, as we move into the new year, **this is the perfect time to take the natural next step in creating integrated solutions from all of our intellectual property, streamlining our organization to reflect the solutions we are already delivering to the market, and doing it profitably."**
>
> \*       \*       \*
>
> The organizational alignment into solution areas enables divine to streamline the company's management and organizational structure as previously discussed in recent earnings announcements. divine has significantly reduced expenses through ongoing integration and consolidation efforts, and this move to solution areas is expected to eliminate more than $100 million in annual expenses, delivering on the 2003 financial commitments made during previous earnings announcements.

"**We have always set aggressive targets for reducing our operational cost structure and cash burn as part of our drive to reach profitability, and this move is a significant step toward achieving those financial goals**," said divine Chief Financial Officer Michael Cullinane. "**This organizational structure allows us to better focus our sales efforts on larger solution deals, while reduce the number of organizational layers and streamline decision-making. As a result, divine will be even more nimble and responsive to market and customer needs.**" [Emphasis added.]

134.    The statements referenced above in ¶ 131 were each materially false and misleading for the reasons set forth in ¶¶ 31, 77 and 96. In addition, the statements referenced above in ¶ 131 were each materially false and misleading because they failed to disclose the true state of affairs at RoweCom as detailed herein.

135.    On December 27, 2002, Humenansky reported to Cullinane and Filipowski the "international forecast 12/27/02 noon" saying "This is going to cause us a big problem for next quarter. This is a big miss, and I have no idea how we are going to make up a miss of [$3.4 million] next quarter. Between Q3 and Q4, we have missed the international number by close to [$12 million]. It's the biggest issue in the company, by far."

### The Truth Begins to Emerge

136.    On January 17, 2003, in an article appearing in the Chicago Tribune, the first details emerged of divine's scheme to defraud RoweCom customers. The article stated, in pertinent part, as follows:

> Thousands of libraries across the country may be out $50 million after a subsidiary of Chicago-based divine Inc accepted their money last year to buy periodicals but failed to pay the publishers.

> *            *            *

> divine executives said Thursday that the subscription service collected money from at least 3,500 libraries but spent the cash on operating costs and debt payments at the subsidiary. There was not enough left to pay the publishers and divine could not get a loan to keep the subscriptions coming, executives said.

> *            *            *

The service in December told the libraries it could not supply them with the publications they had ordered, and said its corporate parent, divine, would not support the business going forward, according to a RoweCom announcement.

"This is unconscionable, unethical and moving rapidly toward grand larceny," said Susan Davis, head of periodical acquisitions at the State University of New York at Buffalo. Her e-mail, sent to a RoweCom sales representative last month, is part of a lawsuit filed against the company by the New York State attorney general's office.

The university's library had paid RoweCom $1.3 million to subscribe to various periodicals. Asked where the money had gone, a spokesman for the attorney general's office replied, "We are trying to figure that out ourselves."

The university has recovered $500,000 and is demanding the rest of the money. Thousands of other libraries remain in limbo, with little hard information available.

"What they have been told is RoweCom cannot place their orders for 2003," said Jude Sullivan, general counsel for divine. He said divine is trying to sell RoweCom to competitors, which might resolve the problem.

Sullivan gave this explanation for RoweCom's problems: The company would typically receive periodical orders from customers, pay the publishers, and later collect from the libraries. To carry it through, the company would borrow against future payments by the libraries.

But just a year after divine took over RoweCom, no one would advance the struggling company money. "We were not able to get a line of credit," Sullivan said.

Sullivan said the money the libraries paid to RoweCom was used in other divine operations having nothing to do with the subscription business, but said other divine money was used to fund RoweCom.

"We have multiple subsidiaries, Sullivan said. "Was RoweCom money used to fund those operations? I suppose the answer to that is sure, because cash is cash."

On balance, he said, RoweCom received a $10 million subsidy from divine. In its most recent report to the Securities and Exchange Commission, for the quarter ending Sept. 30, 2002, divine said it had $61 million in cash. Jeff Schultz, chief marketing officer for divine, would not say whether divine had considered repaying the libraries itself.... [Emphasis added.]

137.    Then, on January 29, 2003, an article titled "Lawsuit: divine looted company;

Creditors allege millions taken from RoweCom" appeared in the Chicago Tribune, and provided the

following additional details:

Creditors of a divine, Inc. subsidiary that filed for bankruptcy protection Monday say the Chicago-based company looted the unit, fraudulently transferring $73.7 million before abandoning the business.

*The 14-count lawsuit, filed Tuesday in bankruptcy court in Massachusetts, alleges that divine determined in the spring it would no longer support RoweCom, a library subscription service, but continued to collect payments from thousands of academic, medical and corporate libraries.*

*Company officials, the lawsuit contends, "formulated a plan to enrich divine at the expense of RoweCom, its employees and its creditors."*

*       *       *

The lawsuit contends that *divine directed RoweCom employees to collect prepayments for libraries by offering discounts to customers who paid early and implementing a "cash first" program, where customers had to pay before their orders were forwarded to publishers.*

*divine told RoweCom those payments would be set aside to pay publishers.*

*By the end of November, RoweCom had collected $65 million from customers for subscriptions, and a total of $73.7 million was transferred from RoweCom to divine from April to December last year, according to the lawsuit.*

*In a recent interview, divine executives said the recently collected subscription payments were used to pay RoweCom debts and its operating expenses, but that cash was regularly transferred between divine units.* [Emphasis added.]

138.    On January 27, 2003, divine announced that "RoweCom, Inc., a wholly owned subsidiary of divine had signed a letter of intent with EBSCO Industries, Inc., the global leader for the delivery of integrated information systems and services, for the sale of RoweCom's business to EBSCO." The press release stated, in pertinent part, as follows:

The proposed transaction, which is contingent upon regulatory approval in France and customary closing conditions, has been endorsed by the steering committee of the ad hoc committee of publishers and RoweCom customers. In connection with this agreement, certain publishers represented on the ad hoc committee have agreed to fulfill subscriptions orders to RoweCom customers who prepaid for subscription orders.

*"We believe that the sale of RoweCom to EBSCO is the optimal solution for its customers and the various publishers that provide content to customers,"* said divine Chairman and Chief Executive Officer Andrew "Flip" Filipowski. "We are grateful to our customers and the publishers who continue to work with us to achieve