**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SHARON BOBBITT, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| ANDREW J. FILIPOWSKI, et al., | ) ) ) |
| Defendants. | ) ) ) ) |

No. 04-12263-PBS

**SECOND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW**

**JURY TRIAL DEMANDED**

**PART 3 PAGES 59-91**

a resolution that we believe is in everyone's best interests and appreciate the patience of customers and publishers as the negotiation process has moved forward."

To facilitate the sale of RoweCom's assets and operations to EBSCO, and to ensure that RoweCom's operations continue without interruption until the transaction is finalized, RoweCom expects to file a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. [Emphasis added.]

139.    On February 6, 2003, divine announced that "EBSCO Industries, Inc. has signed the formal purchase agreements to proceed with the acquisition of its RoweCom, Inc. subsidiary's subscription management businesses in France, the United Kingdom and Spain…. The acquisition of the individual country operations of RoweCom will occur separately and the acquisition for the North American and other components of the RoweCom operations are proceeding as expected." The press release sated, in pertinent part, as follows:

"The timely sale of RoweCom's operations in France, Spain and the UK represents significant progress in achieving a global resolution to all of the issues surrounding the RoweCom situation," stated divine Chairman and Chief Executive Office Andrew "Flip" Filipowski.

140.    An article dated February 9, 2003, and titled "RoweCom purchase haunting divine; Buyer infected by problems it couldn't cure" appeared in the Chicago Tribune, and provided the following additional details:

*But Filipowski wanted to buy RoweCom for two reasons:*

*Despite its losses, RoweCom's $348 million in sales would build divine's revenues, helping Filipowski make good on his boast to shareholders to create a $1 billion in sales company from the ashes of the dot-com disaster that killed his Internet incubator.*

*Filipowski also was convinced he could turn RoweCom into a marketing machine. He envisioned selling divine's software to leading libraries and publishers in the rarefied world in which scholars and scientists exchange ideas.*

RoweCom not only would turbocharge divine's sales. It would also put a glossy sheen on the patchwork of financial strapped companies that Filipowski's team was buying to create a software company in the turmoil following the tech collapse.

What ensued did not come close to Filipowski's plan.

Bankrupt RoweCom's problems now threaten divine's future and spotlight the Chicago company as a culprit in a high profile financial mess.

"This is unquestionably the biggest financial collapse America's libraries have had to deal with," says American Library Association Executive Director Keith Michael Fiels.

The unfolding scandal left hundreds of libraries without important periodicals and out of more than $65 million collectively in subscription fees divine allegedly failed to forward to publishers, according to RoweCom's lawsuit against divine.

The suit, in a Delaware bankruptcy court, seeks the return of at least $74 million to RoweCom — a sum that almost certainly outstrips divine's cash. [Emphasis added.]

141.    On February 18, 2003, divine announced that "despite efforts over the past several months to minimize operating expenses and various liabilities, its board of directors has determined that it must seek alternatives to protect the value and viability of its operations. As a result, divine has engaged Broadview International LLC as advisors to assist in exploring strategic options, which may include asset divestitures, comparable transactions, and/or the filing of a voluntary petition under Chapter 11 of the United States Bankruptcy Code.

142.    Market reaction was swift and negative with divine stock falling from a close of $0.35 on February 14, 2003, the immediate preceding trading day, to a close of $0.12 on February 18, 2003, or a single-day decline of more than 65% on extremely heavy trading volume.

143.    On February 25, 2003, divine announced that it and several of its subsidiaries would "file a voluntary petition to reorganize under Chapter 11 of the U.S. Bankruptcy Code later today. Today's action will be taken to protect the value and viability of divine's operations while it works to restructure its liabilities and achieve a timely and favorable resolution to the remaining economic issues facing the RoweCom Inc. subsidiary. In part to increase the efficiency of the reorganization process, divine will file the petition in the United States Bankruptcy Court in Boston, Massachusetts, the same venue where RoweCom's Chapter 11 case is proceeding. divine's subsidiary

divine/Whitman-Hart, formed with the acquisition of certain assets of marchFIRST, is not included in this filing."

144.    An article dated March 1, 2003 and titled "Lessening the pain of divine collapse; real estate deals soften the blow for "Flip" Filipowski appeared in the Chicago Crain's Business and provided the following additional details:

> Not everyone suffered equally in the meltdown of Chicago's divine Inc.
>
> While investors ranging from small public shareholders to Chicago's business elite saw the value of their holdings wiped out during the company's three-year stumble from Internet wannabe to Bankruptcy Court, divine founder and CEO Andrew "Flip" Filipowski trimmed his own losses in a series of transactions with the company.
>
> *     *     *
>
> Most notably, Mr. Filipowski was a partner and one-third owner in Blackhawk LLC, which acquired an eight-acre tract on Goose Island, intended for divine's headquarters, for $5.25 million in April 1999. divine paid $9.75 million for the site a year later — an 86% markup — while pumping an additional $1.8 million into the partnership to cover its expenses and an option to develop the site. divine later sold the property at a loss.
>
> All told, Blackhawk and another Filipowski real estate partnership that rented office space to divine received about $13 million from the company.
>
> *     *     *
>
> But the big winner in the divine derby appears to have been Aleksander Szlam (pronounced "shalaum"), a former divine director and longtime associate of Mr. Filipowski who invested $1 million during divine's early days and appears to have actually turned a profit on his divine dealings.
>
> Mr. Szlam, an Atlanta software developer known as a shrewd negotiator, and entities he controlled, pocked $12 million last year after selling Georgia-based e-share communications Inc. to divine for $40.1 million. Mr. Filipowski, an eshare director and major shareholder at the time of the sale, did not participate in board discussions about the transaction.
>
> Like others who sold to Mr. Filipowski during his acquisition spree of 2001 and 2002, Mr. Szlam accepted divine stock for his eshare holdings. But unlike others, he received a put option allowing him to sell the shares back to divine if their market value declined, which it did.

