IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHARON BOBBITT, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 04-12263-PBS |
| v. | ) ) | Judge Saris |
| ANDREW J. FILIPOWSKI and MICHAEL P. CULLINANE, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

Defendants, Andrew J. Filipowski and Michael P. Cullinane, by their counsel, and in support of their motion to dismiss plaintiffs' Second Consolidated Class Action Complaint For Violations Of The Federal Securities Law ("Amended Complaint"), state as follows:

## INTRODUCTION

This shareholder class action is precisely the type that the Private Securities Litigation Reform Act ("Reform Act") was intended to stop at the outset. "Risk is real" in the investment world, and must be assumed by many investors seeking the higher returns that accompany it. But often businesses fail and their investors lose money, and seldom fail because of fraud. This was particularly true for start-up technology companies, like divine, inc. ("Divine"), that sought to exploit the newly-evolving internet business sector in the late 1990's, only to succumb to the "bursting bubble" that consumed so technology companies in the early 2000's.

But plaintiffs' lawyers inevitably attempt to transform everyday business failures into securities fraud cases. To do so, they have to create a "fiction" in their pleadings that in no way resembles the real-world environment in which investments are made. Such lawyers plead snippets

of information out-of-context, string them together from disparate times and places, and attempt to impart materiality and reliance to non-material statements of optimism and puffery.

The Reform Act, in contrast, recognizes that the market absorbs full sentences, full paragraphs, full filings, and all other information that is otherwise prominently and publicly available.  And, the Reform Act mandates cases to be dismissed where, as here, the statements of optimism cited by plaintiffs were invariably surrounded by meaningful disclosures of the risks and dangers facing Divine.  Similarly, the Reform Act recognizes that many of the statements these plaintiffs string together in their pleading are vague statements of corporate positivism that no reasonable investor could rely upon in the face of the risks that were so clearly disclosed, and in light of Divine's actual financial results, which have never been restated.  And finally, the Reform Act requires plaintiffs to demonstrate that each of the alleged deceptive disclosures, and the ultimate disclosure of the alleged "truth," be somehow shown to have resulted in a loss of stock value -- which plaintiffs have nowhere attempted to plead, nor could they.

In the real world, as recognized by the Reform Act, the market assimilates the entirety of the available disclosures in context, and understands and absorbs meaningful cautionary statements made by public companies like Divine.  In this regard, the incontestable facts show that before and during the Class Period, Divine repeatedly and effectively warned the public in no uncertain terms of the many risks inherent in Divine's business strategy and its history of failing to meet its projections.  Among other things, Divine continually told the public that the company had never been profitable and might never be profitable.  Divine also cautioned investors that it might not be able to successfully integrate the businesses it acquired, that its financing opportunities were limited, that the demand for technology products was waning, and that the company might run out of cash before it ever reached profitability.  In light of such dire disclosures, no reasonable investor could have

missed the risks inherent in Divine's business, and failed to appreciate its very uncertain future.

Moreover, the available market data (that can be considered on this motion) vividly confirms the wisdom of the Reform Act. In face of Divine's actual disclosures – in context – the market was not deceived by the snippets of optimism and other vague statements plaintiffs string together. To the contrary, prior to the beginning of the Class period, the market had already steadily devalued Divine stock from $9.00 per share (shortly after its IPO in July 2000), to 80¢ per share. And during the ensuing class period (September 17, 2001 to Feb. 18, 2003) and in light of the in-context full disclosures, made by Divine, the market continued to steadily devalue Divine all the way down to 1.4¢ per share. Thus, based on the actual disclosures, read in context, the market had no difficulty discerning the problems with Divine, either before or during the Class Period: it had devalued its stock to virtually nothing. And significantly, plaintiffs' pleading deals with none of this.

Defendants highlighted these shortcomings in their original motions to dismiss. Implicitly conceding that their original complaint lacked merit under the Reform Act, plaintiffs sought leave to file the Amended Complaint. But the Amended Complaint does not cure any of the pleading deficiencies in the original complaint; it merely plagiarizes 40 paragraphs from a bankruptcy examiner action against the same defendants, none of which solve the inescapable flaws in their securities fraud theories. The complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

Plaintiffs are members of a putative class and subclasses of investors who acquired shares of Divine between September 17, 2001 and February 14, 2003 (the "Class Period"). Am. Cmplt. at ¶¶ 1, 143. Defendants are Andrew J. Filipowski, former Divine board chairman and Chief Executive Officer, and Michael P. Cullinane, former Divine director and Chief Financial Officer. Am. Cmplt. at ¶¶ 6-7.

Divine was founded in 1999. <u>Am. Cmplt.</u> at ¶ 16. Divine's initial business strategy was to purchase small start-up tech companies and act as an "incubator" for those companies with an equity investment in each of them. <u>Am. Cmplt.</u> at ¶ 17. Divine conducted an initial public offering in June of 2000. <u>Id.</u> As a result of the bursting of the "Internet bubble," Divine's stock declined from $9.00 per share to about $1.50 per share in February of 2001. *See* <u>Appendix</u> at Ex. 1.[1] In response to the bursting of the "Internet bubble," which led to an economic recession in the technology industry, Divine changed its business plan to adopt a new strategy that included acquiring businesses with complimentary products or services. <u>Am. Cmplt.</u> at ¶¶ 17-18.

Divine proceeded to carry out its growth strategy, acquiring at least 12 companies prior to the beginning of the Class Period. <u>Am. Cmplt.</u> at ¶ 21. Despite this progress, Divine's stock continued its downward trend, falling to 80 cents per share at the beginning of the Class Period. <u>Appendix</u> at Ex. 1.

During the first six months of the Class Period, Divine continued to carry out its growth strategy, purchasing several publicly-traded companies. <u>Am. Cmplt.</u> at ¶¶ 41, 44, 46. For example, Divine acquired RoweCom, a provider of knowledge resources, Open Market, a provider of content enterprise management and delivery application software, and eShare, a provider of customer interaction software. Yet Divine's stock value continued to decline. *See* <u>Appendix</u> at Ex. 1. In fact, Divine's stock price traded so low that in May of 2002 -- approximately the middle of the Class Period -- Divine conducted a 1-for-25 reverse stock split to avoid being de-listed on NASDAQ. <u>Am.</u>

---

[1] For the convenience of the Court, defendants have provided a chart illustrating the decline in Divine's stock value throughout the Class Period. *See* <u>Appendix to Defendants' Motion To Dismiss</u> ("Appendix") at Ex. 1. The Court may take judicial notice of stock prices in ruling on a motion to dismiss, without converting it to a motion for summary judgment. *See Guerra v. Teradyne Inc.*, No. 01-11789-NG, 2004 WL 1467065 *1, n.2 (D. Mass. Jan. 16, 2004); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (affirming district court's dismissal of complaint where court had taken judicial notice of stock prices, documents referred to in complaint, and SEC filings).

Cmplt. at ¶ 93.  Despite the reverse stock split, Divine's stock price dropped from 21 cents a share to 16 cents a share, as adjusted for the reverse split.[2] *See* Appendix at Ex. 1.

