UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHARON BOBBITT, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | No. 04-12263-PBS |
| Plaintiff, | ) ) | MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION |
| vs. | ) ) | TO DISMISS THE SECOND AMENDED CONSOLIDATED COMPLAINT |
| ANDREW J. FILIPOWSKI, et al., | ) ) | |
| Defendants. | ) ) ) | |

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................1

II.   STATEMENT OF FACTS .......................................................................2

III.  ARGUMENT ...........................................................................................5

    A.    STANDARDS ON A MOTION TO DISMISS.................................5

        1.    Legal Standards for Exchange Act Liability............................6

        2.    Legal Standards for Securities Act Liability............................6

    B.    THE COMPLAINT STATES A CLAIM UNDER THE EXCHANGE
        ACT...................................................................................................7

        1.    The Complaint Pleads Fraud with Particularity.........................7

            a.    Legal Standard ...............................................................7

            b.    The Complaint Specifies Each Statement Alleged to Be
                False and Misleading and the Reasons Why....................7

            c.    The Complaint Sufficiently Pleads Facts Giving Rise to a
                Strong Inference that Defendants Acted with Scienter...................9

                (1)    Conscious Disregard and Recklessness ...........................10

                    (i)    Defendants' Knowledge of divine's Dire
                          Financial Condition..................................................10

                    (ii)    RoweCom Allegations ..........................................13

                    (iii)    Defendants Deceived divine's Board and
                            Auditor ..................................................................14

                    (iv)    Generally Accepted Accounting Principles
                          ("GAAP") Violations.............................................14

                (2)    Motive and Opportunity.................................................16

         2.    Defendants' Statements Are Actionable...................................17

            a.    Defendants' Statements Concerning divine's Growth
                 Strategy and Financial Condition.....................................17

**Page**

b.     Defendants' GAAP Violations Are Actionable ............................21

c.     Defendants' False and Misleading Statements Are Not Protected by the PSLRA Safe Harbor Provision ..........................24

3.     Defendants' Statements Are Not Puffery ..................................27

C.     Plaintiffs Have Adequately Pled Loss Causation ..................................28

IV.     THE COMPLAINT STATES CLAIMS UNDER THE SECURITIES ACT ..................30

A.     The Complaint Adequately Alleges All of the Elements of a Securities Act Claim ..................................................................30

B.     The Securities Act Claims Are Not Barred by the Statute of Limitations ............30

C.     Rule 9(b) Does Not Apply to the Securities Act Claims .......................33

V.     CONCLUSION..................................................................................35

# TABLE OF AUTHORITIES

**Page**

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002)............................................................................7, 9, 15

*Burstyn v. Worldwide Xceed Group*,
  No. 01 Civ. 1125 (GEL), 2002 U.S. Dist. LEXIS 18555
  (S.D.N.Y. Sept. 30, 2002)............................................................................16

*Chalverus v. Pegasystems, Inc.*,
  59 F. Supp. 2d 226 (D. Mass. 1999)............................................................15

*Conley v. Gibson*,
  355 U.S. 41 (1957)........................................................................................5

*Cooperman v. Individual, Inc.*,
  171 F.3d 43 (1st Cir. 1999)...........................................................................5

*Crowell v. Ionics, Inc.*,
  343 F. Supp. 2d 1 (D. Mass. 2004)...........................................................16, 17

*Dura Pharmaceuticals, Inc. v. Broudo*,
  125 S. Ct. 1627 (2005).................................................................................28

*Eckstein v. Balcor Film Investors*,
  8 F.3d 1121 (7th Cir. 1993)..........................................................................27

*Fitzer v. Security Dynamics Technologies, Inc.*,
  119 F. Supp. 2d 12 (D. Mass. 2000)..........................................................19, 20

*Florida State Bd. Of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) ........................................................................22

*Friedberg v. Discreet Logic Inc.*,
  959 F. Supp. 42 (D. Mass. 1997)..................................................................9

*Fujisawa Pharm. Co. v. Kapoor*,
  115 F.3d 1332 (7th Cir. 1997) ......................................................................31

*Geffon v. Micrion Corp.*,
  249 F.3d 29 (1st Cir. 2001)...........................................................................9

*Gelfer v. Pegasystems, Inc.*,
  96 F. Supp. 2d 10 (D. Mass. 2000)...............................................................9

**Page**

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999) ........................................................................7, 9, 13, 14

*Gross v. Summa Four*,
  93 F.3d 987 (1st Cir. 1996) ............................................................................................6

*In re Adaptive Broadband Sec. Litig., No. C 01-1092 SS*,
  No. C 01-1092 SS, 2002 U.S. Dist. LEXIS 5887
  (N.D. Cal. Apr. 2, 2002) ..............................................................................................17

*In re Allaire Corp. Sec. Litig.*,
  224 F. Supp. 2d 319 (D. Mass. 2002) ...............................................................6, 19, 28

*In re American Holographic, Inc. Sec. Litig.*,
  93 F. Supp. 2d 424 (S.D.N.Y. 2000) ...........................................................................16

*In re Bank of Boston Corp. Sec. Litig.*,
  762 F. Supp. 1525 (D. Mass. 1991) .............................................................................21

*In re Cabletron Sys. Inc.*,
  311 F.3d 11 (1st Cir. 2002) ....................................................................................8, 22

*In re Complete Management*,
  153 F. Supp. 2d 314 (S.D.N.Y. 1999) .........................................................................16

*In re Cylink Sec. Litig.*,
  178 F. Supp. 2d 1077 (N.D. Cal. 2001) .......................................................................15

*In re Eaton Vance Corp. Sec. Litig.*,
  206 F. Supp. 2d 142 (D. Mass. 2002) ..........................................................................34

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  154 F. Supp. 2d 741 (S.D.N.Y. 2001) .........................................................................26

*In re Lernout & Hauspie Sec. Litig.*,
  208 F. Supp. 2d 74 (D. Mass. 2002) ..............................................................................9

*In re Northern Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) .........................................................................17

*In re Number Nine Visual Tech. Corp. Sec. Litig.*,
  51 F. Supp. 2d 1 (D. Mass. 1999) .................................................................20, 33, 34

**Page**

*In re Polaroid Corp. Sec. Litig.*,
  134 F. Supp. 2d 176 (D. Mass. 2001) ........................................................................29

*In re Raytheon Sec. Litig.*,
  157 F. Supp. 2d 131 (D. Mass. 2001) ........................................................................15

*In re Sears, Roebuck and Co. Sec. Litig.*,
  291 F. Supp. 2d 722 (N.D. Ill. 2003) ........................................................................12

*In re Transkaryotic Therapies, Inc. Sec. Litig.*,
  319 F. Supp. 2d 152 (D. Mass. 2004) ........................................................................30

*KA Investments LDC v. Number Nine Visual Technology Corp.*,
  No. 00-10966-DPW, 2002 WL 31194865
  (D. Mass. Aug. 26, 2002) ...............................................................................33, 34

*LaGrasta v. First Union Securities, Inc.*,
  2004 U.S. App. LEXIS 1427
  (11th Cir. Jan. 30, 2004) ........................................................................................33

*LaSalle v. Medco Research, Inc.*,
  54 F.3d 443 (7th Cir. 1995) ..............................................................................32, 33

*Lampf, Plvea, Lipkind, Prupis & Petigrow v. Gilbertson*,
  501 U.S. 350 (1991).................................................................................................31

*Lessler v. Little*,
  857 F.2d 866 (1st Cir. 1988)...............................................................................22, 23

*Lindelow v. Hill*,
  No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301
  N.D. Ill. July 20, 2001) ...............................................................................12, 24

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
  927 F. Supp. 1297 (C.D. Cal. 1996) ........................................................................15

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding
  Corp.*,
  320 F.3d 920 (9th Cir. 2003) ...................................................................................17

*Olkey v. Hyperion 1999 Term Trust*,
  98 F.3d 2 (2d Cir. 1996) ........................................................................................25

**Page**

*Orton v. Parametric Tech. Corp.*,
   344 F. Supp. 2d 290 (D. Mass. 2004) ..................................................................25

*Reed v. Prudential Sec. Inc.*,
   875 F. Supp. 1285 (S.D. Tex. 1995) ....................................................................33

*Roeder v. Alpha Indus., Inc.*,
   814 F.2d 22 (1st Cir. 1987) ...................................................................6, 18, 26

*Rosen v. Textron, Inc.*,
   321 F. Supp. 2d at 308, 320 (D.R.I. 2004) ........................................................27, 28

*Rothman v. Gregor*,
   220 F. 3d 81 (2d Cir. 2000) ...............................................................................16

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974) ...........................................................................................5

*Scritchfield v. Paolo*,
   274 F. Supp. 2d 163 (D.R.I. 2003) .....................................................................28

*Sekuk Global Enter. v. KVH Indus., Inc.*,
   C.A. No. 04-306ML, 2005 U.S. Dist LEXIS 16628
   (D.R.I. Aug. 11, 2005) ......................................................................................22

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ...........................................................6, 27, 30, 33

