IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SHARON BOBBITT, Individually and on Behalf )
of All Others Similarly Situated, )
)
Plaintiff, )                Case No. 04-12263-PBS
)
v. )                Judge Saris
)
ANDREW J. FILIPOWSKI and )
MICHAEL P. CULLINANE, )
)
Defendants. )

## REPLY MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Bruce S. Sperling
Thomas D. Brooks
(Admitted *Pro Hac Vice*)
SPERLING & SLATER, P.C.
55 West Monroe, Suite 3200
Chicago, Illinois 60603
(312) 641-3200

Halye A. Sugarman
HANIFY & KING
One Beacon Street
Boston, Massachusetts 02108
(617) 423-0400

*Counsel for Andrew J. Filipowski*

Samuel B. Isaacson
Lawrence A. Wojcik
Joseph Collins
(Admitted *Pro Hac Vice*)
DLA PIPER RUDNICK GRAY CARY US LLP
203 North LaSalle Street
Suite 190
Chicago, IL 60601
(312) 368-4000

John Gilmore
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place
21st Floor
Boston, MA 02110-2613
(617) 406-6000

*Counsel for Michael P. Cullinane*

October 31, 2005

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

   I.    Both the Securities Act and Exchange Act Claims Fail for a Number of Independent
Reasons. ............................................................................................................................ 2

      A.   Plaintiffs Have Failed To Plead Loss Causation........................................................ 3

      B.   Alleging Corporate Mismanagement Does Not Amount to Pleading a Securities
Violation. ....................................................................................................................... 6

      C.   The Allegedly Fraudulent Statements in Question Are Protected by the Statutory Safe
Harbor, and Also Immaterial As a Matter of Law. ................................................. 8

   II.    Plaintiffs Are Also Unable to Plead Scienter Under the Exchange Act. .......................... 11

   III.   The Securities Act Claims Fail for Additional Reasons. ............................................. 13

      A.   Plaintiffs' '33 Act Claims Are Barred by the Statute of Limitations. ......................... 13

      B.   Plaintiffs Have Failed to Allege That an Affirmative Statement in a Prospectus was
False or Misleading. ...................................................................................................... 15

      C.   Plaintiffs' '33 Act Claims Do Not Satisfy Rule 9(b). ............................................. 17

   IV.   The "Control Person" Claims Fall With the Other Claims........................................... 18

CONCLUSION.................................................................................................................. 18

## INTRODUCTION

As of February 18, 2003, the date when plaintiffs allege that defendants' "fraudulent schemes" were revealed to the world, Divine's stock price had already steadily fallen from $9.00 (at the time of its IPO) to 1.4 *cents* per share.  At just over a penny per share, it is difficult to conceive of any adverse material information about Divine that the market had yet to digest. Divine's repeated warnings about its business and market problems, and its regular financial disclosures that showed the company's extensive and continued financial deterioration, had already driven Divine's stock price to the verge of oblivion.  Thus, the market clearly had already been told about and expected the worst *before* the allegedly "new" revelations on February 18, 2003 that form the basis of this securities fraud claim.

And what "fraudulent schemes" were disclosed on February 18, 2003?  Absolutely none. The purported "revelation" on February 18, 2003 was simply the announcement that Divine was considering bankruptcy.  As the Sixth Circuit recognized, the announcement of possible bankruptcy is bad news that will, of itself, cause a drop in stock price.  *D.E. & J. Limited Partnership v. Conaway*, 133 Fed. Appx. 994, 2005 WL 1386448 (6th Cir. June 10, 2005).  But, as the Sixth Circuit made clear in *Conaway*, and as the Supreme Court's recent ruling in *Dura Pharmaceuticals v. Broudo*[1] requires, a plaintiff is obligated to allege much more.  Plaintiff must explain what previously undisclosed fraud was newly revealed and how that new revelation  was the cause of a new drop in stock price that was not simply the result of the bankruptcy announcement.  The amended complaint completely fails in both respects.

Indeed, it is significant that the plaintiff in *Conaway* alleged the same types of purported "frauds" as are alleged here (and more): failed and failing business plans; internal management

---

[1] 125 S.Ct. 1627 (2005).

disagreements on the ability to execute and proceed; and purported accounting discrepancies. In dismissing that complaint, the Sixth Circuit not only held that plaintiff had failed to explain how the disclosure of *any* of those purported "frauds" had caused a loss in stock value, but further explained that many of the alleged misrepresentations, like those here, were just expressions of optimism, or vague claims of general business success, or statements that were necessarily "forward looking" and otherwise accompanied by sufficient warnings and risk disclosures.

In the present case, Divine's disclosures were even more extensive. With each and every statement regarding its growth strategy, Divine provided clear and conspicuous warnings that it had never been profitable and might never be profitable, that it might not be able to successfully integrate the businesses it acquired, that the demand for technology products was waning, and that the company might run out of cash before it ever reached profitability. Plaintiffs cavalierly attempt to dismiss the warnings as "boilerplate." But the Reform Act makes these disclosures significant. Moreover, as the steady decline in Divine's stock price shows, the market did not sweep these cautionary disclosures away: the market listened attentively, and punished Divine's stock price accordingly.