Mr. Szlam exercised the put last year, draining $6.2 million from divine's coffers at a time when the firm was desperately scrambling for cash. That's on top of the $5.8 million divine paid to ventures controlled by Mr. Szlam for options to purchase two buildings occupied by eshare. Mr. Szlam didn't return calls.

Such arrangements show that divine's collapse wasn't only a story of Internet dreams dashed, but also a tale of insider dealings for a favored few.

145.    An article dated March 4, 2003 and titled "divine faces federal probe; Grand jury wants to determine fate of libraries' cash" appeared in the Chicago Tribune and provided the following additional details:

A federal grand jury is investigating divine Inc., Chicago's one-time technology darling, to determine what happened to $65 million in customer payments, documents obtained by the Tribune show.

*      *      *

In February, libraries began receiving federal subpoenas for their records in connection with a grand jury investigation, according to copies of the subpoenas obtained by the Tribune.

*      *      *

Several library managers said Monday that they were contacted in February by postmaster general officials in connection with the investigation. Legal experts say the postmaster general's involvement suggests the investigation is centering on possible wire fraud.

Libraries initially were asked in early February to deliver their RoweCom records to a federal economic-crimes unit in Boston, but the matter later was moved to Chicago.

*      *      *

The biggest creditor is the National Institutes of Health Library in Bethesda, MD, which is owed $2.4 million, according to RoweCom's bankruptcy filing.

Milner Library paid about $1.15 million to RoweCom in October 2002 to order subscriptions for about 3,000 newspapers, magazines and scholarly journals, Boyd said.

"In early December we got calls from publishers about our not having renewed," she said.

The library has since determined that only $33,857 of its payments went to publishers.

Major publishers of scholarly journals have agreed to continue providing issues without payment at least through March while negotiations continue about who will pay the remainder of the year's subscriptions.

*    *    *

RoweCom's suit alleges that by the spring of 2002, divine had decided it no longer would invest to keep RoweCom going as a viable business.

**The suit alleges that RoweCom's employees were instructed to offer discounts to libraries that paid cash in advance — months before payments were due to publishers. RoweCom collected more than $65 million in payments last year through Nov. 30, the suit alleges, even though divine "had no intention to pay those obligations."**

**At the same time, the suit alleges, divine diverted nearly $74 million from RoweCom's operations during the period from April through December 2002....** Sullivan [divine's general counsel] said divine inherited a shortfall of at least $54 million. "I'm not sure we fully understood the financial situation it was in," he said.

divine realized it had a cash flow problem in September, Sullivan said, and the company tried unsuccessfully to arrange short-term financing, as it had the previous year. He said divine stopped taking orders in December when it was clear the company would not be able to meet RoweCom's obligations. [Emphasis added.]

**divine's Materially False and
Misleading Financial Statements**

146.    At all relevant times during the Class Period, divine represented that its financial statements were prepared in accordance with GAAP. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, ¶42, states:

Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future

enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

147.    Regulation S-X [17 C.F.R. §210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. The representations by the defendants that divine's financial statements were prepared in accordance with GAAP were materially false and misleading because the financial statements materially inflated and created a false impression about the Company's expected future cash flows, the value of divine's business, and failed to disclose known loss contingencies and risks and uncertainties associated with the Company's liquidity.

148.    In an attempt to mask the decline in the Company's business, the defendants caused divine's employees to engage in improper accounting practices, and/or knowingly acquiesced in and condoned those practices. These practices inflated the price of divine's common stock during the Class Period which it used as currency to acquire numerous companies.

    (a)    **divine's Improper Reporting of Revenue**

149.    On December 8, 1999, Jane B. Adams, then Deputy Chief Accountant of U.S. Securities & Exchange Commission ("SEC") made the following remarks at the 27th Annual National AICPA Conference on Current SEC Developments:

> ***With the emergence of Internet companies as a significant part of the economy and for which investment decisions have been based on revenues rather than earnings, income statement classification and presentation has become a critical area.*** The staff is seeing a number of accounting issues for which the underlying objective seems to be the grossing up of the income statement. For example, we have seen a number of transactions where one party, acting as an agent, and paid on a commission basis, records the transaction as if it had provided that service as a principal. In other words, ***the enterprise was grossing up its revenue and expenses for selling a third party good or service.*** Thus, the revenue that is recorded may be multiples higher than the revenue that would be recorded on a net fee basis....