Following the reverse stock split, Divine acquired two more publicly-traded companies, Delano and Viant, which brought over $20 million in cash to Divine. *See* Am. Cmplt. at ¶¶ 111, 117. Divine also received a $61 million venture capital investment from Oak Investment Partners in July of 2002. Am. Cmplt. at ¶ 115.  The market continued to respond negatively to these transactions, however, causing Divine's stock to trade at just under 9 cents a share upon the closing of these transactions. *See* Appendix at Ex. 1.

On December 20, 2002, Divine announced that it was divesting itself of RoweCom. Am. Cmplt. at ¶ 133.  At the time of the announcement, Divine's shares were trading at 5 cents a share. *See* Appendix at Ex. 1.  On January 17, 2003, a newspaper reported that several libraries might not receive the periodicals they had ordered from RoweCom, and that Divine would not continue to financially support RoweCom. Am. Cmplt. at ¶ 136.  In response to this report, Divine stated that it used some of RoweCom's funds to fund Divine operations, but that $10 million more of Divine's money was used to fund RoweCom. Id.  Divine's stock price actually increased in response to this news. *See* Appendix at Ex. 1.  RoweCom eventually filed for bankruptcy on January 27, 2003.

On February 18, 2003, Divine announced that despite its efforts to increase revenues and reduce expenses, it was seeking alternative options, including bankruptcy protection. Am. Cmplt. at ¶ 141.  In response to that announcement, Divine's stock price fell from 1.4 cents to 0.5 cents per share. Am. Cmplt. at ¶ 142.[3]  Divine filed for bankruptcy one week later. Am. Cmplt. at ¶ 143.

---

[2] For the sake of uniformity, references herein to Divine's stock price after the reverse stock split are set forth on a pre-reverse split adjusted basis.

[3] On a post-reverse split adjusted basis, Divine's stock price fell to 12 cents. *See* Id.

## PLEADING STANDARDS

To state a viable claim under Section 11 of the Securities Act of 1933 ("Securities Act"), plaintiffs must properly allege that a prospectus contained "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *15 U.S.C. §77k(a)*. To state a cause of action under § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"),[4] plaintiffs must plead (1) that defendants made a false statement or omitted a material fact; (2) with the requisite scienter, (3) that plaintiffs relied on this statement; and (4) the statement or omission caused the plaintiffs' injury. *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996). "A misrepresented or omitted fact will be considered material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" *Id.*, 93 F.3d at 992 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232, 108 S. Ct. 978 (1988)).

Since a cause of action under § 10(b) and Rule 10b-5 of the Exchange Act sounds in fraud, it is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b). *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir.1997) (citations omitted). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed.R.Civ.P. 9(b)*. The particularity requirement of Rule 9(b) serves three primary purposes: "(1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit';[5] and (3) to safeguard defendants from frivolous charges which might damage their reputations." *New England*

---

[4] Under § 10(b) and Rule 10b-5 of the Exchange Act, it is unlawful for any person, directly or indirectly, to commit fraud in connection with the purchase or sale of securities. *15 U.S.C. § 78j*; *17 C.F.R. § 240.10b-5*.

[5] A strike suit occurs when "a plaintiff with a largely groundless claim [is able] to simply take up the time of a number of other people [by extensive discovery], with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant

*Data Servs., Inc. v. Becher*, 829 F.2d 286, 289 (1ˢᵗ Cir.1987). The First Circuit has been "especially strict in demanding adherence to Rule 9(b) in the securities context ... ." *Gross*, 93 F.3d at 991.

Rule 9(b) equally applies to claims under the Securities Act that sound in fraud. While allegations of fraud are not required to properly allege a Section 11 claim under the Securities Act, when such a claim is based upon a unified course of fraudulent conduct, the claim sounds in fraud and is therefore subject to the heightened pleading standards of Rule 9(b). *See Lucia v. Prospect Street High Income Portfolio, Inc.*, 769 F. Supp. 410, 417 (D. Mass. 1991) (applying Rule 9(b) to Securities Act claim); *Haft v. Eastland Financial Corp.*, 755 F. Supp. 1123, 1132-33 (D.R.I. 1991) (same).

To allege scienter adequately under the Reform Act, the complaint must, with respect to each allegedly fraudulent act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*. "A mere reasonable inference [of scienter] is insufficient to survive a motion to dismiss." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196-97 (1ˢᵗ Cir. 1999).

## **ARGUMENT**

Plaintiffs' complaint fails to state a claim for the following reasons:

1. Plaintiffs fail to demonstrate that an affirmative statement in any prospectus is false or misleading;

2. The Securities Act claims are barred by the statute of limitations;

3. Many of the statements at issue are protected by the Reform Act's safe harbor for forward-looking statements, or consist of non-actionable puffery;

4. Divine's financial statements were not false and misleading because all material information was disclosed;

5. Plaintiffs fail to adequately allege loss causation; and

6. The Exchange Act claims fail to plead particularized facts that give rise to a strong

---

evidence ... ." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S. Ct. 1917 (1975).

inference of scienter.

These reasons apply to both plaintiffs' Securities Act claims (Counts I-IV), and Exchange Act

claims (Counts V and VI), unless otherwise indicated below.

**I.    THE PROSPECTUSES AT ISSUE IN COUNTS I-IV DO NOT CONTAIN ANY UNTRUE OR MISLEADING STATEMENT OF MATERIAL FACT.**

    **A.    There Is Nothing Untrue Or Misleading About Divine's Statement Of Its Growth Strategy.**

Counts I-IV of the Complaint, brought under Sections 11 and 15[6] of the Securities Act,

primarily allege that the following statement of Divine's growth strategy in the eShare, Data Return

and Delano prospectuses was false and misleading:

*Our Growth Strategy*

Our objective is to become the leading provider of enterprise Web solutions … In order to achieve this objective, we have adopted the following key elements of our strategy:

•    *Become a recognized leader in advanced enterprise solutions* … By expanding our relationships with [our] customers, we can enhance our reputation and visibility and capitalize on cross-selling opportunities with their customers, suppliers, partners and distributors.

•    *Develop, acquire and integrate offerings and solutions.* We plan to focus on the development, acquisition and integration of components that can be combined to form a powerful set of services, technology and hosting capabilities …

•    *Target a specific customer base.* We plan to target customers whom we believe can benefit most readily from greater collaboration, more efficient workflow and better management of business relationships between their customers, employees, partners, suppliers, prospects and sources of information …

---

[6] Section 15 of the Securities Act states that "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." *15 U.S.C. §77o.* Where, as here, there is no predicate primary violation of the Securities Act under Section 11, there can be <u>no</u> secondary, "control-person" liability under Section 15. The same is also true with respect to Sections 10(b) and 20(a) of the Exchange Act.

- *Support and complement our solutions through alliances with business partners* … We believe that strategic alliances will enable us to improve our ability to attract and retain customers who prefer to deal with larger, more stable solutions providers, provide additional channels for our products, and enable us to build industry-specific solutions for our customers.

- *Position divine as a technology owner and solutions integrator.* We plan to differentiate divine from other solutions delivery organizations by positioning divine as a technology owner and solutions integrator. We intend to gain a strategic advantage by acquiring and developing innovative technologies and making these part of our broader solutions in order to leverage their full potential.