*Sirota v. Solitron Devices, Inc.*,
   673 F.2d 566 (2d Cir. 1982) .............................................................................16

*Stransky v. Cummins Engine Co.*,
   51 F.3d 1329 (7th Cir. 1995) .............................................................................24

*Summer v. Land & Leisure Inc.*,
   664 F.2d 965 (5th Cir. 1981), *cert. denied*, 458 U.S. 1106 (1982) .......................33

*Suna v. Bailey Corp.*,
   107 F.3d 64 (1st Cir. 1997) .................................................................................7

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*,
   05 Civ. 1898, 2005 U.S. Dist. LEXIS 19506
   (S.D.N.Y. Sept. 6, 2005) ....................................................................................33

**Page**

*Tregenza v. Great American Communications Company*,
 12 F.3d 717 (7th Cir. 1993) ..................................................................32, 33

*Van De Velde v. Coopers & Lybrand*,
 899 F. Supp. 731 (D. Mass. 1995)..............................................................15

*Van Ormer v. Aspen Technology, Inc.*,
 145 F. Supp. 2d 101 (D. Mass. 2000)..........................................................20

*Young v. Lepone*,
 305 F.3d 1 (1st Cir. 2002)....................................................................31, 33

### STATUTES

15 U.S.C.
 §77o .............................................................................................................6
 §78t(a)...........................................................................................................6
 §78u-4(b)(1)..................................................................................................7
 §77k(a)...........................................................................................................6

Fed. R. Civ. P. 9(b) ...................................................................... passim

Lead Plaintiffs James Tito and Frank Waddell ("Lead Plaintiffs"), and plaintiffs Jeffrey A. Hoover and Patricia Diamantouros (collectively with the Lead Plaintiffs, the "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss filed by defendants Andrew J. Filipowski and Michael P. Cullinane (collectively, the "Defendants").

## I.    PRELIMINARY STATEMENT

This is a federal securities class action brought on behalf of: (i) open market purchasers of Divine, Inc. ("divine" or the "Company") common stock between September 17, 2001 and February 14, 2003 (the "Class Period") alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; and (ii) investors who exchanged their shares of eshare Communications, Inc., Data Return Corporation or Delano Technology Corp. for shares of divine, alleging violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").  ¶¶8, 195-241.[1]

Defendants have now filed the obligatory defense motion to dismiss, which, in addition to attacking the plaintiffs' bar in general, asserts nothing more than canned arguments that fail to deal with the most damaging allegations of the Complaint.  Contrary to Defendants' protestations, the Complaint adequately states claims under the Securities Act and the Exchange Act and it is respectfully submitted that Defendants' motion to dismiss be denied in its entirety.

---

[1] References to "¶__" are to paragraphs of the Second Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), filed on March 8, 2005.  References to "Mem. at __" are to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint.

## II.    STATEMENT OF FACTS

divine was founded in 1999 as an Internet-holding company engaged in business-to-business e-commerce through a community of associated companies.   ¶16.   In February 2001, divine announced that it was refocusing its business in order to become a major player in the "extended enterprise space" – which the Company generally described as providing enterprise Web solutions. ¶18.  The Company then began a major acquisition campaign in which it acquired companies which presumably fit into the Company's strategy.  ¶¶20-22.  During fiscal years 2001 and 2002, divine completed more than 20 acquisitions and in virtually all instances it used its common stock as currency for such acquisitions.  ¶¶20-22.  This growth-by-acquisition strategy, and divine's ability to effectively integrate acquired businesses and cross-sell these products, is how divine attempted to attract investors to support its stock price.

As detailed in the Complaint, however, unbeknownst to investors, the Company's business strategy was in shambles.   ¶23. Additionally, Defendants never disclosed to investors the true purpose behind its acquisition strategy – to acquire companies which had cash to fund divine's operations, irrespective of the financial performance or prospects of those companies.  For example, toward the beginning of the Class Period, an internal Company communication stated that the acquisition of Data Return made no sense since, among other problems, it was historically losing $5 million per month (¶38), and  another communication stated that buying companies for their cash at "drill bit prices" to pay the Company's cash burn was "no different than paying one's credit card interest with another credit card."   ¶39.  On October 30, 2001, Jude Sullivan, divine's General Counsel, wrote a memo to defendants Filipowski and Cullinane and others stating "the cliff notes version is that RoweCom's [divine's subsidiary] financial position has deteriorated to a much worse position than any of us were aware of . . . ."  ¶32(f)(1).  Sullivan went on to say that the cash burn situation was much worse than anticipated and that RoweCom would need a $30 million capital

contribution "even before reaching the cash/flow management issues" that the business presented. ¶32(f)(3).

Just before divine's acquisition of Data Return, defendant Cullinane wrote to defendants Fillipowski, and Humanensky and Alex Walker, divine's Senior Vice-President in charge of Mergers and Acquistions: "68 million shares for a company running out of cash, losing $5 million a month historically and has lost a few key customers recently. What am I missing?" ¶38. Nonetheless, divine acquired 100% of Data Return without a peep to divine's public investors. *Id*.

Even thought Defendants were well aware of divine's weak financial position and need for cash, Defendants misrepresented divine's condition to investors. For example, on November 12, 2001, in announcing divine's 3rd quarter results, defendant Cullinane stated that "With $176 million cash and cash equivalents, at September 30, we believe we have adequate resources to fund divine and execute our business plan until we achieve our profitability target in the last half of 2002." ¶42. This statement was patently false because defendants knew that the Company was burning cash at an alarming rate and that projected cash flow projections were down to $60-90 million despite internal projections of revenue of $150 million and decreasing revenues. In fact, by January, 2002, Humanensky told defendant Fillipowski that "PSO"[2] revenues were going down EVERY week." ¶48. (emphasis in original memo).

Additionally, Defendants never disclosed to investors that its acquisition strategy was a failure. Indeed, the Complaint details the problems attendant to the Company's acquisition strategy based upon internal Company documents and the accounts of numerous former employees of divine. ¶¶24-29. Even from the start, top Company executives had a very pessimistic view of divine's

---

[2] Divine was divided into three segments: Divine Professional Services ("PSO"), Divine Software Services ("SSO"), and divine Managed Services ("DMS").

prospects in connection with its growth-by-acquisition strategy and the Company's financial position was in dire straits.  *See, e.g.*, ¶¶25-26.  These undisclosed adverse factors continued to materially erode divine's financial condition and eventually forced the Company to file for bankruptcy and liquidate its assets in an attempt to pay its debts.  ¶¶141, 143.

Even thought the Company was experiencing significant problems, Defendants touted the success of its strategy throughout the Class Period.  Specifically, Defendants failed to disclose that:

- despite representations about how divine's growing portfolio of products and expanding customer base would create cross-selling opportunities, divine's sales force was poorly trained, not provided with any meaningful training on new products and, therefore, unable to successfully cross-sell the Company's products.  Thus, the Company was not generating any meaningful cross-selling opportunities and one of the benefits the Company was supposedly generating as a result of its acquisitions was not being realized; ¶31

- the Company was also struggling to integrate the operations of the newly-acquired companies into its existing operations in an efficient and cost-effective manner.  These problems distracted divine management and further weakened the Company's ability to generate any meaningful synergies from its acquisitions; *Id.*

- Unbeknownst to investors, divine's growth-by-acquisition strategy was saddling the Company with ever-increasing real estate costs.  Given the declining state of the U.S. economy during the Class Period, the Company was experiencing increasing difficulty in ridding itself of these obligations by either selling properties or subletting leases; *Id.* and

- divine was engaging in improper accounting practices which further enabled Defendants to positively portray the Company and its prospects.  ¶¶31, 146-83.

Arguably, Defendants' worst offense, however, involved its RoweCom subsidiary, whose business was providing institutions, such as public libraries, with subscriptions to periodicals.[3]  *See*

---

[3] The benefit to RoweCom's customers of utilizing RoweCom's services was that a library might have hundreds or even thousands of subscriptions to different periodicals.  By using RoweCom, the library customer would only have to write one check to RoweCom who would then handle all of the dealings with the publishers.  RoweCom would require payment from the customer for the subscription and also charged the customer a variable service charge that was a percentage of the overall subscription.  RoweCom was then responsible for ensuring that the publisher received payment.  ¶69.

¶¶68-74.  In order to generate cash for divine's operations, Defendants orchestrated a scheme whereby RoweCom customers pre-paid for periodical subscriptions ostensibly because they would receive a discount from RoweCom for doing so.  In this regard, from April 2002 to November 2002, RoweCom collected more than $70 million.  Those monies, however, were not used by RoweCom to pay for periodical subscriptions, as RoweCom's customers expected and as RoweCom had traditionally done.  Instead, the monies were utilized by divine for its ongoing operations because divine was unable to secure other traditional means of financing.  Unfortunately, when the time came for RoweCom to pay publishers for the periodicals they had ordered, RoweCom did not have the funds and divine was unable to pay either.  Thus, in essence, divine used RoweCom to help it generate sorely-needed capital knowing or recklessly disregarding the fact that it would be unable to satisfy RoweCom's obligations to the publishers and its customers when the time came.  ¶74.