In sum, as this Court has noted, "only a fraction" of business failures reflect fraud,[2] and this case is not one of them. The amended complaint should be dismissed with prejudice.

## ARGUMENT

**I.    BOTH THE SECURITIES ACT AND EXCHANGE ACT CLAIMS FAIL FOR A NUMBER OF INDEPENDENT REASONS.**

Although plaintiffs' opposition brief tries to pigeonhole various issues as applying only to the amended complaint's Exchange Act claims (Counts V-VI), these issues apply with full force to dispose also of plaintiffs' Securities Act claims (Counts I-IV), as discussed below:

---

[2] *In re Lotus Development Corp. Sec. Litig.*, 875 F. Supp. 48, 52 (D.Mass. 1995) (Saris J.) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir.)).

A.      **Plaintiffs Have Failed To Plead The Necessary Element Of Loss Causation.**

As the Supreme Court recently held, plaintiffs must connect the misstatements/omissions they allege to a drop in stock price in order to plead loss causation. *Dura*, 125 S.Ct. at 1634; *see also In re Polaroid Corp. Sec. Litig.*, 134 F. Supp. 2d 176, 188 (D. Mass. 2001) (Saris, J.). In *Dura*, the plaintiffs alleged that the defendants made materially false and misleading statements concerning both the company's drug profits and prospective FDA approval of a new asthmatic spray device. 125 S.Ct. at 1630. When the company announced that it would miss earnings due to an unrelated event (*i.e.*, slow drug sales), its stock price lost almost half its value. *Id.* The plaintiffs claimed that they were damaged because they paid artificially inflated prices for the company's securities based on the market's presumptive reliance upon the alleged false and misleading statements regarding expected FDA approval and increased profits. *Id.* However, the plaintiffs did not include any allegations connecting expected FDA approval and increased profits to the announcement of slow sales that caused the drop in stock price. *Id.* The district court dismissed the plaintiffs' claims, holding that their complaint alleged "transaction causation," but failed to allege "loss causation." *Id.* In reversing this decision, the Ninth Circuit held that the plaintiffs' allegation of an inflated purchase price was sufficient to allege loss causation. *Id.*

In reversing the Ninth Circuit's decision, the Supreme Court unanimously held that plaintiffs did not allege loss causation merely by stating that they paid artificially inflated prices for the company's securities. *Id.* at 1634. Instead, to show loss causation, the Supreme Court stated that the plaintiffs must demonstrate that the alleged misrepresentations or omissions caused their loss. *Id.* After determining that the plaintiffs failed to provide any connection between the alleged misrepresentations and omissions (statements regarding FDA approval and increased profits) and the announcement that caused the drop in stock price (announcement of

3

slower-than-expected sales), the Supreme Court held that the plaintiffs failed to allege loss causation, thereby rendering the complaint as legally insufficient. *Id.*

Similarly, plaintiffs in the instant action fail to connect the alleged misrepresentations/omissions to the drop in Divine's stock price that occurred after Divine's February 18, 2003 announcement. This announcement merely revealed that Divine was considering strategic options, including bankruptcy:

> On February 18, 2003, Divine announced that "despite efforts over the past several months to minimize operating expenses and various liabilities, its board of directors has determined that it must seek alternatives to protect the value and viability of its operations. As a result, divine has engaged Broadview International LLC as advisors to assist in exploring strategic options, which may include asset divestitures, comparable transactions, and/or the filing of a voluntary petition under Chapter 11 of the United States Bankruptcy Code."

(Am. Cmplt. ¶141). Upon this announcement, the stock price fell, as one would expect (from 1.4 cents to 0.5 cents per share). But this announcement is hardly a revelation of fraud. It in no way "discloses" *any* of the "previously concealed facts" alleged by plaintiffs, which generally concerned integration problems, cross-selling difficulties, real estate obligations, accounting issues and the upstreaming of cash from Divine's subsidiary RoweCom. Plaintiffs in no way explain how any of the purportedly disclosed "fraud" caused any more of a price drop than otherwise would have occurred as a result of any announcement of imminent bankruptcy. And plaintiffs also do not come to terms with the great length of the class period alleged here (17 months), and the many events and disclosures that occurred during this period. *See Dura*, 125 S.Ct. at 1632 ("[T]he longer the time between purchase and sale ... the more likely that other factors caused the loss.") Like the plaintiffs in *Dura*, plaintiffs in the instant case are incapable of pleading loss causation.