150.    As a result, the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB") issued Abstract No. 99-19 which stated:

{00004344.DOC ; 1}

How companies report revenue for the goods and services they offer has become an increasingly important issue because some investors may value certain companies on a multiple of revenues rather than a multiple of gross profit or earnings.

151.    As a result, GAAP mandated that beginning no later than the December 31, 2000, financial statements for calendar year-end companies, the provisions of EITF Abstract No. 99-19 were to be applied.  EITF Abstract No. 99-19 provides:

The issue is whether a company should report revenue based on (a) the gross amount billed to a customer because it has earned revenue from the sale of the goods or services or (b) the net amount retained (that is, the amount billed to the customer less the amount paid to a supplier) because it has earned a commission or fee.  The accounting model in this Issue is consistent with the requirements of [SEC Staff Accounting Bulletin ("SAB")] 101. Those requirements are included in SAB 101 in the interpretive response to question 10 of Topic 13-A and are as follows:

In assessing whether revenue should be reported gross with separate display of cost of sales to arrive at gross profit or on a net basis, the [SEC] staff considers whether the registrant:

1.    acts as principal in the transaction,

2.    takes title to the products,

3.    has risks and rewards of ownership, such as the risk of loss for collection, delivery, or returns, and

4.    acts as an agent or broker (including performing services, in substance, as an agent or broker) with compensation on a commission or fee basis.

If the company performs as an agent or broker without assuming the risks and rewards of ownership of the goods, sales should be reported on a net basis. [Footnote reference omitted.]

152.    EITF Abstract No. 99-19 also provides that following are indicators of "Gross Revenue Reporting:"

The company is the primary obligor in the arrangement — ***Whether a supplier or a company is responsible for providing the product or service desired by the customer is a strong indicator of the company's role in the transaction.***  If a company is responsible for fulfillment, including the acceptability of the product(s) or service(s) ordered or purchased by the customer, that fact is a strong indicator that a company has risks and rewards of a principal in the transaction and that it should record revenue gross based on the amount billed to the customer.  Representations

(written or otherwise) made by a company during marketing and the terms of the sales contract generally will provide evidence as to whether the company or the supplier is responsible for fulfilling the ordered product or service. Responsibility for arranging transportation for the product ordered by a customer is not responsibility for fulfillment.

The company has general inventory risk *(before customer order is placed or upon customer return)—Unmitigated general inventory risk is a strong indicator that a company has risks and rewards as a principal* in the transaction and, therefore, that it should record revenue gross based on the amount billed to the customer. *General inventory risk exists if a company takes title to a product before that product is ordered by a customer* (that is, maintains the product in inventory) or will take title to the product if it is returned by the customer (that is, back-end inventory risk) and the customer has a right of return. Evaluation of this indicator should include arrangements between a company and a supplier that reduce or mitigate the company's risk level. For example, a company's risk may be reduced significantly or essentially eliminated if the company has the right to return unsold products to the supplier or receives inventory price protection from the supplier. A similar and equally strong indicator of gross reporting exists if a customer arrangement involves services and the company is obligated to compensate the individual service provider(s) for work performed regardless of whether the customer accepts that work.

The company has latitude in establishing price—If a company has reasonable latitude, within economic constraints, to establish the exchange price with a customer for the product or service, that fact may indicate that the company has risks and rewards of a principal in the transaction and that it should record revenue gross based on the amount billed to the customer.

The company changes the product or performs part of the service — *If a company physically changes the product (beyond its packaging) or performs part of the service ordered by a customer, that fact may indicate that the company is primarily responsible for fulfillment*, including the ultimate acceptability of the product component or portion of the total services furnished by the supplier, and that it should record revenue gross based on the amount billed to the customer. This indicator is evaluated from the perspective of the product or service itself such that the selling price of that product or service is greater as a result of a company's physical change of the product or performance of the service and is not evaluated based on other company attributes such as marketing skills, market coverage, distribution system, or reputation.

The company has discretion in supplier selection — *If a company has multiple suppliers for a product* or service ordered by a customer and discretion to select the supplier that will provide the product(s) or service(s) ordered by a customer, that fact may indicate that the company is primarily responsible for fulfillment and that it should record revenue gross based on the amount billed to the customer.

***The company is involved in the determination of product or service specifications***
—If a company must determine the nature, type, characteristics, or specifications of
the product(s) or service(s) ordered by the customer, that fact may indicate that the
company is primarily responsible for fulfillment and that it should record revenue
gross based on the amount billed to a customer.

The company has physical loss inventory risk (after customer order or during
shipping)—Physical loss inventory risk exists if title to the product is transferred to a
company at the shipping point (for example, the supplier's facilities) and is
transferred from that company to the customer upon delivery. Physical loss
inventory risk also exists if a company takes title to the product after a customer
order has been received but before the product has been transferred to a carrier for
shipment. This indicator may provide some evidence, albeit less persuasive than
general inventory risk, that a company should record revenue gross based on the
amount billed to the customer.