Am. Cmplt. at ¶ 30.[7] As set forth below, this statement can only be false or misleading if Divine had already abandoned this strategy and "had a different plan in mind" at the time this statement was made. *Fitzer v. Security Dynamics Technologies, Inc*., 119 F. Supp. 2d 12, 30 (D. Mass. 2000); *Van Ormer v. Aspen Technology, Inc.*, 145 F. Supp. 2d 101, 106 (D. Mass. 2000).

In *Fitzer*, a case factually analogous to the instant action, the defendants made statements in a prospectus about its future predictions for corporate growth, and its integration plans with a potential acquisition candidate. *Fitzer*, 119 F. Supp. 2d at 19. The plaintiffs in *Fitzer* alleged that the statements in the prospectus were false and misleading because (i) there was a decreasing demand for the company's products; (ii) the company was having problems integrating the companies it acquired; (iii) the company had poorly-trained sales personnel; and (iv) the company was artificially inflating its revenues. *Id.* at 19, 31. In granting the defendants' motion to dismiss, the *Fitzer* court held that the defendants' statements about the company's future strategy had absolutely nothing to do with its present condition:

The … statements identified by Fitzer consist of loosely optimistic descriptions of [the company's] plans for the integration of [the acquisition candidate]. They take no position on the present condition of that integration. It was not inaccurate for [the company] to represent that it planned to integrate the acquired companies' product lines, even if that integration met with initial difficulties. These statements could

---

[7] Counts V and VI, which plead securities fraud claims under the Exchange Act, similarly assert that Divine's statement of its growth strategy was false and misleading.

only be viewed as false if, at the time they were made, [the company] had totally abandoned the idea of integrating the companies and had a different plan in mind. These statements would not have been relied on by investors to determine the progress of the integration, but rather only to determine [the company's] intentions, which were precisely those expressed by the statements.

*Id*. at 30.

As in *Fitzer*, plaintiffs here allege that Divine's statement of its growth strategy was materially false and misleading because (i) demand for Divine's products was decreasing; (ii) Divine was having problems integrating its acquisitions; (iii) Divine had poorly-trained sales personnel; (iv) Divine was struggling to fund its operations; (v) Divine was experiencing an ever-increasing cash burn rate and additional real estate obligations with each acquisition; and (vi) Divine was artificially inflating its revenues. Am. Cmplt. at ¶¶ 31, 33, 45, 106. Plaintiffs further allege that this statement "created a duty to disclose the problems attendant to that strategy were then impacting the Company." *Id*. Like *Fitzer*, however, Divine's strategy said nothing about the *present* condition of Divine's integration, real estate obligations, sales training, cash flow or accounting practices. Moreover, this statement of Divine's strategy could not have been reasonably relied upon by plaintiffs to determine the *progress* that Divine had already made in implementing the strategy, but rather only to determine Divine's *intentions*, as expressed in the strategy itself. Indeed, the Amended Complaint acknowledges that Divine acted in a manner consistent with its strategy, acquiring 29 companies in a two-year period, including eShare, Delano and Data Return, the very companies that were the subjects of the prospectuses. *See* Am. Cmplt. at ¶¶ 35, 46, 111. Because there is nothing in the Amended Complaint indicating that Divine or defendants *ever* abandoned the company's growth strategy, there is nothing actionable about this statement.

**B.     Warnings About The Potential Effects Of Not-Yet-Completed Acquisitions Cannot Possibly Be Actionable.**

In addition to the statement of Divine's growth strategy, plaintiffs allege that the following statements in the eShare prospectus -- issued the same day as the RoweCom and Open Market prospectuses -- are false and misleading:

> Our overall performance and quarterly operating results may fluctuate and will be affected by the revenues generated from eshare's, Open Market's and RoweCom's products and services and will be affected by fluctuations in the sales of these products and services.
>
> *            *            *
>
> Because RoweCom's revenue flow is seasonal in nature, RoweCom periodically will have to rely on financing from divine or third parties to support its needs for working capital.  RoweCom has an established practice of paying publishers 30 to 60 days before receipt of its customers' funds.  Consequently, RoweCom anticipates making substantial additional expenditures in the fourth quarter of each year, while receiving the majority of its cash receipts relating to those purchases late in the first quarter of the following year.  Given these seasonal cash flow imbalances, if RoweCom has an unexpected demand for liquid capital, or does not have financing available on commercially reasonable terms, or at all, when needed, it could have a material adverse effect on our future results of operations and financial condition.

Am. Cmplt. at ¶ 33.  Specifically, plaintiffs allege that these statements are false and misleading because they "failed to disclose that at the very time that Defendants were warning that the Company's financial results might fluctuate the Company was then experiencing declining financial results and was not performing to internal expectations." Id.  In essence, plaintiffs allege that a company's warnings about the *future* effects of prospective acquisitions are false and misleading where they fail to disclose the *present* condition of the company.

As set forth in **Part I.A.** above, this Court has rejected similar contentions.  *See Fitzer*, 119 F. Supp. 2d at 30 (statements by a company about future cannot reasonably be relied on by investors to evaluate present condition of company).  Whether Divine was then experiencing declining financial results could not possibly have any effect on potential "fluctuations" in revenue -- whether

11

up or down -- that might result from future acquisitions. *See In re Boston Technology, Inc. Sec. Litig,* 8 F. Supp. 2d 43, 65 (D. Mass. 1998) (finding failure to state a claim where omitted information bore no inherent or logical relation to statement at issue). As such, these allegations, even if true, bear no logical relation to the truth or falsity of these statements, and therefore are non-actionable.

### C.    Prospectuses As a Whole Cannot Be False Or Misleading.

As an alternative to alleging that the aforementioned statements in the prospectuses are false and misleading, plaintiffs allege that the prospectuses *themselves* are misleading by virtue of certain alleged material omissions. A threshold requirement of a Section 11 claim, however, is the presence of an "affirmative statement" that is made misleading by the material omission. *In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525, 1538 (D. Mass. 1991); *see also, In re Alliance Pharmaceutical Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003); *Castlerock Management Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 323-24 (D. N.J. 2000). If a plaintiff fails to identify an affirmative statement in the prospectus that was made misleading by an alleged omission, no Section 11 Claim exists. *Bank of Boston*, 762 F. Supp. at 1538.

For example, in *Bank of Boston* the plaintiffs alleged that certain omissions by defendants materially altered "the general conservative picture" presented in a prospectus. *Bank of Boston*, 762 F. Supp. at 1538. Because the plaintiffs failed to identify a single statement in the prospectus that was made misleading by such non-disclosure, the *Bank of Boston* court rejected plaintiffs' claims under Section 11 of the Securities Act. *Id.*

Like the plaintiffs in *Bank of Boston*, plaintiffs here cannot allege that any picture painted by defendants in the prospectuses is false and misleading by virtue of certain alleged omissions. As expressly required by Section 11 of the Securities Act, plaintiffs must point to an *affirmative* statement in the prospectuses at issue. *15 U.S.C. §77k(a)*. Accordingly, any allegations by plaintiffs

that the prospectuses as a whole are misleading fail to state a claim.