Finally, on February, 18, 2003, when divine announced that it was considering filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code, its stock price lost more than 65% of its value on extremely heavy trading volume.  ¶142.

## III.    ARGUMENT

### A.    STANDARDS ON A MOTION TO DISMISS

In considering Defendants' motion to dismiss, the Court must presume that the allegations of the Complaint are true, read the Complaint as a whole, and give Plaintiffs the benefit of every favorable inference that can be drawn from their allegations.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir. 1999).  Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), it is well-settled that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)

(footnote omitted); *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 234 (D. Mass. 2002).

### 1.     Legal Standards for Exchange Act Liability

To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must allege that, in connection with the purchase or sale of a security: (1) defendants made a materially false or misleading statement or omitted to state a fact necessary to make a statement not misleading; (2) with scienter; (3) upon which either plaintiff or the market relied; and (4) which proximately caused plaintiff's injuries. *Gross v. Summa Four*, 93 F.3d 987, 992 (1st Cir. 1996).

Under Section 20(a) of the Exchange Act, any person who "controls" someone who violated the Exchange Act is liable for the violation. *See* 15 U.S.C. §78t(a).

### 2.     Legal Standards for Securities Act Liability

The Complaint asserts claims under Sections 11, 12(a)(2) and 15 of the Securities Act.[4] To state a claim under Section 11 of the Securities Act, a plaintiff must allege that defendants made untrue statements of material fact or omitted material facts in a registration statement or prospectus. Section 11 imposes liability on the signers of a registration statement if the registration statement, "as of its effective date: (1) 'contained an untrue statement of material fact'; (2) 'omitted to state a material fact required to be stated therein'; or (3) omitted to state a material fact 'necessary to make the statements therein not misleading.'" *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1201, 1204 (1st Cir. 1996) (quoting the Securities Act 15 U.S.C. §77k(a)).

---

[4] Section 15 imposes derivative liability upon persons who "control" those liable under Section 11 or 12. *See* 15 U.S.C. §77o.

### B.    THE COMPLAINT STATES A CLAIM UNDER THE EXCHANGE ACT

#### 1.    The Complaint Pleads Fraud with Particularity

##### a.    Legal Standard

"In all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). The First Circuit has held that this rule requires "specification of the time, place, and content" of all of the defendants' alleged false representations. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999). In addition, the PSLRA provides that a §10(b) complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1). *Greebel*, 194 F.3d at 193 (The requirements of Rule 9(b) and the PSLRA do not differ from the requirements traditionally applied by the First Circuit.). *See also Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997) (Rule 9(b) requires that a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.") (citation omitted). Finally, plaintiffs must allege sufficient facts to show that the inferences of scienter "are both reasonable and strong." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002) (citation omitted).

##### b.    The Complaint Specifies Each Statement Alleged to Be False and Misleading and the Reasons Why

The Complaint sufficiently identifies the: (i) people involved with the wrongdoing and the speakers of the allegedly false and misleading statements – the Defendants (¶¶7, 26, 28, 30, 33, 42, 44-45, 54, 57, 61, 63, 68-74, 76, 78-79, 86, 88, 93, 96, 98, 101, 104, 112, 115, 118, 121, 128, and 133); and (ii) when (at varying points during the Class Period) and where (at the Company and in the Company's SEC filings and public statements) the wrongdoing and statements took place (¶¶26, 28,

30, 33, 42, 44-45, 54, 57, 61, 63, 68-74, 76, 78-79, 86, 88, 93, 96, 98, 101, 104, 112, 115, 118, 121, 128, and 133).

Furthermore, the allegations of the Complaint detail the statements that were materially misstated in divine's press releases, conference calls and SEC filings – the Company's true earnings, financial performance, growth prospects and net worth, all of which were manipulated through a fraudulent scheme designed to deceive investors into believing that divine's strategy of growth-by-acquisition was succeeding and that the Company was financially healthy. ¶¶30, 33, 36, 42-43, 45, 54, 57, 76, 78-79, 86, 88, 93, 96, 98, 101-102, 104, 106, 112, 115, 118, 121, 128, 131 and 133.

Similarly, the Complaint also alleges with particularity why the statements were misleading and how the fraud took place. Specifically, the Complaint details how, while making positive public statements about the Company's performance and future prospects, Defendants were in possession of information concerning the: (i) declining demand for the Company's products and services; (ii) increasing real estate obligations of the Company which increased with each acquisition; (iii) difficulties the Company was experiencing integrating the operations of the newly acquired companies; and (iv) Company's insufficient cash position. ¶¶28, 31, 38-39, 40, 47-48, 49, 55, 63, 77, 97, and 103. The Complaint also details the improper diversion of funds from RoweCom so that they could be used for divine's operating expenses as opposed to being used to pay for magazine subscriptions. ¶¶68-74. This is sufficient under Rule 9(b) and the PSLRA. *See In re Cabletron Sys. Inc.*, 311 F.3d 11, 33 (1st Cir. 2002) ("The fraud allegations advanced in this complaint, with their consistent details provided from at least half a dozen different sources . . . reinforce each other and suggest reliability of the information [in satisfaction of the PSLRA]"). Nothing more is required under Rule 9(b) and the PSLRA, especially before discovery has commenced. *Id.* (noting that a pre-discovery motion to dismiss should be scrutinized less stringently than a post-discovery motion).

c.     **The Complaint Sufficiently Pleads Facts Giving Rise to
a Strong Inference that Defendants Acted with Scienter**

It is well established in the First Circuit, that in the context of pleading a securities fraud claim, scienter may be established by allegations of knowing or reckless conduct. *Geffon v. Micrion Corp.,* 249 F.3d 29, 35-36 (1st Cir. 2001). Recklessness has been defined as "a highly unreasonable omission, involving not merely simple, or even excusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the Defendants or is so obvious the actor must have been aware of it." *Gelfer v. Pegasystems, Inc.,* 96 F. Supp. 2d 10, 13 (D. Mass. 2000). Further, although allegations of "motive and opportunity," standing alone, may be insufficient to support a showing of scienter, such allegations may be relevant and persuasive in meeting the "strong inference" standard. *Greebel*, 194 F.3d at 197. Therefore, Plaintiffs may combine various facts and circumstances demonstrating fraudulent intent to show a strong inference of scienter. *Aldridge*, 284 F.3d at 82.

The First Circuit has also noted that the "[i]nferences [of scienter] must be reasonable and strong – but not irrefutable [and] Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder." *Aldridge*, 284 F.3d at 82 (citing *Helwig v. Vencor*, 251 F.3d 540, 553 (6th Cir. 2001)). In this regard, in determining whether scienter can be inferred, courts are instructed not to look at each allegation in isolation, but to consider instead the totality of the circumstances. *See*, *e.g.*, *Friedberg v. Discreet Logic Inc.*, 959 F. Supp. 42, 50 (D. Mass. 1997) ("The plaintiff here alleges three specific facts that constitute circumstantial evidence of conscious misbehavior by defendants. When these facts are examined in the aggregate, they amount to a 'strong inference of scienter.'"). "Determining whether the complaint's allegations raise a strong inference of scienter requires a fact-specific approach, and the plaintiff is not bound to follow any precise pattern or method of establishing unlawful intent." *In re Lernout & Hauspie Sec. Litig.*, 208 F. Supp. 2d 74, 83 (D. Mass. 2002).

Here, the Complaint pleads specific facts demonstrating that Defendants knew, or recklessly disregarded, that the Company suffered from numerous and significant problems with its growth-by-acquisition strategy that were never disclosed to investors and that due to the Company's weak cash flow position, it perpetrated a fraud upon RoweCom's customers. These facts, supported by, *inter alia*, interview with former Company employees, internal Company documents and communications involving the Defendants, are alone sufficient to raise a strong inference of scienter. Thus, when the factual allegations concerning Defendants' motive to artificially inflate the Company's stock price to enable Defendants to employ their acquisition binge are taken in the aggregate with the allegations demonstrating Defendants' knowledge, Plaintiffs have more than adequately alleged facts giving rise to a strong inference of scienter.

### (1)    Conscious Disregard and Recklessness

The Complaint sets forth numerous allegations which, when considered in their totality, raise a strong inference of conscious disregard and recklessness, as follows:

### (i)    Defendants' Knowledge of divine's Dire Financial Condition

The Complaint contains specific factual allegations based upon internal Company documents and the accounts of former Company employees which show that Defendants understood the precarious nature of the affairs at divine. These facts raise a strong inference that Defendants had direct knowledge about the facts underlying Plaintiffs' allegations. The factual allegations in the Complaint create a strong inference that Defendants were aware that divine: (i) had a poorly trained sales staff which would be incapable of adequately "cross-selling" the products of acquired companies; (ii) was unable to successfully integrate its acquisitions; and (iii) was saddled with undisclosed debt as a result of its growth-by-acquisition strategy. ¶28.