In their response, plaintiffs contend that their case is different from *Dura* because the amended complaint contains a conclusory recitation that the alleged misrepresentations "directly or proximately caused or were a substantial contributing cause of the damages sustained by

[plaintiffs]." This very same argument was recently rejected in *D.E. & J. Limited Partnership v. Conaway*, 133 Fed. Appx. 994, 2005 WL 1386448 (6th Cir. June 10, 2005), a case with similar facts. In *Conaway*, the plaintiffs alleged that Kmart's former executives and auditor made materially false and misleading statements concerning the company's financial connection. *Id.* at 996. In particular, the plaintiffs alleged that the defendants concealed from the investing public that it was committing accounting fraud, that the company's internal controls systems were outdated, and that the company's competitors were gaining marketshare. *Id.* When Kmart announced that it was filing for bankruptcy, a "predictable" drop in the company's stock price followed. *Id.* at 995-96. The plaintiffs in *Conaway* made the following conclusory allegation of loss causation:

> As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Kmart publicly traded securities during the class period.

*Id.* at 1000. The plaintiffs in *Conaway* did not include any allegations connecting any of the misrepresentations (*e.g.*, accounting fraud, loss of marketshare, etc.) to the company's bankruptcy announcement, but instead alleged that the defendants' wrongful conduct "directly and proximately" caused the plaintiffs' losses. *Id.* The district court dismissed the plaintiffs' complaint for, *inter alia*, failure to plead loss causation. *Id.* at 998.

In affirming the decision of the district court, the Sixth Circuit, citing *Dura*, agreed that the *Conaway* plaintiffs failed to connect Kmart's bankruptcy announcement with any alleged prior misrepresentations to the market:

> Here, [the plaintiffs have] done nothing more than note that a stock price dropped after a bankruptcy announcement, never alleging that the market's acknowledgement of prior misrepresentations caused that drop. *But the observation that a stock price dropped on a particular day, whether as a result of a bankruptcy or not, is not the same as an allegation that a defendant's fraud caused the loss.*

*Id.* at. 1000-01 (emphasis added). The Sixth Circuit further held that the plaintiffs' conclusory allegation that they suffered loss from the alleged misrepresentations "does not change matters." *Id.* at 1000.

Nor does it "change matters" here. Like the plaintiffs in *Conaway*, plaintiffs here allege that Divine's bankruptcy announcement, and nothing else, caused the "predictable" decline in the company's stock price from 1.4 cents to 0.5 cents. But as the Sixth Circuit recognized, a bankruptcy announcement does not necessarily mean that fraud exists, no matter how many conclusory allegations plaintiffs include in their pleading. The plain language of the February 18, 2003 announcement makes it impossible for plaintiffs to allege loss causation. As such, Plaintiffs cannot state a claim under either the Exchange Act or the Securities Act.[3] The amended complaint should be dismissed with prejudice.

### B.    Alleging Corporate Mismanagement Does Not Amount to Pleading a Securities Violation.

In an attempt to bolster plaintiffs' thinly-pleaded securities fraud claims, the amended complaint borrows liberally from a bankruptcy adversary complaint alleging fiduciary breach by Divine's management; and many of the borrowed paragraphs, which recite internal debates among management, now figure prominently in plaintiffs' effort to defend the amended complaint. (*See* Opp. at 7-8, string-citing to various paragraphs of the amended complaint.)[4]

---

[3] Plaintiffs suggest in a footnote that dismissal on this ground is not appropriate as to the Securities Act claims because loss causation is an affirmative defense to such claims. This argument ignores the fact that where, as here, a valid affirmative defense is apparent from the face of the complaint, the complaint may be dismissed on that basis. *Greene v. Rhode Island*, 398 F.3d 45, 49 (1st Cir. 2005) (affirming dismissal of complaint based on affirmative defense); *accord In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 16 (1st Cir. 2003) As explained above, there is a clear disconnect between Divine's February 18, 2003 statement and the plaintiffs' alleged misrepresentations. As such, it is more than apparent from the face of the amended complaint that plaintiffs could never prevail under the Securities Act. *See In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp.2d 1173, 1182-83 (N.D. Cal. 2004) (dismissing Section 11 claim for failure to properly plead loss causation).

[4] Moreover, plaintiffs' practice of simply listing quotes followed by legal conclusions runs afoul of the stringent pleading requirements of Rule 9(b) and the PSLRA. The amended complaint should be dismissed for this reason alone. *See, e.g., Havenick v. Network Express, Inc.*, 981 F. Supp. 480, 526

6

But as plaintiffs' lead case itself notes, this Circuit does not recognize such claims of corporate mismanagement, and the alleged failure to disclose it, as being actionable under the securities laws. *See Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1206 (1st Cir. 1996) ("To the extent that the claim comprises allegations of mismanagement, it is not cognizable under the securities laws"); *see also Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479 (1977); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir. 1981) (allegations of mismanagement cannot be "bootstrap[ped] into a federal securities action" by also alleging failure to disclose the purported mismanagement), 646 F.2d at 288; *Fitzer v. Security Dynamics Technologies*, 119 F. Supp. 2d 12, 33 (D. Mass. 2000) (poor management or even gross mismanagement is not actionable under the securities laws); *In re Number Nine Visual Technology Corp.*, 51 F. Supp. 2d 1, 22 at fn. 18. (D. Mass. 1999) ("Mismanagement claims are not actionable under the federal securities laws;" cited by plaintiffs). As the court in *Fitzer* succinctly held:

> Regardless of the wisdom of [defendant's] decision, [plaintiff] cannot successfully argue that poor management is a proxy for fraud .... This Court will not sit in judgment of such business decisions .... A claim of fraud cannot arise from poor management.... [T]he claim is one of director malfeasance – violation of the duties of care and loyalty....