The company has credit risk — ***If a company assumes credit risk for the amount
billed to the customer***, that fact may provide weaker evidence that the company has
risks and rewards as a principal in the transaction and, therefore, that it should record
revenue gross for that amount. Credit risk exists if a company is responsible for
collecting the sales price from a customer but must pay the amount owed to a
supplier after the supplier performs, regardless of whether the sales price is fully
collected. A requirement that a company return or refund only the net amount it
earned in the transaction if the transaction is cancelled or reversed is not evidence of
credit risk for the gross transaction. ***Credit risk is not present if a company fully
collects the sales price prior to the delivery of the product or service to the
customer*** (in other words, before the company incurs an obligation to the supplier).
Credit risk is mitigated, for example, if a customer pays by credit card and a
company obtains authorization for the charge in advance of product shipment or
service performance. Credit risk that has been substantially mitigated is not an
indicator of gross reporting. [Emphasis added.]

153.    In its December 31, 2000, financial statements filed with the SEC on Form 10-K,

divine disclosed:

> The Company does not expect the adoption of recently issued accounting
> pronouncements to have a significant impact on its results of operations, financial
> position or cash flows.

154.    As explained by a former divine Senior Vice President of Business Development,

SageMaker basically provided a so-called "electronic portal" for enterprise-level (i.e., large)

customers. Said another way, SageMaker sold a system (a portal) to large customers so that these

customers could electronically access different kinds of content from various content providers.

This former employee explained that SageMaker made money by selling a license for the portal software to the customer and also received a royalty from the content-provider whose content was accessed by the customer through the portal. As such, SageMaker, RoweCom and NorthernLights are similar as all three of these companies were essentially intermediaries between content-providers (such as publishers) and content-users (i.e., customers like libraries in the case of RoweCom or enterprise-level businesses in the case of SageMaker).

155.   In its December 31, 2001, Form 10-K, divine disclosed:

We expect the revenues of businesses we acquire to comprise a significant portion of our revenues in the future. In particular, *we expect the revenues of RoweCom Inc., a provider of knowledge resources which we recently acquired, to represent a significant portion of our revenues* because RoweCom historically has recognized as revenue *its cost* of the knowledge resource it sells *plus the fee retained* by RoweCom. [Emphasis added.]

156.   This statement, which appeared for the first time as part of its risk factor disclosure when divine filed its 2001 Form 10-K with the SEC on or about April 1, 2002, indicates that throughout the Class Period, divine reported RoweCom's revenues on a "gross" basis.

157.   divine's reporting of, at least, RoweCom's revenue of on gross basis violated GAAP, specifically SEC SAB No. 101 and EITF Abstract No. 99-19, because RoweCom acted as an agent without assuming the risks and rewards of ownership of the goods it sold.

158.   For example, former RoweCom employees, including its former President and COO, stated that RoweCom would place orders with publishers only after receiving orders from its customers. As such, divine did not have "general inventory risk," as contemplated by EITF Abstract No. 99-19, which is a "strong indicator" that the Company did not possess the risks and rewards as a principal in the transaction.

159.   In addition, RoweCom was not responsible for providing content to its customers. As such, it was not responsible for fulfillment, including the acceptability of the product(s) or service(s)

ordered or purchased by the customer, another "strong indicator" that divine did not possess the risks and rewards of a principal in the transaction. RoweCom did not make any change in the product purchased by its customers; yet another indicator that it was primarily responsible for fulfillment of the RoweCom products its sold. In addition, RoweCom's customers selected the supplier of the product ordered by a customer and RoweCom did not determine the nature, type, characteristics, or specifications of the product(s) or service(s) ordered by the customer, both of which are factors indicating that RoweCom was not primarily responsible for product fulfillment.

160.  Moreover, as noted in detail herein, beginning in September 2002, RoweCom required that its customers pay for orders in full before RoweCom place such orders with content providers. Accordingly, RoweCom did not assume any credit risk on its reported sales.

161.  Each of the above factors required that divine report, at least, RoweCom's revenues on a net basis, as defendants knew or recklessly ignored. Indeed, a former divine Senior Vice President acknowledged that divine's reporting of RoweCom's revenues did not represent true revenues because "the monies were simply being passed-through divine to the publishers." In fact, the former divine Senior Vice President said that a potential RoweCom suitor, NewEdge, disagreed with RoweCom's reporting of revenue which inflated RoweCom's market value.

162.  Indeed, divine admitted in its 2001 Form 10-K that "we expect the revenues of RoweCom Inc., a provider of knowledge resources which we recently acquired, to represent a significant portion of our revenues." Nonetheless, divine, in violation of GAAP, reported RoweCom's sales on a gross basis throughout the Class Period, thereby materially overstating divine's reported revenues which created a false impression about the value of divine's business.

(b)  **divine's Failure To Timely Record Impaired Goodwill**

163.  divine's annual 2001 financial statements were materially false and misleading and presented a violation of GAAP and SEC rules and regulations because the Company failed to timely

{00004344.DOC ; 1}

record an impairment in the value of its reported goodwill. In so doing, divine misled investors about cash flows it expected to receive from certain of its numerous acquisitions.