## II.    COUNTS I-IV ARE BARRED BY THE STATUTE OF LIMITATIONS.

Even if plaintiffs sufficiently alleged that a statement in the prospectuses was false and misleading, which they did not, they failed to bring such claims in a timely manner.  Section 11 claims are subject to a one-year statute of limitations. *15 U.S.C. § 77m*.[8]  Following the receipt of sufficient "storm warnings" that indicate the possibility of wrongdoing, the limitations period starts to run when, exercising reasonable diligence, plaintiffs would have discovered the wrongful conduct. *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002); *Bamberg v. SG Cowen*, 236 F. Supp. 2d 79, 85 (D. Mass. 2002); s*ee also, In re Tyco Int'l, Ltd. Sec. Litig.*, 185 F. Supp. 2d 102, 115 (D. N.H. 2002). For example, a precipitous drop in stock price in the face of expressed optimism about the stock is an unmistakable message, or "storm warning," that puts investors on inquiry notice.  *See Young*, 305 F.3d at 13 n.9 (40% drop in stock price and NASDAQ de-listing were among factors putting plaintiffs on inquiry notice); *Tregenza v. Great Am. Comm. Co.*, 12 F.3d 717, 720 (7th Cir. 1993), *cert denied*, 511 U.S. 1085 (1994) (90% drop in stock price over a year, in the face of expressed optimism about the stock, put plaintiffs on inquiry notice); *KA Investments LDC v. Number Nine Visual Technology Corp.*, No. 00-10966-DPW, 2002 WL 31194865 at *9 (D. Mass. Aug. 26, 2002) (threatened NASDAQ de-listing among factors putting plaintiff on inquiry notice); *Reed v. Prudential Sec. Inc.*, 875 F. Supp. 1285, 1289 (S.D. Tex. 1995), *aff'd* 87 F.3d 1311 (5th Cir. 1996) ("courts throughout the United States have held that a sharp drop in the price of stock triggers an investor's duty to make diligent inquiry").  Once such storm warnings exist, plaintiffs must plead factual allegations demonstrating that they made a "reasonably diligent inquiry into the possibility of

---

[8] The Sarbanes-Oxley Act of 2002, which extended the applicable statute of limitations for certain securities fraud actions, does not apply to Section 11 claims. *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 440-44 (S.D.N.Y. 2003).

fraudulent activity." *Bamberg*, 236 F. Supp. 2d at 85, (quoting *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002)).

Plaintiffs were clearly on inquiry notice by May 23, 2002; not only had Divine's stock been in a continuous tailspin (losing over 70% of its value since the beginning of the Class Period), but Divine had just conducted a 1-for-25 reverse stock split to avoid being de-listed from NASDAQ. *See* Am. Cmplt. at ¶93.  Despite these "storm warnings," plaintiffs did not file a Section 11 claim until July 28, 2003 – <u>more than one year later</u> -- and then only filed one such claim relating to the eShare prospectus.[9]  The remaining two Section 11 claims, relating to Data Return and Delano, were not brought until plaintiffs filed their first consolidated complaint on December 11, 2003 – more than 18 months after those claims accrued.  Significantly, nowhere in the Amended Complaint do any of these subclasses of plaintiffs allege that they made a "diligent inquiry" of possible fraudulent activity following the precipitous stock drop/stock split.  Thus, because Counts I through IV[10] are time-barred, they must be dismissed.

### III.    THE STATEMENTS IN THE PROSPECTUSES AND EVERY OTHER FORWARD-LOOKING STATEMENT AT ISSUE ARE PROTECTED BY THE REFORM ACT'S SAFE HARBOR.

Codifying the judicially-recognized "bespeaks caution" doctrine, Congress enacted the "safe harbor" to allow directors and officers the freedom to state what they foresaw for the company, without fearing the threat of shareholder lawsuits if such predictions later turned out to be inaccurate. The safe harbor applies under both the Securities Act and the Exchange Act. *15 U.S.C. § 77z-2(c)(i)* (Securities Act); *15 U.S.C. § 78u-5(c)(i)* (Exchange Act).  The Reform Act defines forward-looking statements as including statements containing projections of revenues, income,

---

[9] On July 28, 2003, one of the current named plaintiffs, Mr. Tito, filed a Section 11 claim in Case No. 03 C 5194, which is one of the cases consolidated by Order of Judge Der-Yeghiayian of the Northern District of Illinois on August 19, 2003.

[10] Because Count IV, alleging controlling person liability under Section 15 of the Securities Act, is based

earnings per share, capital expenditures, dividends, capital structure or other financial items, including any statement of the assumptions underlying or relating to these predictions. *15 U.S.C. § 77z-2(i)(1)* (Securities Act); *15 U.S.C. § 78u-5(i)(1)* (Exchange Act).  Forward-looking statements also include management's plans and objectives for future operations, statements of future economic performance, and the underlying assumptions for such matters. *Id.*[11]

Under the safe harbor, a speaker is not liable, as a matter of law, for making a forward-looking statement if:

(1)    the statement is identified as a forward-looking statement and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; <u>or</u>

(2)    the forward-looking statement is immaterial; <u>or</u>

(3)    the plaintiffs fail to prove that the forward-looking statement was made with actual knowledge that it was false or misleading.

*15 U.S.C. § 77z-2(c)(1)(A)-(B)* (Securities Act)*; 15 U.S.C. § 78u-5(c)(1)(A)-(B)* (Exchange Act).  If <u>any</u> of these prongs is satisfied, the statement is not materially false or misleading as a matter of law. *Greebel*, 194 F.3d at 201.

In Counts I-VI of the Amended Complaint, plaintiffs complain of over a dozen forward-looking statements contained in Divine's press releases, prospectuses, quarterly reports, annual reports and investor conference calls, including the statements at issue in **Part I** above. *See, e.g.*, <u>Am. Cmplt</u>. at ¶¶ 30, 33, 36, 42, 45, 57, 76, 78, 88, 96, 102, 104, 106, 112, 114, 115, 118, 121, 128, 133; *see also*, <u>Appendix</u> at Ex. 2-24 (providing complete copies of the press releases, prospectuses, quarterly reports, annual reports and investor conference calls quoted from in the Amended

---

on plaintiffs' time-barred Section 11 claims in Counts I-III, it is also time-barred.

[11] Even statements in the present or past tense are considered forward-looking statements if the statement is verifiable only in the future. *See, e.g., Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) (whether company is "well positioned" is statement whose truth can only be known after seeing how company's future plays out).

Complaint).  What plaintiffs cannot avoid, however, is the fact that each of these statements is accompanied by meaningful cautionary language that immunizes each such statement from liability.

For example, plaintiffs allege that the following forward-looking statement in Divine's June 30, 2002 and September 30, 2002 10-Q's was false and misleading:

> Our operating plan **depends** on us achieving increases in revenue and cash receipts and decreases in expenses.  **We intend** to decrease our operating costs, primarily through workforce and payroll reductions, as we continue to integrate acquired companies into our operations.  Based on our [plan forecast], **we believe** that our existing unrestricted cash and cash equivalents, accounts receivable … and new cash generated from our customers **will be** sufficient to fund our operations and capital requirements.