Defendants were even warned, prior to the Class Period, about the problems at divine that would surface during the Class Period and cause Plaintiffs' losses when investors eventually learned

these facts.  For example, prior to the Class Period, a presentation to divine's board of directors described the situation at divine as follows: "The situation is simply put – ugly."  ¶25.  On February 15, 2001, Paul Humenansky ("Humenansky"), divine's President and Chief Operating Officer at that time, in an email to Defendants regarding his "Thoughts going forward" specifically warned Defendants about the problems with the growth-by-acquisition strategy which would eventually occur throughout the Class Period but which were not disclosed to investors.  ¶26.[5]

During the Class Period, on October 30, 2001, shortly before the RoweCom closing, Defendants received an email from Jude Sullivan, divine's General Counsel, which stated: "RoweCom's financial position has deteriorated to a much worse position than I believe any of us were aware of" and that "This balance sheet problem will generate an even worse cash flow problem at the end of the year."  ¶32(f).

Defendants also understood that there were serious problems with the Data Return acquisition.  ¶38.  For example, in connection with the Data Return acquisition, Defendant Cullinane wrote to Defendant Filipowski: "68 million [f***ing] shares for a company [Data Return] running out of cash, losing $5 million per month historically and has lost a few key customers recently. What am I missing?"  ¶38.  At the beginning of the Class Period, Humenansky wrote to Defendant Filipowski that he was "shocked at the state of the financial picture [of divine] going forward."  ¶39. On January 18, 2002, Humenansky wrote to Defendant Filipowski and stated: "We are running out

---

[5] Humenansky's email stated in part:

> I'm primarily concerned about three issues going forward: . . . 3). Too much, too fast. I'm concerned when I hear discussions concerning acquiring some of the companies on the list . . . because **we have no infrastructure, integration services, even HR services**, in place to handle a vast acquisition strategy.  **I don't have an "organization" to really help** with these companies **as they are acquired** and they will thrash without the right controls and support organization in place.

¶26.

of cash." ¶47.  On April 5, 2002, Ron Bienvenu, divine's Head of Enterprise Portals, stated in an email to Humenansky: "we have a bunch of loosely coupled products that are not any closer to being integrated than they were a year ago, all being run as mini-fiefdoms." ¶81.  The Complaint is replete with other detailed factual allegations demonstrating Defendants' knowledge during the Class Period of divine's precarious financial condition and problems with its growth-by-acquisition strategy.  *See, e.g.,* ¶¶26, 28, 32, 39, 40, 47-49, 66-67, 81-85, 91-92, 100, 107-109, 120, 125-127, and 135.

Defendants attempt to downplay the extremely damaging factual allegations showing the Defendants' direct knowledge of the problems at divine by characterizing them as a disagreement among management.  These were not simply disagreements about how divine's business should have been run.  Rather, they were facts which gave Defendants knowledge of the undisclosed problems at divine.

Furthermore, even without the recitations from internal document and emails sent to the Defendants documenting the problems at divine, since each of the Defendants were senior executive officers at divine, it can be presumed that they were aware of, *inter alia*, divine's poor financial condition, the failure of divine's growth-by-acquisition strategy, and the fraudulent conduct in connection with deceiving RoweCom's customers.  *See Allaire*, 224 F. Supp. at 330 (holding that it is reasonable to infer that senior executive officers of a company were informed of the performance of an important aspect of company's business).[6]

---

[6] *See In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 726-27 (N.D. Ill. 2003)(holding that plaintiffs had sufficiently alleged scienter with respect to Sears' credit practices because those practices were critical to Sears' business and "officers of a company can be assumed to know of facts critical to a business's core operations . . ."); *Lindelow v. Hill*, No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301, at *24 (N.D. Ill. July 20, 2001) ("[I]t is strongly inferential that every officer or director . . . either had the knowledge of the . . . [core project] . . . or, if not, that his failure to have such knowledge equated to reckless disregard.")

(ii)        **RoweCom Allegations**

The detailed allegations in the Complaint concerning the fraud perpetrated by the Company on RoweCom's customers also raise a strong inference of scienter.  As alleged in the Complaint, divine's financial condition had deteriorated to such an extent that Defendants embarked on a fraudulent scheme to cover up divine's poor financial condition by diverting funds that RoweCom had collected from its customers for magazine subscriptions to fund divine's operating expenses. ¶¶68-74.  In total, divine diverted at least $74 million from RoweCom to divine.  ¶73.

Defendants contend that the allegations concerning the fraud at RoweCom are insufficient to plead scienter.  First, Defendants assert that Plaintiffs have failed to satisfy the pleading standards set forth under Rule 9(b) and the PSLRA.  However, as discussed above, Plaintiffs have sufficiently alleged the "who, what, where, when and why" of the fraud at RoweCom.  Second, Defendants attempt to minimize the fraud perpetrated on RoweCom's customers.  Mem. at 29.  Contrary to Defendants' characterizations, divine fraudulently induced RoweCom's customers to prepay for its services so that divine could divert those funds from RoweCom to fund divine.  Ultimately, the fraud was revealed and RoweCom's customers did not get their subscriptions and were out millions of dollars.

Defendants' heavy reliance on *Greebel*, 194 F.3d at 185 is misplaced.  The First Circuit in *Greebel* concluded that "channel stuffing" allegations did not create a strong inference of scienter because it found there is nothing inherently improper with recognizing sales in an earlier period.  *Id.* at 203.  Here, in stark contrast, it was inherently improper for divine to fraudulent induce RoweCom's customers to fund divine's cash flow when those customers understood their money to be safe and used for their subscriptions.  Unlike *Greebel*, the Complaint alleges facts that Defendants perpetrated a fraud on RoweCom's customers.  For example, as alleged in the Complaint, divine determined that it would no longer support RoweCom or its subscription service but continued

collecting payments from RoweCom's customers. ¶137. RoweCom's customers, as well as divine's

shareholders, were totally unaware of RoweCom's and divine's precarious financial situations. It is

surprising that Defendants would attempt to compare the facts in *Greebel* to those before this Court.

In fact, divine's conduct was so reprehensible that a federal grand jury is investigating divine's

conduct in connection with RoweCom's customers. ¶145.

### (iii)    Defendants Deceived divine's Board and Auditor

The fact that Defendants deceived the Company's board of directors and the Company's

auditor also support finding a strong inference of scienter.[7] For example, in March 2002, defendant

Filipowski insisted on using inflated projections in a presentation to the Company's board of

directors and concealed the fact that he was considering substantial pay cuts across the board at

divine. ¶61. In addition to deceiving the Company's board, Defendants also attempted to deceive

the Company's own auditors in order to avoid a "Going Concern" qualification. ¶64. Defendants

even kept two sets of books in furtherance of their fraudulent scheme. ¶66.

### (iv)    Generally Accepted Accounting Principles ("GAAP") Violations

The significant violations of GAAP by the Company further support a strong inference of

scienter. The Complaint alleges that divine issued financial statements during the Class Period that

did not comply with GAAP, and that the Defendants participated in a series of manipulative

accounting practices that violated GAAP, creating a false impression of the value of divine's assets,

its profitability, and the continuing viability of the Company by: (i) improperly reporting gross

revenues for RoweCom even though the monies were simply being passed through to the publishers

---

[7] Defendants fail to address these allegations.

(¶¶149-62); (ii) failing to timely record a charge for impaired goodwill (¶¶163-75); and (iii) failing to record and disclose contingent liabilities and risks and uncertainties (¶¶176-83).

Courts in the First Circuit and elsewhere recognize that allegations demonstrating that defendants violated GAAP and their own corporate revenue recognition policies are probative of scienter. *See*, *e.g.*, *Aldridge*, 284 F.3d at 83 (allegations that defendants knowingly committed accounting violations, even in the absence of a restatement, supports strong inference of scienter); *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 148 (D. Mass. 2001) ("GAAP are intended to provide a reliable degree of predictability, and an application of GAAP that strays beyond the boundaries of reasonableness will provide evidence from which scienter can be inferred."); *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999) (GAAP violations combined with other circumstances, including company's violation of own revenue recognition policy, may raise a strong inference of scienter).[8]

Defendants assert that the GAAP violations do not support a strong inference of scienter because the Complaint does not contain allegations that Defendants admitted that they committed fraud or that divine's auditors questioned the Company's financial statements. Plaintiffs' pleading burden does not require the inclusion of those facts and requiring that a defendant admit to accounting fraud as a predicate for pleading a securities fraud claim is not supported by any precedent and would be absurd.

---

[8] S*ee also Van De Velde v. Coopers & Lybrand*, 899 F. Supp. 731, 735-37 (D. Mass. 1995) (finding auditor's knowledge that company violated its own internal policies sufficient to plead scienter); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) ("[T]he mere fact that the [financial] statements were restated at all supports . . . an inference [of scienter]."); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (GAAP violations "may be used to show [] scienter").