119 F. Supp. 2d at 33 (citing cases).

Here, plaintiffs quote verbatim various (i) internal e-mail debates among Divine's management, (ii) concerns expressed by parties other than the defendants, and (iii) a fiction, with no factual support whatsoever, regarding the upstreaming of cash to Divine from its subsidiary RoweCom.[5] In effect, plaintiffs argue that every opinion or moment of hand-wringing in an

---

(E.D.Mich. 1997) (dismissing with prejudice when plaintiffs "simply compiled a long list of block quotes, many of which contain statements that cannot seriously be regarded as false or misleading, and ... line[d] these statements up against a conclusory list of omissions and pronounce[d] that fraud exists").

[5] Plaintiffs' allegations concerning Divine's acquisition and subsequent management of RoweCom also have nothing to do with any violations of securities laws. Whether the cash collected by RoweCom stayed in the wholly owned subsidiary (*i.e.*, RoweCom), or was transferred to the parent (*i.e.*, Divine), made no economic difference to Divine's consolidated balance sheet, and hence no difference to Divine's shareholders.

internal corporate debate must be disclosed to the public. But this Court squarely rejects any such argument. *See In re Vertex Pharmaceuticals, Inc. Sec. Litig.*, 357 F. Supp. 2d 343, 352 (D. Mass. 2005) (dismissing securities fraud complaint when certain individuals "expressed their concerns" internally at the company, but were allegedly "ignored") (Saris, J.)  As such, plaintiffs' attempt to dress up mismanagement allegations as a securities claim does not succeed.

C.    **The Allegedly Fraudulent Statements in Question Are Protected by the Statutory Safe Harbor, and Also Immaterial As a Matter of Law.**

Under the Reform Act's safe harbor, if a statement is "forward-looking" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," the statement is non-actionable under both the Exchange Act and the Securities Act. *15 U.S.C. § 77z-2(c)(1)(A)* (Securities Act); *15 U.S.C. § 78u-5(c)(1)(A)* (Exchange Act). As set forth in defendants' opening brief (*e.g.*, p.18), virtually every one of the two-dozen statements alleged by plaintiffs to be false and misleading was a forward-looking statement that was accompanied by sufficiently detailed cautionary language. *See also* Exhibit A to opening brief (compiling allegedly misleading statements, and related cautionary language). As such, these statements are non-actionable under the Reform Act's safe harbor.

Plaintiffs do not challenge the fact that the statements are "forward-looking" in nature, so defendants will not belabor the point. However, plaintiffs do argue that Divine's cautionary language, which they took great pains to avoid throughout the amended complaint, was "boilerplate" and "did not adequately warn investors of the true extent of the risks of investing in divine." (Opp. at 25).

Plaintiffs' argument is patently absurd. Divine did not make merely generalized, cookie-cutter warnings such as "your investment may decline in value." To the contrary, Divine disclosed several distinct reasons why the investment could fail, *including those that plaintiffs*

*complain about.* Below is just a small sample of the dire warnings Divine made to investors:

> divine has been in business for only two years, has little operating history and has a new business strategy that may continue to change, which makes it difficult to evaluate its business.
>
> * * *
>
> We expect to incur losses for the foreseeable future, and we may never become profitable.
>
> * * *
>
> Our overall performance and quarterly operating results may fluctuate and will be affected by the revenues generated from RoweCom's, eshare's and Open Market's products and services and RoweCom's need for additional capital.
>
> * * *
>
> If we do not successfully implement our acquisition strategy or address the risks associated with the acquisitions, our growth and ability to compete may be impaired.
>
> * * *
>
> Our success is dependent upon the market for Internet services, which, along with the general economy, is experiencing a downturn.
>
> * * *
>
> If we cannot cross-sell the products and services of divine, RoweCom, eshare and Open Market to the other companies' customers, we will not achieve one of the expected benefits of the mergers.

(*See* Appendix to opening brief at Ex. 2, pp. 27-43).   How these compelling and detailed disclosures (and the many others like them) "did not adequately warn investors of the true extent of the risks of investing in divine" is beyond comprehension.