164.    As noted above, prior to and during the Class Period, divine engaged in an acquisition binge, which, in the aggregate, were valued in excess of $300 million. divine utilized the "purchase method" of accounting for these acquisitions. The purchase method, as set forth in then existing GAAP's Accounting Principles Board ("APB") Opinion No. 16, ¶11, provided that:[1]

> The acquiring corporation records at its cost the acquired assets less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable intangible assets less liabilities is recorded as goodwill.

165.    Accordingly, the acquiring entity records the acquired assets (both tangible and identifiable intangible assets) and liabilities assumed at their respective fair values, and the difference between the cost of the acquired entity the respective fair values of the acquired assets and liabilities is recorded as goodwill.

166.    In its financial statements for the year ended December 31, 2001, divine disclosed:

> The Company accounts for its acquisitions of consolidated companies under the purchase method of accounting pursuant to SFAS No. 141, Business Combinations. Other intangible assets that are separable from goodwill and have determinable useful lives are valued separately and amortized over their useful lives. Goodwill represents mainly the excess of cost over net assets of acquired businesses that are consolidated. Goodwill and other identifiable intangible assets that do not have determinable useful lives and are not valued separately are not amortized pursuant to SFAS No. 142, Goodwill and Other Intangible Assets. Goodwill is reviewed for impairment on an ongoing basis. Other identifiable intangible assets consist mainly of developed technology and are generally amortized over two to four years.

---

[1] APB Opinion No. 16 has been superceded by FASB's Statement of Financial Accounting Standard ("SFAS") No. 141 for business combination after June 30, 2001. However, SFAS No. 141 carries forward, without reconsideration, the guidance in APB Opinion No. 16 (and certain of its amendments and interpretations) related to the application of the purchase method.

Prior to its adoption of SFAS No. 141 on July 1, 2001, the Company accounted for its acquisitions and the related amortization of goodwill and other intangible assets under Accounting Principles Board Opinion No. 16, Business Combinations (APB No. 16). Under APB No. 16, the Company amortized all of its goodwill and other intangible assets over two or three years. The Company continued to amortize, through December 31, 2001, its remaining goodwill and other intangible assets resulting from business combinations occurring prior to July 1, 2001.

167.    GAAP, in FASB's SFAS No. 142, which provides that goodwill is to be tested for impairment on an annual basis and whenever indicators of impairment arise. These indicators include an event or circumstance that would more likely-than-not reduce the fair value of a reporting unit below its carrying amount which is unlikely to reverse before the next annual test for impairment.[2]

168.    Pursuant to SFAS No, 142, goodwill is tested for impairment using a two-step approach. The first step is to make a comparison of the fair value of a reporting unit to its carrying amount, including goodwill. If the fair value of the reporting unit is greater than its carrying amount, goodwill is not considered impaired and the second step is not required. However, if the fair value of the reporting unit is less than its carrying amount, the second step of the impairment test must be performed to measure the amount of the impairment loss, if any. If the carrying amount of goodwill exceeds its implied fair value, an impairment loss is recognized equal to that excess.[3]

---

[2]    A reporting unit is generally a component of an enterprise that engages in business activities from which it may earn revenues and incur expenses (including revenues and expenses relating to transactions with other components of the same enterprise), whose operating results are regularly reviewed by the enterprise's chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance, and for which discrete financial information is available.

[3]    The implied fair value of goodwill is calculated in the same manner that goodwill is calculated in a business combination. In effect, the company must perform another "purchase" accounting computation each time it tests goodwill for impairment. The excess "purchase price" over the amounts assigned to assets and liabilities is the implied fair value of goodwill.

169.   divine's financial statements for the year ended December 31, 2001, also disclosed:

On a continuous basis, *but no less frequently than at the end of each quarterly reporting period*, the Company evaluates the carrying value for financial statement purposes of its goodwill and other intangible assets. The Company accounts for the impairment of goodwill and other intangible assets in relation to the operating performance and future undiscounted cash flows of the reporting units of the underlying businesses when indications of impairment are present. Such indications of impairment include, but are not limited to, the actual performance of reporting units compared with budgeted performance, layoffs within reporting units and associated facilities impairment charges, if applicable, and market trends.

170.   On November 7, 2002, divine held a conference call to discuss its September 30, 2002, earnings release.  During such conference call, defendant Cullinane stated:

As you are aware, with the new accounting literature all companies are looking at goodwill at least once a year.  We are doing the same.  We have $300 million in goodwill and other intangibles on our September 30, [2002] balance sheet and *based on what Devine's market CAP currently is, we would expect that significant amount of that would be written down in the fourth quarter*.  So, we wanted to give all of the people on the call a preview of that.