Am. Cmplt. at ¶¶ 112, 128 (emphasis added to forward-looking language).  But plaintiffs conveniently omit the dire warnings that immediately followed this very statement:

> **There is a substantial risk, however, that our revenue and cash receipts will not grow at a sufficient rate, and that we will not be able to reduce our expenses to keep them in line with our revenue.  If we are unable to meet our revenue and expense management goals, we will need to significantly reduce our workforce, enter into business combinations, discontinue some or all of our operations, or take other restructuring actions.**  While we expect that these actions would result in a reduction of recurring costs, they also may result in a reduction of recurring revenues and cash receipts.  It is also likely that we would incur substantial non-recurring costs to implement one or more of these restructuring actions.
>
> **We are also exploring other alternatives to generate cash, including selling certain assets and obtaining funding through the issuance of new debt, and we may also explore additional equity financings.  We do not currently have in place any agreements to provide us any sources of these funds, and these sources of funds may not be available to us on favorable terms, if they are available to us at all.**

Appendix at Ex. 23, p. 28; *see also,* Memorandum at Ex. A, p. 26 (emphasis added).[12]  Plaintiffs further ignore the following cautionary language that Divine prominently displayed in these particular reports, and other reports Divine filed with the SEC:

---

[12] For the convenience of the Court, each and every statement at issue in the Amended Complaint, and any cautionary language accompanying these statements, are compiled in a chart attached as Ex. A to this Memorandum.

## SPECIAL NOTE ON FORWARD-LOOKING STATEMENTS

This report includes forward-looking statements that reflect our current expectations and projections about our future results, performance, prospects, and opportunities. We have tried to identify these forward-looking statements by using words such as "may," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate," and similar expressions. These forward-looking statements are based on information currently available to us and are subject to a number of risks, uncertainties, and other factors that could cause our actual results, performance, prospects, or opportunities to differ materially from those expressed in, or implied by, these forward-looking statements. These risks, uncertainties, and other factors include:

- our ability to become cash flow positive before we deplete our unrestricted cash reserves or become insolvent;

- our ability to maintain our Nasdaq National Market listing;

- our ability to sell our products and services to customers concerned about our long-term financial viability;

- our ability to execute our integrated Web-based software services, professional services, and managed services strategy;

- our ability to successfully implement our acquisition strategy, including our ability to integrate the operations, personnel, products, and technologies of, and address the risks associated with, acquired companies;

- our ability to develop enterprise Web software and services;

- our ability to expand our customer base and achieve and maintain profitability;

*   *   *

- our ability to efficiently manage our growing operations;

- changes in the market for Internet services and the economy in general …;

*   *   *

- the uncertainty of customer demand for enterprise Web software and services; and

- our ability to address the risks associated with international operations.

Other matters, including unanticipated events and conditions, also may cause our actual future results to differ materially from these forward-looking statements. We cannot assure you that our expectations will prove to be correct. In addition, all subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements mentioned above. You should not place undue reliance on these forward-looking statements. All of these forward-looking statements are based on our expectations as of the date of this report. We do not intend to update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise.

30562723

17

<u>Appendix</u> at Ex. 28, pp. 28-30; *see also,* Memorandum at <u>Ex. A</u>, p. 26.  With the exception of one press release,[13] similar cautionary warnings were given in each and every prospectus, press release, financial statement and investor conference call at issue in the Amended Complaint.  *See* Memorandum at <u>Ex. A</u>, generally.

In addition to these explicit warnings, Divine disclosed "risk factors" in its 2001 10-K and each and every prospectus at issue in the Amended Complaint.  For example, the risk factors in the RoweCom prospectus contained the following headings:

> divine has been in business for only two years, has little operating history and has a new business strategy that may continue to change, which makes it difficult to evaluate its business.
>
> \*          \*          \*
>
> We expect to incur losses for the foreseeable future, and we may never become profitable.
>
> \*          \*          \*
>
> Our overall performance and quarterly operating results may fluctuate and will be affected by the revenues generated from RoweCom's, eshare's and Open Market's products and services and RoweCom's need for additional capital.
>
> \*          \*          \*
>
> If we do not successfully implement our acquisition strategy or address the risks associated with the acquisitions, our growth and ability to compete may be impaired.
>
> \*          \*          \*
>
> Our success is dependent upon the market for Internet services, which, along with the general economy, is experiencing a downturn.
>
> \*          \*          \*
>
> If we cannot cross-sell the products and services of divine, RoweCom, eshare and Open Market to the other companies' customers, we will not achieve one of the expected benefits of the mergers.

<u>Appendix</u> Ex. 2, pp. 27-43.  These headings were followed by specific language that detailed the various risks that Divine faced in connection with its business plan and growth strategy. <u>Id.</u>; *see also,* Memorandum at <u>Ex. A</u>, pp. 2-7.

---

[13] This press release merely announced that Divine was named a "Rising Star" by Deloitte & Touche. <u>Am. Cmplt.</u> at ¶ 118.  For the reasons set forth in **Part IV** below, the statements made by Mr. Filipowski in

Contrary to the false impressions plaintiffs seek to create, Divine did not represent to the investing public that everything was positive, or that purchasing Divine shares was a risk-free investment. Quite the opposite, Divine explicitly warned the investing public that the company might never succeed. As set forth in the above disclosures, Divine warned investors that it might never become cash-flow positive, its growth strategy might fail, it might fail to integrate its acquisitions, and the market might react negatively to Divine's business plan. When coupled with these compelling disclosures, which plaintiffs take great pains to avoid, defendants' statements set forth in the Amended Complaint are non-actionable under the statutory safe harbor.[14]

## IV.    THE REMAINING STATEMENTS ARE IMMATERIAL STATEMENTS OF CORPORATE PUFFERY.

Stripping away the non-actionable forward-looking statements, plaintiffs are left only to allege that half a dozen statements of either present fact or opinion are false and materially misleading.[15] *See* Am. Cmplt. at ¶¶ 54, 86, 93, 98, 118; *see also,* Appendix, generally. As set forth below, these statements of "puffery" are immaterial as a matter of law. Statements of puffery represent rosy affirmations made by corporate managers that no reasonable investor would take seriously or deem important, and are therefore ignored by the market. *Fitzer*, 119 F. Supp. 2d at 23; *Orton v. Parametric Technology Corp.*, 344 F. Supp. 2d 290, 299-301 (D. Mass. 2004). Yet plaintiffs quote such vague statements of optimism as if the law rendered them actionable:

"Over the past year, divine has made a number of acquisitions and significantly

---

response to this award are non-actionable puffery.