## (2)    Motive and Opportunity

In addition to the detailed factual allegations showing that Defendants had first hand knowledge of the materially false and misleading statements and material omissions alleged in the Complaint, Plaintiffs also demonstrate that Defendants were motivated to engage in the fraudulent scheme detailed in the Complaint in order to use the Company's artificially inflated stock to acquire numerous other companies during the Class Period.  ¶136.  Indeed, both immediately before and during the Class Period, divine made numerous acquisitions and in each instance paid for the acquisition with its stock.  ¶20.  For example, during 2001 alone, divine acquired 20 companies by issuing almost 234 million shares of divine common stock.  ¶22.  Allegations that Defendants used artificially inflated stock as consideration for acquisitions sufficiently allege motive in support of a strong inference of scienter.  *See Crowell v. Ionics, Inc.,* 343 F. Supp. 2d 1, 15-16 (D. Mass. 2004) (holding that "anything that benefits [the company defendants] in turn benefits [the individual defendants who were executives of the company]"); *Rothman v. Gregor,* 220 F. 3d 81, 93 (2d Cir. 2000) *citing In Re Time Warner Inc. Sec. Litig,* 9 F.3d 259, 270 (2d Cir. 1993) ("the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter."); *Burstyn v. Worldwide Xceed Group,* No. 01 Civ. 1125 (GEL), 2002 U.S. Dist. Lexis 18555 (S.D.N.Y. Sept. 30, 2002).[9]  Defendants' authorities to the contrary are inapposite as they do not

---

[9] S*ee also In re American Holographic, Inc. Sec. Litig.* 93 F. Supp. 2d 424, 425 (S.D.N.Y. 2000)(finding sufficient motive where defendants received concrete benefits from scheme to inflate price of its public offering, *i.e.,* to enhance its ability to raise cash under a credit facility agreement."); *In re Complete Management,* 153 F. Supp. 2d 314, 328 (S.D.N.Y. 1999) (Courts have found that although "a generalized desire to maintain a higher stock price will not rise to the level of motive . . . , artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement.") *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 & n.2 (2d Cir. 1982) (sufficient evidence to support jury finding of defendants' fraudulent intent to overstate inventory when strong stock price enabled company to make numerous acquisitions after five-for-one split).

involve the scope of the conduct alleged here as divine made numerous acquisitions during the Class

Period and the acquisition campaign was central to the Company's business and could not continue

if the Company could not use its stock as currency.

Accordingly, it is respectfully submitted that, the Complaint's motive allegations further

contribute to a strong inference of scienter.[10]

### 2.    Defendants' Statements Are Actionable

#### a.    Defendants' Statements Concerning divine's Growth Strategy and Financial Condition

Throughout the Class Period, divine touted its prospects to investors as being based upon its

growth strategy of acquiring other companies and successfully integrating those companies and their

technologies into divine.  divine's appeal to investors was not simply a specific product, but rather

divine's ability to successfully integrate other companies.  Thus, divine's product was its growth-by-

acquisition strategy.  However, as alleged in the Complaint, divine's growth-by-acquisition strategy

was a failure for a host of reasons, rendering statements made by Defendants in the eShare, Data

Return and Delano prospectuses, Company's SEC filings, and on conference calls materially false

and misleading.

---

[10] Defendants' contention that the Complaint fails to allege scienter because there are no allegations that the Individual Defendants sold any of their personally-held divine stock is wrong.  Indeed, the absence of insider trading does not negate a finding of scienter when other unrelated scienter allegations exist.  *See Crowell,* 343 F.Supp.2d  at 15 ("The absence of insider trading does not weaken a case for scienter."); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misrepresentations did not sell stock during the Class Period . . . lack of stock sales by a defendant is not dispositive as to scienter."); *In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SS,  2002 U.S. Dist. LEXIS 5887, at *48-49 (N.D. Cal. Apr. 2, 2002) ("when Plaintiffs relied on the misstated revenues and purchased stock at inflated prices, the fact that Defendants did not sell their own stock matters little.").  Moreover, Defendants' reliance on *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) is misplaced because the court in *Northern Telecom* was deciding a motion for summary judgment and therefore was able to evaluate the evidence before it.

As detailed in the Complaint, and described above, the eShare, Data Return and Delano prospectuses touted divine's growth strategy and contained materially false and misleading statements and omitted material facts. ¶¶30-31. The RoweCom prospectus also contained these statements. Defendants, however, contend that those statements were not materially false and misleading because the Complaint does not allege that divine abandoned the growth-by-acquisition strategy described in the Prospectuses. Mem. at 9.

Defendants miss the point. The issue is not that divine was not following its stated strategy but that the statements about that strategy were materially false and misleading because the strategy was an utter and complete failure and was destroying the Company's financial condition. Defendants spoke about divine's growth-by-acquisition strategy so Defendants had a duty to be truthful and accurate about its failure. *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) ("a voluntary disclosure of information that a reasonable investor would consider material must be complete and accurate.").

Defendants made false and misleading statements on conference calls as well. On a conference call with analysts on May 1, 2002, defendant Filipowski told investors, "I think the revenues as well as the cash position is identical to what we have forecasted." ¶88. However, a communication from defendant Humenansky to defendant Filipowski just prior to that conference call stated that the Company was not meeting its cash flow projections and was having to divert funds from RoweCom in order to help pay expenses. ¶89. On the same day as the conference call, an internal memo entitled "Major Concerns" from Humenansky to defendant Filipowski discussed the implosion of divine's highly touted consulting arm, divine Professional Services, and Humenansky wrote: "I feel the company is in a tailspin, and we need to make major changes." ¶90. On May 18, 2002, Humenansky again wrote to defendant Filipowski, saying, "I do think we are at the point where it's going to be hard to get out of this mess." ¶91. A few days later, on May 23,

2002, divine issued a press release which stated in part, "We have made significant progress in executing our business plan during the past year."  ¶93.

The Complaint cites numerous other examples of false and misleading statements. Defendants, however, in an effort to have the case dismissed, only reference those statements that could possibly be viewed as the most favorable to them and ignore the most incriminating statements.

Defendants rely heavily upon *Fitzer v. Security Dynamics Technologies, Inc.*, 119 F. Supp. 2d 12, 30 (D. Mass. 2000).  *Fitzer*, however, is distinguishable from the action before this Court. While *Fitzer* might have concerned allegations concerning defendant Security Dynamics' acquisition of and integration of DynaSoft, the statements alleged false and misleading by Plaintiffs were very different from those presented here.  Importantly, unlike divine, Security Dynamics' business strategy was not entirely dependent upon its acquisition and integration of other companies.  Here, investors were attracted to divine primarily because of its proffered ability to acquire and integrate other companies.

Additionally, the statements concerning acquisitions in *Fitzer* were "loosely optimistic descriptions of Security Dynamics' plans for integration" and did not take a "position on the present condition of that integration." *Fitzer*, 119 F. Supp. 2d at 30.  Here, divine's statements were precise statements that touched upon divine's business performance and competitive advantages.  For example, divine stated, "[b]y expanding our relationships with . . . customers, we can . . . *capitalize on cross-selling* opportunities . . . ."  ¶30 (emphasis added).  This is a precise statement as to the basis for profit growth at divine, which due to known integration problems and other issues described in the Complaint, could not have been believed by defendants.  *See Allaire*, 224 F. Supp. 2d at 332 (holding that a precise statement as to the basis for profit growth is actionable).

Additionally, in *Fitzer*, plaintiffs claimed that statements made early in the financial reporting period indicated the company was in good health, while the facts at the end of the period showed the company was not. 119 F. Supp. 2d at 20. The Court in *Fitzer* held that this was "fraud by hindsight" and was inactionable because it was entirely possible that the decline occurred after the statements were made. *Id*. Here, the Complaint alleges *internally known* facts which show that divine's business was suffering significant undisclosed problems at the time Defendants made positive statements about divine's business.[11]

Statements in the eShare, Data Return and Delano prospectuses concerning divine's position as a technology owner and solutions integrator are also actionable because it was represented that divine "intended to gain a strategic advantage by acquiring and developing innovative technologies." ¶30.[12] Since Defendants were claiming a strategic advantage over competitors based upon its ability to effectively integrate other companies and technologies, Defendants were under a duty to disclose the problems that existed at that time concerning its inability to integrate its myriad of acquisitions. *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 18 (D. Mass. 1999) (holding that company which compares itself to competitors must fully disclose facts concerning that comparison).

The eShare prospectus also contained other materially false and misleading statements. For example, although the eShare prospectus warned that the Company's financial results might

---

[11] Defendants also cite *Van Ormer v. Aspen Technology, Inc.*, 145 F. Supp. 2d 101, 106 (D. Mass. 2000) which is inapposite. The court in *Van Ormer* found that plaintiffs failed to allege any factual support for the defendant's alleged acquisition problems and according to the court, "they certainly [did] not raise a strong inference that defendants knew of such problems." Here, Plaintiffs have alleged many facts showing problems with divine's growth-by-acquisition strategy and as discussed herein, raised a strong inference of scienter.

[12] To the extent these statements are brought under the Securities Act, they do not require a showing of scienter to be actionable.

fluctuate, it did not disclose that at that very time the Company was experiencing declining financial results and was not performing up to internal expectations. ¶33. Defendants assert that these statements in the eShare prospectus are warnings about the future of the Company so facts about the current position of the Company are of no consequence. Mem. at 11-12. Contrary to Defendants' assertion, the current condition of divine was material in order to enable an investor to fully appreciate the viability of the Company going forward and the risks inherent in the Company's fluctuation of financial results.