And the market certainly heeded Divine's warnings.   As set forth in defendants' opening brief, these and other such disclosures caused the market to drive Divine's stock price down continually during plaintiffs' purported class period.   Plaintiffs run from this fact in both their amended complaint and their opposition brief, asking the Court to read the alleged misstatements in a vacuum.   But the courts do not behave in such a manner.   Nor does the investing public.   *See Shaw*, 82 F.3d at 1219-1220 (finding statements that company was close to "break-even" to be nonactionable, when read in context); *Olkey v. Hyperion*, 98 F.3d 2, 5 (2d Cir. 1996) quoting *Meyer Pincus & Assoc. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir. 1991) ("the central

9

issue [is] whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities].")); *Rosen v. Textron, Inc.*, 321 F.Supp. 2d 308, 320 (D.R.I. 2004) (cautioning that statements "must be read in context"); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 176, 181 (D.R.I. 2003) (statements "must not be assessed in a vacuum" – dismissing statements, similar to those complained of here, about the company's growth and acquisition plan).

In addition to protecting forward-looking statements, the Reform Act's safe harbor also protects statements that are "immaterial." *15 U.S.C. § 77z-2(c)(1)(A)* (Securities Act); *15 U.S.C. § 78u-5(c)(1)(A)* (Exchange Act). As set forth in defendants' opening brief and Exhibit B thereto, several of the statements complained of by plaintiffs were immaterial statements of "puffery," *i.e.*, statements of loose optimism that cannot, as a matter of law, be taken seriously by an investor. In response, plaintiffs argue that the materiality of statements is a "factual matter" that cannot be decided on a motion to dismiss. This Court takes a contrary view. *See Fitzer*, 119 F. Supp. 2d at 23 (dismissing statements as immaterial on a Rule 12(b)(6) motion to dismiss); *Orton v. Parametric Technology Corp.*, 344 F. Supp. 2d 290, 299-301 (D. Mass. 2004) (same). Plaintiffs further suggest, with no legal support, that defendants' statements of puffery are actionable because the defendants "lacked a reasonable basis" for making them. Plaintiffs miss the point: statements of puffery are *never* actionable, regardless of the speaker's state of mind. *Fitzer*, 119 F. Supp. 2d at 23.

There is one more independent reason why Divine's statements are protected by the Reform Act's safe harbor: plaintiffs "fail[ed] to prove that the forward-looking statement was made with actual knowledge that it was false or misleading." *See 15 U.S.C. § 77z-2(c)(1)(B)* (Securities Act); *15 U.S.C. § 78u-5(c)(1)(B)* (Exchange Act). As set forth in defendants'

10

opening brief, and as further set forth below, plaintiffs fail to plead scienter; *i.e.*, that defendants *knew* (or recklessly disregarded the fact that) the statements were false when made. Plaintiffs do not offer any meaningful response, except for restating their conclusory allegations that "these statements are actionable and [] they are alleged to be materially false and misleading because Defendants lacked a reasonable basis for their beliefs." (Opp. at p. 24). This *ipse dixit* retort speaks for itself.

## II.    PLAINTIFFS FAIL TO PLEAD A "STRONG INFERENCE" OF SCIENTER.

As set forth in Part I(C) above, plaintiffs have not presented one statement that is outside the protection of the Reform Act's safe harbor. That alone ends the inquiry. However, in the unlikely event that the Court found any statement complained of by plaintiffs to be outside the protections of the safe harbor, plaintiffs fail to allege that defendants acted with scienter.

First, as set forth in defendants' opening brief, there was no insider trading or personal profit gained by the defendants. Indeed, the amended complaint concedes that defendants held on to their stock holdings during the class period, a fact that "undermines any inference of scienter." *Maldonado v. Dominguez*, 137 F.3d 1, 12 n.9 (1st Cir. 1988). Thus, plaintiffs can present no allegations of "motive and opportunity."

Second, there are no alleged "facts" suggesting that defendants knew (or recklessly disregarded) that their statements were false and misleading. Plaintiffs merely argue that defendants knew that their statements were wrong because a few employees expressed differing opinions in e-mails. (*See* Opp. at 10-12.) But, as noted above, differing opinions among employees do not create an inference of scienter. *See Vertex*, 357 F. Supp. 2d at 352.[6] Moreover,

---

[6] Grasping at straws, plaintiffs resort to taking snippets from e-mails in order to create spurious allegations against defendants. For example, plaintiffs suggest that Divine "kept two sets of books." (*See* Opp. at 14; Am. Cmplt. ¶¶ 66-67.) Yet the e-mail exchange plaintiffs refer to, which did not even involve the defendants, makes clear that any suggestion of "dual versions of [a revenue] plan" was made by an inferior Divine employee and quickly rejected by Divine's controller. *See* Exhibit 1 hereto; *see also Shaw*, 82 F.3d at 1220-21 (on Rule 12(b)(6) motion, court may consider documents sufficiently referred to in complaint, in order to prevent plaintiffs from misquoting them); *Polaroid*, 134 F. Supp.2d at 182.

the context here, in which Divine's disclosures (unlike those of other companies) consistently indicated the difficult situation in which the company was continually operating, belies any notion of materiality or an intent to defraud. *See, e.g., In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 209-10 (1st Cir. 2005); *In re Acterna Corp. Sec. Litig.*, 378 F.Supp.2d 561, 578 (D.Md. 2005) ("In light of the company's full disclosure of its steadily declining financial conditions, … Plaintiffs' assertion that the individual Defendants consciously or recklessly 'misled Plaintiffs and the investing public regarding Acterna's business condition, financial stability and the success of its acquisition program and strategy' is unavailing.").