171.   *The Company's December 31, 2001, financial statements valued the asset it classified as goodwill and other intangible assets at $211.1 million when market valued the entire company including $104.5 million in cash at $271 million*.  Accordingly, *the market valued divine's non cash net assets at December 31, 2001, to be approximately $166.5 million or about $45 million less than divine's reported goodwill and other intangible assets alone.*

172.   Similarly, on or about March 27, 2002, when the Company filed such financial statements with the SEC, the market valued the entire company, including approximately $40 million in cash, at only $183.2 million.  Accordingly, *the market valued divine's non cash net assets at December 31, 2001, to be approximately $68 million less than divine's reported goodwill and other intangible assets alone.*

173.   These circumstances, which were the very same circumstances referred to by defendant Cullinane on the Company's November 7, 2002, conference call, indicated that divine's

goodwill and other intangible assets were impaired no later than December 31, 2001. Nonetheless, divine failed to record an impairment loss in the carrying value of these assets in its Class Period financial statements in violation of GAAP. In fact, *divine's September 30, 2002, financial statements improperly valued and reported the value of it goodwill and other intangible assets at $313.5 million even though by then the market value of the entire Company's non cash net assets at negative $4.2 million.*

174.    Ultimately the Company filed for relief under Chapter 11 of the Federal Bankruptcy Code.

175.    As a result, divine improperly overstated and failed to timely record an impairment in the value of its goodwill and other intangible assets in violation of GAAP during the Class Period. In so doing, divine failed to timely acknowledge that the cash flow it expected from certain of its acquisitions would not be realized.

(c)    **divine's Failure to Record and Disclose Contingent Liabilities and Risks and Uncertainties**

176.    GAAP requires that financial statements disclose contingencies when it is at least reasonably possible (e.g., a greater than slight chance) that a loss may have been incurred. SFAS No. 5, ¶ 10. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss, or state that such an estimate cannot be made. *Id.*

177.    The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. §210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, *except that* "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

{00004344.DOC ; 1}

178.    In addition, GAAP, in the AICPA's Statement of Position No. 94-6, requires that financial statements disclose significant risks and uncertainties associated with an entity's operations.  (SOP 94-6, ¶8)

179.    In further violation of GAAP, divine's March 31, 2002, financial statements failed to disclose the risks and uncertainties associated with growth-by-acquisition strategy including the Company's deteriorating financial condition which ultimately resulted in defendants' defrauding of RoweCom"s customers noted in detail above.

180.    In violation of GAAP, the Company's financial statements improperly failed to inform investors about the risks and uncertainties associated with its business.  As a result, investors were denied information that was essential to an informed investment decision in assessing divine's operations.

181.    As a result of the foregoing accounting improprieties, divine presented its financial results during the Class Period in a manner which violated numerous provisions of GAAP.  In addition to the accounting improprieties stated above, divine presented its financial statements during the Class Period in a manner which also violated at least the following provisions of GAAP:

(i)      The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶34);

(ii)     The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶40);

(iii)    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶50);

(iv)    The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42);

(v)    The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶58-59);

(vi)    The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶79);

(vii)    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97).

182.    The foregoing accounting improprieties caused divine to issue financial statements that materially falsified its financial performance to the detriment of unsuspecting investors.  In

failing to file financial statements with the SEC which conformed to the requirements of GAAP, divine defendants repeatedly disseminated financial statements of divine which were presumptively misleading and inaccurate.

183.    The Company's Class Period Forms 10-Q reports were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a materially adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

### Additional *Scienter* Allegations

184.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding divine, their control over, and/or receipt and/or modification of divine's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning divine, participated in the fraudulent scheme alleged herein.

185.    In addition, defendants were further motivated to engaged in the fraudulent scheme alleged herein in order to artificially inflate the value of divine common stock so that the Company could use that common stock as currency to make acquisitions.

{00004344.DOC ; 1}

## Undisclosed Adverse Information

186.    The market for divine's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, divine's common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired divine common stock relying upon the integrity of the market price of divine's common stock and market information relating to divine, and have been damaged thereby.

187.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of divine's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

188.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about divine's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of divine and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.

189.    Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

{00004344.DOC ; 1}

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

190.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    the defendants made misleading statements and material omissions during the Class Period;

(b)    divine securities traded on NASDAQ, which is in an efficient market;

(c)    As a regulated issuer, divine filed periodic public reports with the SEC and the Nasdaq;

(d)    stock analysts and the media covered divine and its business during the Class Period;

(e)    the misrepresentations and material omissions alleged in this Complaint would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(f)    Plaintiffs and the other Class members purchased their divine stock between the time the defendants made the misleading statements and material omissions and the time that the true facts were disclosed, without knowledge of the omitted facts.

191.    The market for divine's securities promptly digested current information regarding divine from all publicly available sources and reflected such information in divine's stock price. Under these circumstances, all purchasers of divine's securities during the Class Period suffered similar injury through their purchase of divine's securities at artificially inflated prices and a presumption of reliance applies.

192.    Based upon the following, plaintiffs and members of the Class are entitled to the presumption of reliance upon the integrity of the market.

## NO SAFE HARBOR

193.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of divine who knew that those statements were false when made.

194.    In addition, defendant's purported "risk disclosures" issued during the Class Period were not sufficiently detailed in that they merely warned of certain risks when, in truth and in fact, as detailed herein, those risks and other risks were then negatively impacting divine. Thus, defendants' purported risk disclosures did not constitute meaningful cautionary language.