[14] Because all of the statements at issue were identified as forward-looking and accompanied by meaningful cautionary language, that ends the inquiry for purposes of the "safe harbor" analysis. But even if it did not, for the reasons set forth in **Part VII**, *infra*, plaintiffs have not alleged facts that give rise to a "strong inference" that defendants had "actual knowledge" that any of the forward-looking statements were false or misleading. Accordingly, in the absence of allegations of "actual knowledge" of falsity, the forward-looking statements are also protected by the third prong of the statutory safe harbor provision. *See 15 U.S.C. § 78u-5(c)(1)(B).*

[15] To the extent that any of defendants' statements contain accurate reports of past facts, such reports are not actionable. *Boston Technology*, 8 F. Supp. 2d at 67.

rounded out its offering of products and services to *position* itself as a leader in the extended enterprise space.";

"divine is now *positioned* to deliver extended enterprise solutions to a diversified customer base exceeding 21,600 clients with a focus on Global 5000, high-growth middle market companies, academic and government organizations.";

"The acquisitions we made this year, as well as our ability to integrate the products, development teams, management and financial systems of the acquired companies *position* divine for achieving its profitability goal by the fourth quarter of 2002.";

"We are *committed* to reducing our cash burn and to achieving profitability by the fourth quarter…";

"We have made significant progress in executing our business plan during the past year, aggressively building out our extended enterprise offerings through organic growth and acquisitions while working diligently to eliminate excess costs as we *strive* to reach profitability by the end of the year.";

"divine continued to make *progress* during the second quarter toward our goal of achieving operating profitability by year-end, increasing top-line revenue, while controlling spending.";

"We at divine are very *proud* to be recognized among the fastest-growing technology companies in North America … ."  We identified early on the market need for solutions that help companies better interact and collaborate through their value chain, and *attribute* our rapid growth to our ability to acquire, interact and grow the leading technologies and services that enable Extended Enterprise solutions and serve our 20,000-plus customer base.  We *expect* to see growing demand for our solutions as companies embrace Extended Enterprise strategies that demonstrate a real impact on the bottom line.

<u>Am. Cmplt.</u> at ¶¶ 54, 86, 93, 98, 118 (emphasis added).  Courts in the First Circuit routinely reject these types of statements as mere puffery. *See*, *e.g*., *Orton*, 344 F. Supp. 2d at 301-2 (rejecting as puffery statements that company was "*position[ed]* . . . for long term growth;" and "Solid execution of our cost reduction programs . . . will *position* us for enhanced earnings potential . . .") (emphasis added); *Boston Technology*, 8 F. Supp. 2d at 68 (likewise finding the following statement immaterial puffery: "With our new product announcement . . . we have *positioned* the Company to participate in significantly broader market opportunities in the future.") (emphasis added); *see also, Van Ormer*, 145 F. Supp. 2d at 107 (finding immaterial a statement by defendant that "[w]e are very *pleased* with

our performance") (emphasis added); *In re Parametric Tech. Corp.*, 300 F. Supp. 2d 206, 218 (D.

Mass 2001) (rejecting statement of "***confidence***" in "the fundamental strength" of company's

business and its "***strong competitive position***" as immaterial) (emphasis added); *In re Peritus*

*Software Services, Inc.*, 52 F. Supp. 2d 211, 220 (D. Mass. 1999) (likewise rejecting statement that

management is "extremely ***proud*** of our success and our focus on near and long term opportunities

in the software evolution market place" as immaterial) (emphasis added).   Likewise, these

statements of puffery cannot form the basis of a securities fraud action.[16]

## V.    Divine's Financial Statements Are Not False Or Misleading Because It Disclosed All Material Information.

Plaintiffs claim that Divine's financial statements are false and misleading because they

violated Generally Accepted Accounting Principles (GAAP).   Specifically, plaintiffs allege that

Divine should have (1) reported revenues on a net basis, as opposed to a gross basis; (2) recorded

impaired goodwill in a more timely manner; and (3) recorded and disclosed contingent liabilities.

As set forth below, however, Divine's disclosure of all pertinent information belies any such

allegations.

Plaintiffs' allegation that Divine's reporting of revenues on a gross (rather than net) basis

violated GAAP is inadequate on its face.   An alleged deviation from GAAP is immaterial, and thus

not actionable as securities fraud, if the company's financial statements disclosed all of the

underlying information but characterized such information in a manner that did not comply with

GAAP. *See Vosgerichian v. Commodore Int'l*, 862 F. Supp. 1371, 1376-77 (E.D.Pa. 1994)

(dismissing claim after concluding that "no reasonable investor could have found any *mislabeling*

[of disclosed information] to be a material misrepresentation") (emphasis in original); *Chu v.*

---

[16] Many of the forward-looking statements addressed in **Part III** above are also non-actionable statement of puffery.  For the convenience of the Court, each and every statement of puffery in the Amended Complaint is

*Sabratek*, 100 F. Supp. 2d 827, 834 (N.D. Ill. 2000) ("A plaintiff cannot credibly claim to be misled by a company's attempt to hide negative information when that same information is publicly available… .").

In *Lessler v. Little*, 857 F.2d 866, 875 (1st Cir. 1988), *cert. denied*, 489 U.S. 1016 (1989), the plaintiff alleged that a proxy statement that characterized the relationship between an advisory company and the filing company as bona fide, rather than a "sham," was fraudulent. *Lessler*, 857 F.2d at 866. In rejecting plaintiff's claim, the First Circuit reasoned:

> The disclosure required by the [1934] Act is not a rite of confession or exercise in common law pleading. What is required is the disclosure of material objective factual matters.
>
> *            *            *
>
> Indeed, [plaintiff's] complaint, in which the central factual allegations are simply restatements of facts contained in the proxy statement, demonstrates that shareholders could 'see through' management's characterization of [the advisory company's] twenty percent interest as an investment advisory fee. [Plaintiff] has no grounds under the 1934 Act for complaining about management's choice of words.

*Id*. at 875-76 (citations omitted).

Plaintiffs' claims fail for the same reason. Even taking as true plaintiffs' allegation that Divine should have reported RoweCom's revenues on a "net" basis, rather than a "gross" basis, plaintiffs had all material and objective information necessary to determine whether they agreed with Divine's revenue characterization. Divine made the following disclosure in its 2001 annual report:

> In particular, we expect the revenues of RoweCom Inc., a provider of knowledge resources which we recently acquired, to represent a significant portion of our revenues because RoweCom historically has recognized as revenue its cost of the knowledge resource it sells plus the fee retained by RoweCom.

Am. Cmplt. at ¶ 155. Indeed, plaintiffs acknowledge that this statement leads a reasonable investor to conclude that RoweCom's revenues were being reported on a gross basis:

---

compiled in a chart attached as Ex. B to this Memorandum.

> "This statement …. indicates that throughout the Class Period, divine reported RoweCom's revenues on a 'gross' basis."

<u>Am. Cmplt.</u> at ¶ 156.  Similarly, an investor could determine RoweCom's "net" revenues from subscriptions, by subtracting expenses from gross revenues -- <u>a simple act of arithmetic</u>.  Both of those figures were disclosed in Divine's reports, so this calculation could easily have been done by any interested investor.  Where, as here, all material information is disclosed, there is no basis for claiming fraud from a GAAP violation.

Plaintiffs also allege that Divine failed to timely recognize the impairment of goodwill.  Plaintiffs acknowledge, however, that Divine fully apprised investors that it was going to take any writedown in goodwill at the end of the year:

> [W]ith the new accounting literature all companies are looking at goodwill at least once a year.  We are doing the same.  We have $300 million in goodwill and other intangibles on our September 30, [2002] balance sheet and based on what Devine's [sic.] market CAP currently is, we would expect that significant amount of that would be written down in the fourth quarter.  So, we wanted to give all of the people on the call a preview of that.

<u>Am. Cmplt.</u> at ¶ 170.  Again, any alleged failure to timely disclose a decline in goodwill could not have been material if all relevant information was available to the market; in this case the book value of goodwill and the market capitalization of the company.  Otherwise, any plaintiff could allege fraud based on a defendant's "timing" of impairment.  Indeed, "for every write-down, there is always someone who says the company should have acted sooner." *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 851-52 (N.D. Ill. 2003), citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir. 1990); *see also, Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 512 (S.D.N.Y. 2005) (claims of fraud dismissed with prejudice where only timing of a write-off was at issue).