Defendants also assert that the Complaint fails to allege statements that were rendered misleading by material omissions of fact and rely on *In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525 (D. Mass. 1991). Mem. at 12. This argument ignores the detailed allegations of the Complaint. *Bank of Boston*, which was a holding on a motion for class certification, stands for the unremarkable proposition that in order to have an actionable omission, such omission must render statements in a registration statement misleading. *Bank of Boston*, 762 F. Supp. at 1538 ("Plaintiffs . . . cannot identify a single statement in either the Registration Statement or the Prospectus that became misleading as a result of the Bank's failure to disclose certain financial information.") Additionally, the court in *Bank of Boston* found that "any alleged omissions occurred after the documents had been used." *Id.* Here, Plaintiffs have identified numerous statements that were misleading as a result of divine's material omissions and such omissions concerned facts known prior to and at the time of the use of the registration statements and prospectuses. *See* e.g. ¶¶30, 33, 36, 42-43, 45, 54, 57, 76, 78-79, 86, 88, 93, 96, 98, 101-102, 104, 106, 112, 115, 118, 121, 128, 131 and 133.

### b.    Defendants' GAAP Violations Are Actionable

In connection with their fraudulent scheme, Defendants misrepresented their financial statements in violation of GAAP. *See* ¶¶146-83. Defendants violated GAAP by: (i) improperly

reporting gross revenues for RoweCom even though the monies were simply being passed through to the publishers; (ii) failing to timely record a charge for impaired goodwill; and (iii) failing to record and disclose contingent liabilities and risks and uncertainties.

"The First Circuit indicated that GAAP violations resulting from 'systematic fraud . . . that extends to completely fictitious sales' are sufficient to establish liability under Section 10(b)." *Sekuk Global Enter. v. KVH Indus., Inc.*, C.A. No. 04-306ML, 2005 U.S. Dist LEXIS 16628 (D.R.I. Aug. 11, 2005) quoting *Cabletron*, 311 F.3d at 35. Defendants GAAP violations resulted from a systematic fraud and are actionable. A reasonable investor would have deemed the GAAP violations material, as "[a]ccurate earnings figures are vital aspects of the 'total mix of information' which investors would consult when evaluating [divine's] stock." *Cabletron*, 311 F.3d at 35 (internal quotations omitted).

First, divine, in violation of GAAP, improperly reported RoweCom's revenue on a gross basis when it should have recorded it on a net basis. ¶156. Defendants assert that even though divine improperly reported RoweCom's revenues, those statements are not actionable because "any interested investor" could have determined RoweCom's net revenues through a "simple act of arithmetic." Mem. at 23. As a preliminary matter, Defendants' assertion that one could have easily determined RoweCom's net revenues does not make it so. Divine's financial statements did not contain this information so at a minimum there is a clear issue of fact unsuitable for resolution at this stage of the litigation. *See Florida State Bd. Of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) (proper application of an accounting rule is a factual inquiry which is not proper for determination upon a motion to dismiss). The simple fact is that divine's financial statements contained information that violated GAAP, resulting in a significant inflation of divine's revenues.

Defendants cite *Lessler v. Little*, 857 F.2d 866, 875 (1st Cir. 1988) for the proposition that as long as information is disclosed in some section of the financial statements, even if it is the wrong

section, it cannot be considered a material deviation from GAAP.  In *Lessler*, the plaintiffs complained that a statement describing an agreement was materially false because of the way that Defendants worded a description.  *Lessler*, 857 F.2d at 874-75 ("Lessler is, in essence, complaining about the wording and editorial presentation of the proxy statement, not its substance.  Under established case law, this claim must fail.")  Here, by contrast, the Complaint alleges that Defendants' financial statements were materially false and misleading in violation of GAAP because divine improperly reported RoweCom's sales on a gross basis, even though the monies were being passed directly through to the publishers.  Thus, the statements here were contained in the Company's financial statements and such financial statements were required to be prepared in accordance with GAAP.  The statement in *Lessler* was not required to be prepared in accordance with any specific accounting rules or regulations such as GAAP.

Defendants' contention that the financial statements also included the Company's gross expenses and therefore "all of the underlying information" was disclosed is untenable because Defendants placed great emphasis on the Company's increasing revenues and specifically emphasized that increasing revenues were demonstrative of the Company's growth.  Moreover, unlike in *Lessler*, here there were no detailed explanations provided about how the gross revenues reported by RoweCom were not in fact indicative of RoweCom's performance.

Divine also overstated and failed to timely record impairment in the value of its goodwill and other intangible assets in violation of GAAP during the Class Period.  ¶175.  Again, Defendants attempt to minimize divine's materially false statements and assert that even if the Company improperly reported goodwill, that information was not material because, according to Defendants, the Company's true goodwill was an easy calculation based upon publicly available information.  Once again, Defendants present an issue of fact not appropriate to be resolved at this stage of the

litigation. divine's financial statements violated GAAP because divine overstated its goodwill by a material amount and failed to timely record an impairment in its value.

Finally, Defendants contend that the Complaint fails to sufficiently allege that divine fraudulently failed to record and disclose contingent liabilities and risks and uncertainties and refer to Plaintiffs' allegations as conclusory. Mem. at 73. However, as discussed herein, Plaintiffs have satisfied the pleading requirement and alleged facts with the necessary specificity by, *inter alia*, alleging that divine failed to disclose the risks and uncertainties associated with its growth-by-acquisition strategy, and deteriorating financial condition, which ultimately resulted in Defendants' defrauding of RoweCom's customers. ¶179.[13]

### c. Defendants' False and Misleading Statements Are Not Protected by the PSLRA Safe Harbor Provision

Defendants assert that certain alleged materially false and misleading statements are forward-looking and protected by the PSLRA's statutory safe harbor by so-called "meaningful cautionary language" and "risk disclosures." To the extent that the Court deems some of the statements to be forward-looking, it is respectfully submitted that these statements are actionable and that they are alleged to be materially false and misleading because Defendants lacked a reasonable basis for their beliefs.[14] Furthermore, nothing in Defendants' supposedly cautionary language advised investors that the Company was engaged in fraud, and therefore, the statements are not protected by the PSLRA's safe harbor.

---

[13] This section of the Complaint also references other detailed allegations contained in the Complaint in support thereof. ¶179.

[14] *See Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 (7th Cir. 1995)("a projection can lead to liability under Rule 10b-5 only if it was not made in good faith or was made without a reasonable basis."). *See also Sutton v. Bernard*, No. 00 C 6676, 2001 U.S. Dist. LEXIS 11610, at 11 (N.D. Ill. Aug. 6, 2001) ("Forward-looking statements are actionable where the person making the statement did not make the statement in good faith or had no reasonable basis for making it.").

Defendants go to great lengths to list the "cautionary" statements contained in the various prospectuses and other Company statements. Regardless of how many statements Defendants cite, the irrefutable fact is that those disclosures did not adequately warn investors of the true extent of the risks of investing in divine. Furthermore, the boilerplate "risk disclosures" proffered by defendants failed to adequately warn the marketplace of the risks inherent in Defendants' fraudulent scheme. *Orton v. Parametric Tech. Corp.*, 344 F. Supp. 2d 290, 304 (D. Mass. 2004) ("In this instance, the Purchasers allege conduct apart from the usual 'risks and uncertainties' that come with predictions about future performance.")

Moreover, to the extent divine provided so called cautionary statements or "risk disclosures," they were not specific and related only to things that could *possibly* happen, while the Complaint alleges problems and events that had *already* occurred. *Shaw*, 82 F.3d at 53-55. The omitted and misrepresented facts existed at the time of Defendants' statements and Defendants "cautionary" language did not precisely address the substance of the alleged misrepresentations or omissions and did not "warn investors of exactly the risk that plaintiffs claim was not disclosed." *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 5 (2d Cir. 1996). For example, each of the Prospectuses warned, "If we do not successfully implement our acquisition strategy or address the risks associated with the acquisition, our growth and ability to compete may be impaired." Mem. at Ex. A, p.6. However, Defendants did not warn investors that at the time they made those statements, divine was *already* not successfully implementing its acquisition strategy and that divine executives anticipated this to continue.

As alleged in the Complaint, the eShare prospectus discussed the potential for divine's financial performance to fluctuate. ¶33. Defendants assert that this statement is not actionable because it only deals with the future and therefore the current status of the Company is irrelevant. Since Defendants chose to speak about the potential for negative financial performance, they were

under a duty to speak fully and truthfully. *Roeder*, 814 F.2d at 26. By failing to disclose the true financial condition of the Company at the time of that statement, Defendants did not afford investors with facts to fully appreciate divine's financial condition and the risks that divine would not perform well in the future. *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 760 (S.D.N.Y. 2001)(held that securities laws "certainly require disclosure of information that would permit an investor to appreciate the risk that the future sanction may arise.").