Plaintiffs next argue that their account of what happened at RoweCom (Am. Cmplt ¶¶ 68-74) is evidence of intent to defraud Divine investors. Yet, as noted in our moving papers, plaintiffs' RoweCom allegations are devoid of factual support. As this Court has recognized, conclusory allegations do not support a strong inference of scienter. *In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 161 (D.Mass. 2001) (rejecting conclusory and factually-devoid allegations of scienter). Thus, plaintiffs' tall tale regarding RoweCom is entirely irrelevant to the analysis.

Plaintiffs allege that scienter exists because they *believe* that Divine's financial statements purportedly violate GAAP. (Opp. at 14-15) Once again, plaintiffs' arguments are conclusory. As plaintiffs must concede, there has been no determination that Divine's financial statements violated GAAP. Nor has Divine's auditor, trustee, or even the SEC ordered a restatement of Divine's financials over the past 3 years. Plaintiffs only allege that Divine's financials violated GAAP because they believe that to be the case. As such, plaintiffs' opinions do not provide factual evidence of a "GAAP violation" for purposes of determining scienter. See *Focus Enhancements*, 309 F. Supp. 2d at 161; *see also Scritchfield*, 274 F.Supp. 2d at 187, n.27 ("Merely stating in conclusory fashion that a company's books are out of compliance with GAAP would not in itself demonstrate liability under section 10(b) or Rule 10b-5.") (citations

12

omitted).

### III.    THE SECURITIES ACT CLAIMS FAIL FOR ADDITIONAL REASONS.

### A.    Plaintiffs Have Failed to Allege That an Affirmative Statement in a Prospectus was False or Misleading.

As set forth in defendants' opening brief, the Securities Act claims primarily allege that Divine's description of its growth strategy in certain prospectuses was false and misleading because defendants (being somehow blessed with the gift of clairvoyance) "knew" that the growth strategy was a failure.[7] As set forth above, Divine's description of its growth strategy was a classic forward-looking statement of "management's plans and objectives for future operations" (and was accompanied by explicit warnings that its growth strategy may fail), thereby rendering this description non-actionable under the protections of the Reform Act's safe harbor (see Part I(C)). In addition to this statutory protection, this Court has specifically recognized that descriptions of a company's strategy, like Divine's statement of its growth strategy, cannot be false and misleading unless the company had another strategy in mind. *Fitzer*, 119 F. Supp. 2d at 30.

Plaintiffs do not attempt to argue that Divine had another strategy in mind. Instead, plaintiffs suggest that "Defendants spoke about divine's growth-by-acquisition *strategy* so Defendants had a duty to be truthful and accurate about its *failure*." (Opp. at 18, emphasis added).

---

[7] Plaintiffs concede that a prospectus *itself* cannot be false and misleading, but their mischaracterizations of the amended complaint continue when they argue that the eShare and Delano prospectuses were false and misleading because they failed to "disclose the fraud at RoweCom." (Opp. at p. 30). The amended complaint contains no such allegation, and any such allegation would defy logic. The eShare and Data Return prospectuses were issued in the fall of 2001, *before* RoweCom's revenues were included on Divine's financials, *before* RoweCom solicited prepayments from its customers beginning in April of 2002, and *before* Divine recorded goodwill from most, if not all, of its significant acquisitions in its 2001 10-K. Indeed, RoweCom had just been acquired a few weeks before these prospectuses were issued. Thus, any such allegation by plaintiff is nothing more than an attempt to rewrite history.

In essence, plaintiffs argue that Divine's statement of its strategy was false and misleading because it led investors to presume that the strategy was a "success." *Fitzer* rejects this argument. As the *Fitzer* court noted, no reasonable investor would rely on a description of a strategy to determine the success or failure of that strategy. *Fitzer*, 119 F. Supp. 2d at 30. As such, plaintiffs' reliance on Divine's statement of its growth strategy as a barometer of the company's actual success or failure is wholly unreasonable as a matter of law.

Moreover, plaintiffs' fanciful notion that defendants somehow knew *18 months in advance* that their business strategy was a failure (*see* Opp. at 18), and failed to disclose as much, does not amount to a securities claim. Plaintiffs cannot state a claim by attributing psychic abilities to the defendants. Otherwise, disappointed investors could, in perfect hindsight, cast every business failure as a securities violation. The law does not allow this. *See In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 151 (D.Mass. 2001) (Saris, J.) ("Corporate officials need not be clairvoyant.").