## COUNT I

### By Plaintiff Tito against the Individual Defendants
### for Violations of Section 11 of The Securities Act

195.    Plaintiff Tito repeats and realleges ¶¶ 1-33, 146-183 and 193 as if fully set forth herein. This Count does not assert any allegations alleging fraud. This Count is asserted against the Individual Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of person or entities who exchanged their shares of eShare common stock for divine common stock

issued in connection with the merger and pursuant to the eShare Prospectus. This count does not sound in fraud.

196.    The eShare Prospectus and those documents and disclosures incorporated therein by reference, were materially false and misleading; contained untrue statements of material facts, omitted to state material facts necessary to make the statements made in the eShare Prospectus, under the circumstances in which they were made, not misleading; and/or failed to adequately disclose material facts. As detailed herein, the misrepresentations contained in, or the material facts omitted from, the eShare Prospectus included, but were not limited to the adverse facts detailed herein. This information was material to eShare shareholders considering how to vote on the merger, including whether the exchange ratio accurately reflected the value of divine common stock.

197.    The Individual Defendants were responsible for the contents of the eShare Prospectus and caused their filings with the SEC.

198.    The Individual Defendants signed the eShare Prospectus consented to being named therein as directors and/or officers of divine, and caused it to be prepared, filed with the SEC and circulated to shareholders of eShare.

199.    None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the eShare Prospectus, were true, were without omission of any material facts, and/or were not misleading.

200.    Plaintiff Tito and other members of the eShare SubClass each acquired divine common stock issued pursuant to the eShare Prospectus.

201.    At the time they acquired divine's common stock pursuant to the eShare Prospectus, neither Plaintiff Tito nor any member of the eShare SubClass who exchanged their eShare common

stock for divine common stock knew, or by the exercise of reasonable care could have known, of the facts concerning the material misstatements and/or omissions alleged herein.

202.    This action was brought within one year after the discovery of the untrue statements and/or omissions, and within three years after the divine common stock was acquired in connection with the merger.

203.    By reason of the foregoing, the Individual Defendants violated Section 11 of the Securities Act and are liable to Plaintiff Tito and the members of the eShare SubClass, each of whom has been damaged by reason of such violation.

## COUNT II

### By Plaintiff Hoover against the Individual Defendants
### for Violations of Section 11 of The Securities Act

204.    Plaintiff Hoover repeats and realleges ¶¶ 1-46, 146-183 and 193 as if fully set forth herein. This Count does not incorporate any allegations alleging fraud. This Count is asserted against the Individual Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of person or entities who exchanged their shares of Data Return common stock for divine common stock issued in connection with the merger and pursuant to the Data Return Prospectus. This count does not sound in fraud.

205.    The Data Return Prospectus and those documents and disclosures incorporated therein by reference, were materially false and misleading; contained untrue statements of material facts, omitted to state material facts necessary to make the statements made in the Data Return Prospectus, under the circumstances in which they were made, not misleading; and/or failed to adequately disclose material facts. As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Data Return Prospectus included, but were not limited to the adverse facts detailed herein. This information was material to Data Return shareholders considering how to

vote on the merger, including whether the exchange ratio accurately reflected the value of divine common stock.

206.    The Individual Defendants were responsible for the contents of the Data Return Prospectus and caused their filings with the SEC.

207.    The Individual Defendants signed the Data Return Prospectus consented to being named therein as directors and/or officers of divine, and caused it to be prepared, filed with the SEC and circulated to shareholders of Data Return.

208.    None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Data Return Prospectus, were true, were without omission of any material facts, and/or were not misleading.

209.    Plaintiff Hoover and other members of the Data Return SubClass each acquired divine common stock issued pursuant to the Data Return Prospectus.

210.    At the time they acquired divine's common stock pursuant to the Data Return Prospectus, neither Plaintiff Hoover nor any member of the Data Return SubClass who exchanged their Data Return common stock for divine common stock knew, or by the exercise of reasonable care could have known, of the facts concerning the material misstatements and/or omissions alleged herein.

211.    This action was brought within one year after the discovery of the untrue statements and/or omissions, and within three years after the divine common stock was acquired in connection with the merger.

212.    By reason of the foregoing, the Individual Defendants violated Section 11 of the Securities Act and are liable to Plaintiff Hoover and the members of the Data Return SubClass, each of whom has been damaged by reason of such violation.

## COUNT III

### By Plaintiff Diamantouros against the Individual Defendants
### for Violations of Section 11 of The Securities Act

213.    Plaintiff Diamantouros repeats and realleges ¶¶1- 106, 146-183 and 193 as if fully set forth herein.  This Count is asserted against the Individual Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of person or entities who exchanged their shares of Delano Technology common stock for divine common stock issued in connection with the merger and pursuant to the Delano Technology Prospectus.  This count does not sound in fraud.

214.    The Delano Technology Prospectus and those documents and disclosures incorporated therein by reference, were materially false and misleading; contained untrue statements of material facts, omitted to state material facts necessary to make the statements made in the Delano Technology Prospectus, under the circumstances in which they were made, not misleading; and/or failed to adequately disclose material facts. As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Delano Technology Prospectus included, but were not limited to the adverse facts detailed herein.  This information was material to Delano Technology shareholders considering how to vote on the merger, including whether the exchange ratio accurately reflected the value of divine common stock.