Finally, plaintiffs' factually-devoid allegations that Divine fraudulently failed to "record and disclose contingent liabilities" fail to satisfy the stringent pleading requirements of the Reform Act

and Rule 9(b). Plaintiffs merely recite several accounting regulations, then conclude that Divine committed fraud, without presenting <u>one</u> fact to support this conclusion. Such conclusory allegations of GAAP violations do not even come close to meeting the requirement of specificity mandated by the Reform Act. *Orton,* 344 F. Supp. 2d at 305; *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 187, n.27 (D.R.I. 2003) ("Merely stating in conclusory fashion that a company's books are out of compliance with GAAP would not in itself demonstrate liability under section 10(b) or Rule 10b-5.") (citations omitted).

## VI.    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PLEAD LOSS CAUSATION.

A critical element of a securities claim is loss causation; *i.e.*, factual allegations indicating that defendants' alleged misrepresentations and omissions proximately "caused the loss" plaintiffs seek to recover. *15 U.S.C. § 78u-4(b)(4).* As noted by this Court, "loss causation is causation in the traditional 'proximate cause' sense -- that the allegedly unlawful conduct caused the economic harm." *In re Polaroid Corp. Sec. Litig.*, 134 F. Supp. 2d 176, 188 (D. Mass. 2001) (quotations omitted).[17]

In *Polaroid*, the plaintiffs alleged that the defendants' statements about positive sales were false and misleading because the company was engaging in improper revenue recognition practices. *Polaroid*, 134 F. Supp. 2d at 188. In their motion to dismiss, the defendants argued that plaintiffs failed to plead loss causation because the statement allegedly causing the company's stock price to decline did not speak to revenue recognition practices, but to flat sales and product obsolescence. *Id*. In dismissing the complaint, this Court held that because the alleged improper accounting practices never manifested themselves, the plaintiffs failed to adequately plead loss causation. *Id.* at 189.

---

[17] Loss causation is distinguishable from "transaction causation," which is analogous to "but for" causation and means "the violations in question caused the plaintiffs to engage in the transaction in question." *Id*.

The Amended Complaint fails for the same reason. Here, plaintiffs allege that Divine failed to disclose to them that the company was experiencing integration problems and cross-selling difficulties, that Divine was saddled with real estate obligations, that Divine was experiencing cash flow issues, that Divine was engaging in improper accounting practices, and that Divine was transferring cash from its wholly-owned subsidiary, RoweCom. Am. Cmplt. at ¶¶ 31, 37. But the following statement, which is alleged to have caused Divine's stock price to decline, is hardly a revelation of a previously undisclosed fact:

> On February 18, 2003, Divine announced that "despite efforts over the past several months to minimize operating expenses and various liabilities, its board of directors has determined that it must seek alternatives to protect the value and viability of its operations. As a result, divine has engaged Broadview International LLC as advisors to assist in exploring strategic options, which may include asset divestitures, comparable transactions, and/or the filing of a voluntary petition under Chapter 11 of the United States Bankruptcy Code."

Am. Cmplt. at ¶ 141. Indeed, this announcement confirmed that Divine had succumbed to the risks that the company previously disclosed to the investing public:

> There is a substantial risk … that our revenue and cash receipts will not grow at a sufficient rate, and that we will not be able to reduce our expenses to keep them in line with our revenue. If we are unable to meet our revenue and expense management goals, we will need to significantly reduce our workforce, enter into business combinations, discontinue some or all of our operations, or take other restructuring actions.

Appendix at Ex. 18 at p. 25 at Ex. 23 at p. 28; *see also,* Memorandum at Ex. A, pp. 23, 26. Because the disclosure in question does not speak to any previously-undisclosed facts, but instead speaks to fully-disclosed risks, plaintiffs cannot meet the Reform Act's pleading standards for loss causation, and therefore their Amended Complaint must be dismissed in its entirety.[18]

---

[18] Loss causation is not an element of a Section 11 claim under the Securities Act, but rather constitutes an affirmative defense to such a claim. However, where, as here, the absence of loss causation is apparent from the face of the complaint, such claims can be dismissed. *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2nd Cir. 1998).

## VII.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD SCIENTER.

The Reform Act also requires that plaintiffs, with respect to each allegedly fraudulent act or omission, state with particularity facts giving rise to a strong inference that the defendant acted with scienter; that is, the intent to defraud. *15 U.S.C. ¶ 78u-4(b)(2)*; *Polaroid*, 134 F. Supp. 2d at 184. "A mere reasonable inference [of scienter] is insufficient to survive a motion to dismiss." *Greebel*, 194 F.3d at 196.

In support of Counts V and VI, the plaintiffs attempt to create a strong inference of scienter by alleging that: (1) defendants were motivated to increase the value of Divine stock as "acquisition currency," Am. Cmplt. at ¶ 185; (2) the company's financials were in violation of GAAP, Am. Cmplt. at ¶¶ 146-183; (3) defendants knowingly misrepresented Divine's cash burn rate, Am. Cmplt. at ¶ 31; (4) defendants engaged in a scheme to defraud RoweCom customers, Am. Cmplt. at ¶¶ 68-74; and (5) other managers at Divine disagreed with Mr. Filipowski's business strategy. Am. Cmplt. at ¶¶ 28(a), 81-84, 90-92, 95, 107, 108, 126, 127.  As set forth below, these allegations do not plead scienter, and the facts in the Amended Complaint actually belie any such allegation.

### A.    "Acquisition Currency" Allegations Are Easily Disregarded.

Allegations that a defendant is motivated to artificially inflate the value of the company's stock for use in future acquisitions are "routinely rejected by the courts." *Leventhal v. Tow*, 48 F. Supp. 2d 104, 115 (D. Conn. 1999); *see also, In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 889-90 (S.D. Tex. 2002), *aff'd* 33 F.3d 854 (5th Cir. 2003) (dismissing case where alleged motive was "to inflate the price of [the company's] stock so that the company could use its stock as currency for acquisitions"); *Malin v. Ivax Corp.*, 17 F. Supp. 2d 1345, 1361 (S.D. Fla. 1998), *aff'd* 226 F.3d 647 (11th Cir. 2000).  So too should this Court disregard plaintiffs' "acquisition currency" allegations. *See* Am. Cmplt. at ¶ 185.

Also noteworthy is that, as plaintiffs acknowledge, rather than selling Divine stock, Mr. Filipowski continued to buy it and remained heavily invested in it -- thereby suffering perhaps the greatest loss of all plaintiffs. Am. Cmplt. at ¶ 59. Indeed, such facts belie any allegations of scienter. *See Maldonado v. Dominguez*, 137 F.3d 1, 12 n.9 (1st Cir. 1998) (noting that the defendant directors' and officers loss of their own money "undermines any inference of scienter"); *In re Northern Telecom Ltd. Sec. Litig*., 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) ("The absence of stock sales by insiders ... is inconsistent with an intent to defraud... .").