Defendants argue that because the various prospectuses warned investors that "we expect to incur losses for the foreseeable future, and we may never become profitable" and "[i]f we do not successfully implement our acquisition strategy or address the risks associated with the acquisitions, our growth and ability to compete may be impaired," investors were somehow warned that the prospectuses included materially misstated financial statements. Mem. at 18 Plaintiffs' allegations implicate a number of adverse facts the prospectuses failed to disclose, including the inability of divine to integrate or cross-sell the products of acquired companies, which clearly fall outside of the scope of Defendants' boilerplate warnings about future events that have not yet occurred but may occur in the future.

For example, Plaintiffs allege that Defendants' frequent positive statements about RoweCom were rendered materially misleading because of what was occurring at divine **while** the statements were being made. Thus, statements such as "RoweCom has an established practice of paying publishers 30 to 60 days before receipt of its customer's funds . . ." (¶33) are misleading because RoweCom was not following the practices it claimed it followed and could not make these payments because it was using the money collected from its libraries for operating expenses. ¶32 (a-b). Also, statements such as ". . . we expect the revenues of RoweCom . . . to represent a significant portion of our revenues because RoweCom historically has recognized as revenue its cost of the knowledge resource it sells plus the fee retained by RoweCom" are materially misleading not because it is

forward-looking but because revenues from RoweCom's libraries were **at that time** being recorded and reported improperly and not in compliance with GAAP.  ¶76.  *Shaw*, 82 F.3d at 1194. *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993) ("A prospectus stating a risk that such thing could happen is a far cry from one stating that this had happened. The former does not put an investor on notice of the latter.").

### 3. Defendants' Statements Are Not Puffery

Defendants also argue that certain of the alleged misrepresentations are statements of "puffery" and immaterial as a matter of law.  Mem at 19.  First, since the "puffery" argument looks to the materiality of statements, it is a factual matter that is not suitable to be addressed on a motion to dismiss.  *Shaw,* 82 F.3d at 1217 ("disputes over the materiality of allegedly false or misleading statements must be reserved for the trier of fact").  Second, Defendants also reference portions of statements and ignore other statements in their Memorandum.  For example, while Defendants reference statements alleged to be false and misleading in ¶54, they ignore that Plaintiffs alleged that it was false and misleading for defendant Cullinane to state that the Company had a "strong balance sheet" when divine's cash position was weakening and internally divine management believed that the Company would run out of cash by April 2002.  ¶55.  As such, defendant Cullinane lacked a reasonable basis for his statement characterizing divine's balance sheet as "strong."[15]

---

[15] Defendants assert that certain phrases in alleged false and misleading statements are not actionable since other cases may have found that those specific phrases in other specific cases were not actionable.  *See* Mem. 20-21; Mem. Exhibit B.  Contrary to Defendants' contention, this is not simply a black and white issue because statements must be read in their context.  *Rosen v. Textron, Inc.*, 321 F. Supp. 2d at 308, 320 (D.R.I. 2004) (In dictum, recognizing that even though the First Circuit in *Shaw* found that the phrase "on track" was not actionable in *Shaw*, the same phrase "on track" may have been materially misleading in *Rosen* had plaintiffs sufficiently alleged defendant had knowledge of the problems with its product (which plaintiffs had not done) since that phrase referred to a specific product of substantial financial importance to the company.)  Here, many of Defendants' materially false and misleading statements concerned divine's growth-by-acquisition strategy which was of substantial financial importance to divine.

In any event, even the statements referenced by Defendants in their Memorandum go beyond the vague and optimistic pronouncements of a company's well-being that may characterize corporate puffery. *See Rosen*, 321 F. Supp. 2d at 320; *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175 (D.R.I. 2003) ("The representation that LOA was the 'premier provider of high-speed DSL services in the Northeast corridor,' as it was described in a . . . press release . . . is much more than mere puffery: it is a statement of LOA's present status and capabilities . . . .")  For example, the statement: "the acquisitions we made this year, as well as our ability to integrate the products, development teams, management and financial systems of the acquired companies position divine for achieving its profitability goal . . ." is not puffery but was materially false and misleading because it was false – the Company was unable to integrate its acquisitions, its products, management or development teams.  ¶55.  Here, the statements alleged to be false and misleading are specific and sufficiently material that an investor would rely on them in deciding whether to purchase divine stock.  ¶¶30, 33, 36, 42-43, 45, 54, 57, 76, 78-79, 86, 88, 93, 96, 98, 101-102, 104, 106, 112, 115, 118, 121, 128, 131 and 133.  Defendants other puffery arguments fail for similar reasons as well.

## C.    Plaintiffs Have Adequately Pled Loss Causation

Plaintiffs need only overcome a "minimal burden" to satisfy the pleading requirements for loss causation. *Allaire*, 224 F. Supp. 2d at 339 ("[S]cienter requires a 'strong showing'" [of facts] . . . . "Loss causation, however, does not.")  "Loss causation describes the existence of a causal connection between the misrepresentation made by the defendant and the loss suffered by the plaintiff."  *Sekuk Global Enters.*, 2005 U.S. Dist. LEXIS 16628, at *17, *citing Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005).  Plaintiffs, at this stage of the proceedings, need only express "a short and plain statement of the claim showing that [they are] entitled to relief." *Dura*, 125 S. Ct. at 1631.  Plaintiffs clearly satisfy that standard here, as Plaintiffs allege that the price of divine's common stock was artificially inflated by Defendants'

misrepresentations and that the price of divine's stock declined when the truth about Defendants' fraud had been revealed to the market, including the problems at RoweCom and the Company's announcement of its financial problems.  ¶¶89-94.

On February 18, 2003, divine announced that it was experiencing severe financial difficulties and that it may seek bankruptcy protection.  ¶141.  divine's stock price declined more than 65% on very heavy volume on February 18, 2003 in response to this news.  The statements causing the decline in divine's stock price were directly related to the fraudulent conduct alleged in the Complaint.  It was because of the undisclosed problems at divine in connection with, *inter alia*, divine's growth-by-acquisition strategy, which existed during the Class Period, that divine was ultimately forced to seek bankruptcy protection.  Thus, Plaintiffs have sufficiently alleged loss causation.

Defendants assert that Plaintiffs have failed to allege loss causation because, according to Defendants, the disclosures which caused divine's stock to drop at the end of the Class Period were already disclosed to the market through the Company's risk disclosures.  As discussed herein, Defendants' cautionary statements and risk disclosures did not sufficiently warn investors about Defendants' fraud.  Furthermore, Defendants' lone case, *In re Polaroid Corp. Sec. Litig.*, 134 F. Supp. 2d 176, 188 (D. Mass. 2001), is inapposite.  In *Polaroid*, the court found that the plaintiffs failed to sufficiently allege loss causation because the alleged misrepresentation concerned a GAAP violation that corrected itself during the Class Period.  As such, the court found that the plaintiffs did not allege that the GAAP violation manifested itself when the truth was disclosed and therefore failed to sufficiently allege loss causation.  Here, the fraud alleged in the Complaint did not correct

itself during the Class Period.  In fact, the reason that divine failed as a viable business and filed for bankruptcy protection is directly related to the fraud alleged in the Complaint.[16]

## IV.    THE COMPLAINT STATES CLAIMS UNDER THE SECURITIES ACT

### A.    The Complaint Adequately Alleges All of the Elements of a Securities Act Claim

The Complaint also adequately pleads that Defendants violated Sections 11 and 15 of the Securities Act by issuing multiple prospectuses during the Class Period which contained materially false and misleading statements.  *See In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 158 (D. Mass. 2004).  As described above, the Complaint sufficiently alleges that the eShare, Data Return and Delano prospectuses were materially false and misleading by, *inter alia*, containing financial statements prepared in violation of GAAP, misrepresenting and omitting material facts concerning the Company's growth-by-acquisition strategy, and failing to disclose the fraud at RoweCom.  This adequately states a claim under Sections 11 and 15 of the Securities Act.  *See Shaw,* 82 F.3d at 1201.

### B.    The Securities Act Claims Are Not Barred by the Statute of Limitations

Defendants erroneously argue that the Securities Act claims should be dismissed because those claims are barred by the statute of limitations, since Plaintiffs were on "inquiry notice" of the problems at divine by May 23, 2002, more than one year before the first complaint alleging violations of the Securities Act was filed. Mem. at 14.

------

[16] Plaintiffs are not required to allege loss causation under Section 11.  Section 11(e) of the Securities Act provides that in order to establish negative causation, it is Defendants' burden to "prove that any portion of damages represents other than the depreciation in value of such security." Defendants have failed to come forward with the requisite proof.  In fact, Plaintiffs have sufficiently alleged loss causation in connection with the Exchange Act claims.