The only other statement alleged to be false and misleading in the prospectuses is the warning in the eShare prospectus that Divine's future revenues may "fluctuate."[8] In their complaint, plaintiffs argue that this statement of future fluctuation was false and misleading because the company was at that time experiencing declining financial results. (Am.Cmplt. ¶33). In response, defendants pointed out that under the Court's decision in *Fitzer*, an investor cannot rely on a company's statements about the future to evaluate the present condition of the company. *Fitzer*, 119 F. Supp. 2d at 30. In their opposition brief, plaintiffs do not argue with *Fitzer*, but instead reiterate that this statement of the future is misleading because Divine "was experiencing declining financial results and was not performing to internal expectations." (Opp. at 21). Under

---

[8] Plaintiffs insist that they "identified numerous statements that were misleading as a result of divine's material omissions." (Opp. at 21). However, plaintiffs fail to inform the Court that none of these "statements" appear anywhere in the prospectuses and thereby do not give rise to a claim under the Securities Act.

*Fitzer*, Divine's warnings about future fluctuations could not reasonably comfort plaintiffs that the present condition of the company was stable. Plaintiffs' attempts to argue otherwise have no basis in both law and fact. There are no statements in the prospectuses that give rise to a claim under the Securities Act.

**B.    Plaintiffs' '33 Act Claims Are Barred by the Statute of Limitations.**

Plaintiffs do not dispute that the one year limitations period (15 U.S.C. §77m) applies to their '33 Act claims. Instead they argue that, despite the deluge of negative information revealed during the entire class period both by and about Divine, nothing before January 2003 would have put a reasonable investor on notice of potential '33 Act claims.

Plaintiffs' position is that a reasonable investor would not have any reason to investigate potential '33 Act claims in the face of a 70%-plus drop in Divine's stock price over eight months[9] – in the face of optimism expressed by Divine about the stock that culminated in a drastic 1-for-25 reverse stock split, undertaken for the express purpose of avoiding NASDAQ delisting. But a reasonable investor would unquestionably have been put on inquiry notice of potential '33 Act claims by at least May 23, 2002 (the date of the reverse split) – well more than one year before plaintiffs filed their '33 Act claims. (Am. Cmplt. ¶93) *See Young v. Lepone*, 305 F.3d 1, 8, 13 n.9 (1st Cir. 2002); *Bamberg v. SG Cowen* , 236 F. Supp. 2d 79, 85 (D. Mass. 2002); *Reed v. Prudential Securities Inc.*, 875 F. Supp 1285, 1289 (S.D. Tex. 1995).

Plaintiffs do not dispute the stock plunge, the reverse stock split, or the threatened delisting (indeed, they allege those facts). Moreover, plaintiffs' own cases recognize that such circumstances put a reasonable investor on notice of a potential claim, *e.g., La Grasta v. First*

---

[9] From the beginning of the class period in September 2001 until Divine undertook a reverse stock split in May 2002.

*Union Securities, Inc.*, 358 F.3d 840, 849 (11th Cir. 2004) ("substantial and/or sudden price drop may be one of the relevant factors to arouse suspicion among investors; in the appropriate case, it may even be the primary factor"), and that plaintiffs have the burden of pleading facts explaining their lack of suspicion in the face of storm warnings, *e.g.*, *Summer v. Land & Leisure*, 664 F.2d 965, 970 (5th Cir. 1981) (investor made "significant allegations tending to explain his lack of suspicion and tending to support his allegation of due diligence.").

Although there is ample support for the principle that a plunge in stock price alone establishes inquiry notice, *see Reed, supra* (compiling cases), that is not what defendants argue (although plaintiffs say it is). Rather, we argue that the full context of the plunge in stock price, including the threatened delisting and ultimate reverse split, put plaintiffs on notice – but they sat on their hands.

In response, plaintiffs argue that the instant action, unlike *Reed*, does not involve purported misrepresentations regarding the value of (or, more accurately here, the "undervalued character of"[10]) the stock. But that is exactly what plaintiffs allege – that "[i]n an attempt to mask the decline in the Company's business defendants caused divine's employees to engage in improper accounting practices, and/or knowingly acquiesced in and condoned those practices. These practices inflated the price of Divine's common stock during the Class Period which it used as currency to acquire numerous companies." (Am. Cmplt. ¶148.) Thus, even under the authority cited by plaintiffs, the negative information disclosed to the market was more than sufficient to have put reasonable investors on inquiry notice well over a year before these plaintiffs filed their claims.

---

[10] *LaSalle v. Medco Research, Inc.*, 54 F.3d 443, 446 (7th Cir. 1995).

**C.      Plaintiffs' '33 Act Claims Do Not Satisfy Rule 9(b).**

Where, as here, plaintiffs rely on allegations that suggest fraud "lies at the core of the action," plaintiffs must plead those Securities Act claims with the specificity required by Rule 9(b). *Shaw*, 82 F.2d at 1223, citing *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985). In a one-sentence argument, plaintiffs state that "the Securities Act claims have been pled with sufficient particularity for the purposes of the motion." (Opp. at 34). Yet plaintiffs fail to cite even one citation to the amended complaint to support their "did so" argument. No further argument by defendants is necessary.