215.    The Individual Defendants were responsible for the contents of the Delano Technology Prospectus and caused their filings with the SEC.

216.     The Individual Defendants signed the Delano Technology Prospectus consented to being named therein as directors and/or officers of divine, and caused it to be prepared, filed with the SEC and circulated to shareholders of Delano Technology.

217.     None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Delano Technology Prospectus, were true, were without omission of any material facts, and/or were not misleading.

218.     Plaintiff Diamantouros and other members of the Delano Technology SubClass each acquired divine common stock issued pursuant to the Delano Technology Prospectus.

219.     At the time they acquired divine's common stock pursuant to the Delano Technology Prospectus, neither Plaintiff Diamantouros nor any member of the Delano Technology SubClass who exchanged their Delano Technology common stock for divine common stock knew, or by the exercise of reasonable care could have known, of the facts concerning the material misstatements and/or omissions alleged herein.

220.     This action was brought within one year after the discovery of the untrue statements and/or omissions, and within three years after the divine common stock was acquired in connection with the merger.

221.     By reason of the foregoing, the Individual Defendants violated Section 11 of the Securities Act and are liable to Plaintiff Diamantouros and the members of the Delano Technology SubClass, each of whom has been damaged by reason of such violation.

## COUNT IV

### Against the Individual Defendants for
### Violations of Section 15 Of The Securities Act

222.    Plaintiffs Tito, Hoover and Diamantouros repeat and reallege ¶¶ 1- 106, 146-183 and 193, as if fully set forth herein. This Count is brought against the Individual Defendants pursuant to Section 15 of the Securities Act on behalf of the SubClasses each of whom acquired divine common stock in connection with a merger with divine.

223.    Each of the Individual Defendants was a controlling person of the Company within the meaning of Section 15 of the Securities Act at the time of the mergers.

224.    None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the eShare Prospectus, Data Return Prospectus or Delano Technology Prospectus were true and devoid of any omissions of material facts. Therefore, by reason of their positions of control over divine, as alleged herein, each of the Individual Defendants is jointly and severally liable with, and to the same extent as, divine to Plaintiff and other members of the Class as a result of the wrongful conduct alleged herein.

## COUNT V

### For Violation of Section 10(b) of The Exchange Act and SEC Rule 10b-5

225.    Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein. This count is asserted against the Individual Defendants.

226.    This Count is asserted against all defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

227.    During the Class Period, defendants, singly and in concert, engaged in a common plan, scheme, and unlawful course of conduct which was intended to and, throughout the Class

Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of divine's securities; and (iii) cause plaintiff and other members of the Class to purchase divine securities during the Class Period at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

228.    By reason of the foregoing, the defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of divine securities during the Class Period.

229.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of divine as specified herein.

230.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings

so that the market price of the Company's securities would be based on truthful, complete and accurate information.

231.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors in divine securities concerning the value of divine, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company's business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of divine securities during the Class Period.

232.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

{00004344.DOC ; 1}

233.   The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing divine's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

234.   Throughout the Class Period, divine acted through the Individual Defendants, whom it portrayed and represented to the financial press and public as its valid representatives.   The willfulness, motive, knowledge, and recklessness of the Individual Defendants is therefore imputed to divine, which is primarily liable for the securities law violations of the Individual Defendants while acting in their official capacity as a Company representative, or, in the alternative, which is liable for the acts of the Individual Defendants under the doctrine of respondent superior.

235.   The information that the defendants disseminated to the investing public was materially false and misleading as set forth above, and the market price of divine securities was artificially inflated during the Class Period.   In ignorance of the duty to disclose the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, Plaintiffs and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing divine securities.   Had

Plaintiffs and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

236.    Plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

## COUNT VI

### For Violation of Section 20(a) of The Exchange Act

237.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.  This count is asserted against the Individual Defendants.

238.    The Individual Defendants, by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

239.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

240.    The Individual Defendants had the power and influence and exercised the same to cause divine to engage in the illegal conduct and practices complained of herein.

241.    By reason of the conduct alleged in Count V of this Complaint, the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of divine's and the Individual Defendants' wrongful conduct, defendants are liable for the aforesaid wrongful

conduct, and are liable to plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of divine securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the Class and SubClasses, pray for judgment as follows:

A. Declaring this action to be a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory and/or rescissory damages in favor of Plaintiffs and the other members of the Class against all of the defendants, jointly and severally, for the damages sustained as a result of the wrongdoings by the defendants, together with interest thereon;

C. Awarding Plaintiffs pre-judgment and post-judgment interest, as well as the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiff's attorneys and experts;

D. Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

DATED: March 8, 2005                    GILMAN AND PASTOR LLP

/s/ David Pastor
David Pastor (BBO #391000)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906
Tel.: 781/231-7850
Fax:  781/231-7840
*Liaison Counsel for Plaintiffs and the Class*

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
Samuel H. Rudman
David A. Rosenfeld
200 Broadhollow Road
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

STULL STULL & BRODY
Howard Longman
6 East 45th Street
New York, New York  10017
Telephone:  212/687-7230
212/490-2022 (fax)

*Lead Counsel for Plaintiffs and the Class*