### B. There Is No Inference Of Scienter Where Divine Disclosed All Material Financial Information.

Plaintiffs' conclusory allegations that Divine violated GAAP similarly fail to raise any inference of scienter, much less a strong inference. In alleging scienter, plaintiffs do not state any factual allegations where Divine's auditors questioned Divine's accounting, or where defendants discussed manipulating its financials. Instead, plaintiffs merely allege in classic "fraud-by-hindsight" fashion that because Divine's financials could have been presented in a different manner, defendants must have intended to defraud investors. Such bare allegations fall short of the Reform Act's requirement that scienter be pleaded with particularity. *15 U.S.C. ¶ 78u-4(b)(2)*; *see also, Polaroid*, 134 F. Supp. 2d at 184. Moreover, as explained in more detail in **Part V** above, where the company discloses all material financial data, the intent to deceive is wanting. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424 (9th Cir. 1994), *cert. denied*, 516 U.S. 868, 516 U.S. 909 (1995) (inference of scienter is inconsistent with disclosure of the information). Because plaintiffs cannot complain about Divine's presentation of accurate and material financial data, their conclusory GAAP allegations are legally insufficient to create a strong inference of scienter.

### C. Concerns About Numbers That Prove To Be Accurate Do Not Demonstrate An Intent To Deceive.

One of the few changes from plaintiff's prior complaint is that it cites several e-mails from a complaint filed by Divine's bankruptcy examiner, ostensibly to support plaintiffs' allegation that defendants knowingly misled investors about Divine's cash flows. *See* <u>Am. Cmplt.</u> at ¶¶ 31, 39, 40, 47, 83, 90. Specifically, plaintiffs cite numerous emails in which COO Paul Humenansky informs Mr. Filipowski of his concerns about Divine's cash burn rate. What plaintiffs fail to allege, however, is that defendants falsified Divine's statement of cash flows in the 10-K and 10-Q reports and prospectuses released during the Class Period. Indeed, the e-mails do not even *suggest* the falsification of cash in the financials. These e-mails only present concerns about cash flows that never came to pass. There is nothing in these e-mails that raises <u>any</u> inference of an intend to defraud.

### D.    Allegations Of Mismanagement Do Not Establish Scienter.

Plaintiffs also graft from the Divine examiner's complaint numerous e-mails from Mr. Humenansky and other members of Divine management expressing disagreements about how Divine should operate. *See* <u>Am. Cmplt.</u> at ¶¶ 28(a), 80-84, 90-92, 95, 107, 108, 126, 127. The mere existence of a disagreement within a company about a business decision, however, does not establish scienter. *See In re Vertex Pharmaceuticals, Inc. Sec. Litig.*, No. 03-11852-PBS, 2005 WL 415911 at *11 (D. Mass. Feb. 18, 2005) (Saris, J.) (holding that disagreements by company management about the viability of a drug in development did not give rise to scienter). Moreover, even if these allegations of "mismanagement" were true, such allegations do not constitute a proper basis for a claim of securities fraud. *See Van Ormer*, 145 F. Supp. 2d at 106. Indeed, "poor management is a risk that every investor takes." *Fitzer*, 119 F. Supp. 2d at 31.

### E.    There Was Nothing Improper About Divine's Dealings With RoweCom, and Plaintiffs' Conclusory Allegations Fail To Suggest Otherwise.

Plaintiffs' allegations that defendants orchestrated a scheme to defraud RoweCom customers are completely devoid of factual support; they fail to tell the "who, what, where, when and why," as required by the Reform Act and Rule 9(b). Am. Cmplt. at ¶¶ 68–74; *see also 15 U.S.C. ¶ 78u-4(b)(2)*; *Fitzer*, 119 F. Supp. 2d at 35-6 (dismissing plaintiffs' conclusory and factually devoid allegations of improper accounting practices); *Orton*, 344 F. Supp. 2d at 305 (plaintiffs failed to provide who, when, where for claim that company was improperly recognizing revenue, thereby rendering claims non-actionable).  For this reason alone, they are insufficient to plead scienter.

Moreover, accounting practices are not presumed to be fraudulent simply because a plaintiff, without any factual support, alleges that they were used in an inappropriate manner.  In *Greebel*, the First Circuit addressed whether allegations that a company was engaged in "channel stuffing"[19] sufficed to raise a strong inference of scienter. *Greebel*, 194 F.3d at 202-203.  The plaintiffs alleged that defendants used channel stuffing to artificially inflate revenues in certain financial periods. *Id.* at 202.  The First Circuit concluded, however, that this theory, without supporting factual allegations, was insufficient to raise a strong inference of scienter, as there is nothing inherently improper about recognizing sales in an earlier period, and there are several legitimate reasons for a company to engage in such practices. *Id.* at 203.

Here, plaintiffs' allegations that defendants' improperly required prepayments for RoweCom subscriptions are equally insufficient to establish scienter.  There is nothing wrong with requiring customers to pay prior to receiving their product, and plaintiffs present no factual allegations -- as opposed to conclusions -- that suggest defendants had any improper motives in requiring such pre-payments.  Nor is transferring cash from Divine to RoweCom, or vice versa, improper where

---

[19] Channel stuffing is a practice in which a seller induces purchasers to accelerate their purchases at the end of a quarter expressly for the purpose of allowing the seller to recognize revenue in the current quarter, rather than future quarters.

Divine's and RoweCom's financials were reported on a consolidated basis. Indeed, such inter-company transactions were entirely irrelevant to how Divine reported cash on its consolidated financials. Plaintiffs conclusory allegations fail to suggest otherwise.

## CONCLUSION

"Only a fraction of financial deteriorations reflect fraud,"[20] and no such fraud exists here. Statements of optimism made by defendants during the class period were accompanied by voluminous and specific warnings that would give any reasonable investor great pause. Indeed, the continuous fall of Divine's stock price confirmed what the investing public already knew: an investment in Divine was risky. No matter how many times plaintiffs attempt to amend their pleadings, they will be unable to overcome these inescapable truths. For all the foregoing reasons, defendants Andrew J. Filipowski and Michael P. Cullinane respectfully request that the Court dismiss plaintiffs' complaint with prejudice.

---

[20] *In re Lotus Development Corp. Securities Litigation*, 875 F. Supp. 2d 48, 52 (D. Mass. 1995) (quotations omitted).

Dated: April 7, 2005                    Respectfully submitted,

                                        ANDREW J. FILIPOWSKI


                                        /s/ Bruce S. Sperling
                                        By One of His Attorneys

                                        MICHAEL P. CULLINANE


                                        /s/ Joseph Collins
                                        By One of His Attorneys

Bruce S. Sperling
Thomas D. Brooks
(Admitted *Pro Hac Vice*)
SPERLING & SLATER, P.C.
55 West Monroe, Suite 3200
Chicago, Illinois 60603
312-641-3200

Daniel J. Lyne
Halye A. Sugarman
HANIFY & KING
One Beacon Street
Boston, MA 02108
Tel.: (617) 423-0400

*Counsel for Defendant Andrew J. Filipowski*

Samuel B. Isaacson
Lawrence A. Wojcik
Joseph Collins
(Admitted *Pro Hac Vice*)
DLA PIPER RUDNICK GRAY CARY US LLP
203 North LaSalle Street
Suite 1800
Chicago, IL 60601
Tel.: (312)368-4000

*Counsel for Defendant Michael P. Cullinane*