In the First Circuit, there is a two-step test for determining whether a plaintiff has been put on inquiry notice. First, the defendants have the burden of demonstrating sufficient indications or "storm warnings" of securities fraud that would trigger the reasonable investor to investigate further. *See Young v. Lepone*, 305 F.3d 1, 9 (1st Cir. 2002). If defendants satisfy this stringent requirement, the Court must find that after being alerted to the storm warnings, the investor could have reasonably discovered the fraud in the exercise of reasonable diligence. *Young*, 305 F.3d at 9. The period in which plaintiffs have to file their claims does not begin on the date when storm warnings appear, but rather "only at the point when [a] . . . violation reasonably could have been discovered." *Id.*. An investor then has one year from the time he discovered, or should have discovered, the existence of his claim to file suit. *Lampf, Plvea, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991). This two-step analysis involves complicated issues of fact and therefore, in most cases, cannot appropriately be resolved on a motion to dismiss. *See Young*, 305 F.3d at 9 (holding that the "multifaceted question" of whether storm warnings existed and whether securities claims could have been discovered in the exercise of reasonable diligence are questions or the trier of fact).

The above analysis stops at the first step because Defendants have not demonstrated sufficient "storm warnings" more than one year before Plaintiffs brought their Securities Act claims. Plaintiffs plainly filed suit within the one year period, because they were not put on either actual or inquiry notice of Defendants' false and misleading statements until, at the earliest, January 17, 2003.[17] *See, e.g., Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997) ("The facts constituting such notice must be sufficiently probative of fraud – sufficiently advanced beyond the

---

[17] It was on this date that it was first reported that divine had collected subscription service money from RoweCom libraries and had spent the money on operating costs and debt payments and that there was not enough money to pay the publishers and divine could not get a loan to keep subscriptions coming. ¶136.

stage of a mere suspicion, sufficiently confirmed or substantiated – not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit."). Plaintiff Tito filed his claim on behalf of owners of shares of eShare who exchanged their shares for shares of divine under the Securities Act on July 25, 2003 (not on July 28, 2003 as defendants represent). Additional claims under the Securities Act were filed in the Consolidated Complaint on December 11, 2003.

In support of meeting their burden, Defendants cite to no instance which could have put a plaintiff on inquiry notice of a securities law violation. Their sole argument is that a decline in divine's stock price should have alerted investors to wrongdoing by Defendants.[18] On its face this proposition makes little sense and many circuit courts, as discussed below, including this one, have rejected that notion. Defendants have pointed to no substantive information which investors were aware of which formed the basis of Plaintiffs' claims under the Securities Act.[19] In fact, Plaintiffs have specifically described how this negative information was concealed by Defendants.

The cases cited by Defendants are distinguishable. *Tregenza v. Great American Communications Company*, 12 F.3d 717, 718 (7th Cir. 1993), a case decided not on a motion to dismiss but on summary judgment, simply stands for the proposition that when the misstatements at issue are specifically about the price of shares in a company, a decline in the price of the stock triggers inquiry notice. *See LaSalle v. Medco Research, Inc.*, 54 F.3d 443, 446 (7th Cir. 1995)

---

[18] On the one hand, Defendants began their memorandum in support of their motion to dismiss with an attack on the plaintiffs' bar as lawyers who "inevitably attempt to transform everyday business failures into securities fraud cases." Mem. at 1. On the other hand, Defendants argue that a drop in a company's stock price alone is sufficient grounds to suspect fraud. They can't have it both ways.

[19] Defendants mention the announcement by the Company of a reverse stock split ostensibly done for various reasons including possible delisting. Possible delisting and/or reverse stock splits, which are accepted Wall Street practice are clearly, by themselves, not indicative of wrongdoing or securities violations.

(limiting the holding of *Tregenza* to situations where specific representations about the price of the stock were made and were central to the claims).[20]  In *Young v. Lepone*, 305 F.3d 1, n.9 (1st Cir. 2002), the 40% stock price drop was accompanied by an announcement by the company that: (i) it had ousted its Chief Executive and Financial Officers, would delay release of its quarterly results and would restate its financials; (ii) its shares were being de-listed; and (iii) its auditor had withdrawn its opinion. 305 F.3d at n9 and 6.  Such announcements are hardly notice of just a stock price decline.

In sum, because under the law and facts Defendants have not and cannot meet their burden of showing "inquiry notice" their motion to dismiss based on statute of limitations grounds should be denied.[21]

### C.    Rule 9(b) Does Not Apply to the Securities Act Claims

Defendants erroneously argue that Plaintiffs' Securities Act claims are required to be pled with particularity, as required by F.R.C.P. 9(b).[22]  In *Number Nine*, 51 F. Supp. 2d at 12, Chief Judge

---

[20] *See also LaGrasta v. First Union Securities, Inc.*, 2004 U.S. App. LEXIS 1427 at * 22  (11th Cir. Jan. 30, 2004) (we decline the invitation to adopt a bright-line rule that a certain price drop within a certain period of time constitutes inquiry notice as a matter of law. ); *Summer v. Land & Leisure Inc.*, 664 F.2d 965, 968 (5th Cir. 1981), *cert. denied,* 458 U.S. 1106 (1982) (stock price declines are indicative of many possibilities other than wrongdoing or securities violations); *Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*, 05 Civ. 1898, 2005 U.S. Dist. LEXIS 19506, *36-37 (S.D.N.Y. Sept. 6, 2005) ("While the price decline may have put [plaintiff] on notice that the [securities] were performing poorly, it did not indicate the type of fraudulent activity alleged in the Complaint.").

[21] The other cases cited by defendants are consistent with the above stated principles of law. In *Reed v. Prudential Sec. Inc.*, 875 F. Supp. 1285, 1289 (S.D. Tex. 1995), also a case decided on summary judgment, the defendant brokers represented to the plaintiff that the stock "would keep going up." *Id.*  The *Reed* Court, in finding that there had been inquiry notice, distinguished the facts before it, as *LaSalle* distinguished *Tregenza*, on the centrality of specific misrepresentations about the price of the stock.  In *KA Investments LDC v. Number Nine Visual Technology Corp.*, No. 00-10966-DPW, 2002 WL 31194865, at *9 (D. Mass. Aug. 26, 2002), the court found that the plaintiff, by reading the defendants' SEC filings could have been alerted to fraud.  That could not have happened here.

Young considered this very issue and refused to apply the requirements of Rule 9(b) to Securities

Act Claims. In *Number Nine,* the Securities Act claims expressly excluded "(a) paragraphs [relating

to scienter of *Number Nine* and the Insiders for the 10(b) claim]; (b) any element of any paragraph

that alleges that defendants' misconduct was done intentionally, knowingly or with reckless

disregard for the truth; or (c) any element of a paragraph that otherwise sounds in fraud." *Id.*

(quoting complaint). Specifically, the Court concluded, "[T]he Complaint's disclaimer of fraud-type

allegations is effective to prevent the Securities Act claims from 'sounding in fraud.' This will

minimize litigation costs by ensuring that plaintiffs need file only one complaint and one civil action

to pursue their securities claims." *Id.* at 12-13; *In re Eaton Vance Corp. Sec. Litig.*, 206 F. Supp. 2d

142, 154-155 (D. Mass. 2002) (same). Judge Young in *Number Nine* stated, "'Although the

complaint [at issue] does assert that defendants actually possessed the information that they failed to

disclose, those allegations cannot be thought to constitute 'averments of fraud,' absent any claim of

scienter and reliance. Otherwise, any allegation of nondisclosure of material information would be

transformed into a claim of fraud for purposes of Rule 9(b).'" *Number Nine*, 51 F. Supp. 2d at 12

(quoting *Shaw*, 82 F.3d at 1223). Here, the Securities Act claims explicitly state: "This Claim does

not sound in fraud." ¶¶195, 204 and 213.

      In any event, the Securities Act claims have been pled with sufficient particularity for the

purposes of this motion.

---

[22] Although Rule 9(b) could apply if a complaint sounds in fraud, plaintiffs Securities Act allegations
do not allege scienter or reliance and therefore cannot be thought to constitute "averments of fraud."
*Shaw*, 82 F.3d at 1223. "Otherwise, any allegation of nondisclosure of material information would
be transformed into a claim of fraud for purposes of Rule 9(b)." *Shaw*, 82 F.3d at 1223.

## V.     CONCLUSION

For the reasons set forth herein, it is respectfully submitted that Defendants' motions to dismiss be denied in their entirety.

DATED:  September 12, 2005                     GILMAN AND PASTOR LLP


                                               /s/ David Pastor
                                               _____

                                               David Pastor (BBO #391000)
                                               GILMAN AND PASTOR, LLP
                                               60 State Street
                                               37th Floor
                                               Boston, MA  02109
                                               Telephone:  617/742-9700
                                               617/742-9701 (fax)

                                               Local Counsel
                                               LERACH COUGHLIN STOIA GELLER
                                                       RUDMAN & ROBBINS LLP
                                               SAMUEL H. RUDMAN
                                               DAVID A. ROSENFELD
                                               EVAN J. KAUFMAN
                                               200 Broadhollow Road, Suite 406
                                               Melville, NY  11747
                                               Telephone:  631/367-7100
                                               631/367-1173 (fax)

                                               STULL, STULL & BRODY
                                               JULES BRODY
                                               HOWARD T. LONGMAN
                                               6 East 45th Street
                                               4th Floor
                                               New York, NY  10017
                                               Telephone:  212/687-7230
                                               212/490-2022 (fax)

                                               Co-Lead Counsel