Plaintiffs also argue that plaintiffs in one other case, *In re Number Nine Visual Technology Corp.*, were not required to comply with Rule 9(b), and thus plaintiffs here need not do so. (Opp. at 33-34). However, plaintiffs' argument ignores the differences between the cases' allegations. In *Number Nine*, plaintiffs specifically disavowed, paragraph by paragraph and element by element, any reliance on allegations of fraud. 51 F. Supp. 2d 1, 12 (D.Mass. 1999). Here, in contrast, Count IV contains no disavowal at all; and in Counts I-III, plaintiffs' disavowal is mere conclusion: plaintiffs state "This Count does not assert any allegations alleging fraud" and "This count does not sound in fraud." (Am. Cmplt., ¶¶ 195, 204, 213).

Moreover, it is clear that plaintiffs' conclusion is incorrect, because they, like the plaintiffs in *Number Nine*, incorporate by reference the precise allegations that they claim to disavow, namely allegations "suggesting that the conduct of [defendants] was done knowingly, intentionally, or with reckless disregard for the truth, or was otherwise fraudulent." *Number Nine*, at 13 and fn. 10. For example, paragraph 148 alleges that defendants intentionally caused or "knowingly acquiesced" in GAAP violations, paragraph 161 alleges that defendants "knew or recklessly ignored" other violations, paragraph 182 alleges that Divine issued financial statements that "materially falsified its financial performance to the detriment of unsuspecting investors," and paragraph 193 alleges that "defendants are liable for ... false forward-looking

17

statements because at the time each of those [statements] was made, the particular speaker knew that the [statement] was false..."

In sum, given plaintiffs' specific incorporation by reference of allegations of fraudulent conduct, plaintiffs' "disavowal" of any fraud allegations is ineffective to avoid dismissal on Rule 9(b) grounds here. *See, e.g., Rombach v. Chang*, 2004 WL 77928 (2d Cir. Jan. 20, 2004) (affirming dismissal of '33 Act claims when "the wording and imputations of the complaint [were] classically associated with fraud"); *Lucia v. Prospect Street High Income Portfolio*, 769 F. Supp. 410, 417 (D. Mass. 1991) (dismissing '33 Act claims pursuant to Rule 9(b)); *Cathedral Trading LLC v. CBOE*, 199 F. Supp.2d 851, 858 (N.D.Ill. 2002) (Securities Act claim was subject to Rule 9(b) when it incorporated preceding factual allegations by reference and "repeatedly aver[red] that defendants 'intentionally,' 'knowingly,' or 'recklessly' misrepresented and omitted to represent certain information"); *Van Wagoner*, 382 F. Supp. 2d at 1180 (although plaintiffs purported to disavow fraud allegations, their Section 11 claims relied on allegations of "a unified course of fraudulent conduct" and thus were subject to Rule 9(b)). Counts I-IV must be dismissed for this reason.

### IV.    THE "CONTROL PERSON" CLAIMS FALL WITH THE OTHER CLAIMS.

Plaintiffs do not dispute that a "control person" claim cannot stand in the absence of a predicate securities violation. Accordingly, since plaintiffs have failed to allege any predicate securities violations, their control person claims (counts IV and VI) must also be dismissed. *Vertex*, 357 F. Supp. 2d at 355; *Ezra Charitable Trust v. Tyco International Ltd.*, 2005 WL 2127619, fn. 2 (D.N.H. Sept. 2, 2005).

### CONCLUSION

For all the foregoing reasons, defendants Andrew J. Filipowski and Michael P. Cullinane respectfully request that the Court dismiss the amended complaint in its entirety, with prejudice.

Respectfully submitted,

October 31, 2005                          ANDREW J. FILIPOWSKI

                                         By _____
                                              One of his attorneys


                                         MICHAEL P. CULLINANE

                                         By _____
                                              One of his attorneys


Bruce S. Sperling
Thomas D. Brooks
SPERLING & SLATER, P.C.
(Admitted *Pro Hac Vice*)
55 West Monroe, Suite 3200
Chicago, Illinois 60603
312-641-3200
312-641-6492 (fax)

Halye A. Sugarman
HANIFY & KING
One Beacon Street
Boston, MA 02108
(617) 423-0400

*Counsel for Andrew J. Filipowski*

Samuel B. Isaacson
Lawrence A. Wojcik
Joseph Collins
(Admitted *Pro Hac Vice*)
DLA PIPER RUDNICK GRAY CARY US LLP
203 North LaSalle Street
Suite 1800
Chicago, IL 60601
(312) 368-4000

John Gilmore
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place

19

21st Floor
Boston, MA 02110-2613
(617) 406-6000

*Counsel for Michael P. Cullinane*