UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHARON BOBBITT, Individually and On Behalf of All Others Similarly Situated,<br><br>                     Plaintiff,<br><br>vs.<br><br>ANDREW J. FILIPOWSKI, et al.,<br><br>                     Defendants. | No. 04-12263-PBS<br><br>PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT |

**I.     PRELIMINARY STATEMENT**

Pursuant to the Court's request at the conference on June 23, 2006, Plaintiffs respectfully submit this supplemental memorandum in further support of their motion for preliminary approval of the proposed settlement in this securities class action.

As explained in our prior submissions, and as set forth herein, the agreed-upon settlement of $6.5 million in cash provides an excellent recovery for members of the Class and Sub-Classes.[1] Although Plaintiffs' counsel believed and continues to believe in the merits of this action, Plaintiffs' counsel recognizes that there are several real and significant risks with successfully prosecuting this case through trial. First, at a trial, Plaintiffs would likely face severe obstacles in proving liability. Perhaps of greatest significance, the most difficult task for Plaintiffs would be to prove liability for the portion of the Class Period when divine, Inc. ("divine") shares were significantly and artificially inflated by the alleged wrongdoing. Plaintiffs' claims would be relatively easier to prove later in the Class Period, when divine shares were already far lower and, thus, far less artificially inflated. In addition to this problem, in light of the Supreme Court's decision in *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), defendants would have raised numerous arguments concerning the extent of Plaintiffs' recoverable damages which, if successful, would limit the size of Plaintiffs' claims to the $0.23 decline at the end of the Class Period.

Moreover, proving their Exchange Act claims requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.S. §78u-4(b)(2). Here one of the common indicia of motive permitting such a strong inference -- insider selling by defendants -- was absent**.** The defendants in this action sold none of

---

[1] The definitions in Plaintiffs Memorandum In Support of Preliminary Approval of the Proposed Settlement are incorporated by reference herein.

their divine shares during the Class Period and basically "went down with the ship" as divine plunged into insolvency and bankruptcy. Thus, Plaintiffs would have had a difficult time convincing a jury that there was a scheme to inflate the price of the Company's stock when the insiders themselves continued to hold their shares, thereby demonstrating their own belief in the Company.

In addition, Plaintiffs faced limited sources of recovery. The Company was and is in bankruptcy and will not emerge therefrom. It was not known what amount of judgment the Individual Defendants could afford to pay, but it was represented to Plaintiffs' counsel by the mediator and by defendants' counsel that the Individual Defendants were steadfast in their refusal to contribute to the settlement. In Plaintiffs' counsels' judgment and experience this representation was accurate in particular because individual defendants are rarely willing to contribute their personal funds in a settlement when insurance, purchased specifically for such purpose and for their benefit, is available. Thus, Plaintiffs' recovery was limited by the Company's Directors and Officer's Liability policies which totaled $30,000,000. These policies were "wasting" policies and less than $19 million remained at the time of settlement.

As to these remaining proceeds, there were essentially two competing sets of claims. On the one hand, in the instant action were the Section 10(b) claims of the proposed Class under the Securities Exchange Act of 1934 and claims of the proposed Subclasses under the Securities Act of 1933 (including claims in the *Turner* Action asserting Securities Act claims of behalf of certain proposed subclasses members and which has been consolidated with this action). On the other hand were the claims of the Trustee in the bankruptcy and adversary proceedings pursuant to Chapter 11 in the United States Bankruptcy Court in the District of Massachusetts, Eastern Division. The Trustee's claims have not been settled yet, but the current demand, and the Trustee's demand at the time the proposed settlement was reached in this action, far exceeds the amount of insurance

proceeds remaining if the instant settlement is approved. The only source of recovery for the Trustee's claims in the Bankruptcy Court was the same limited insurance proceeds.

In addition, the procedural posture of this case at the time of settlement posed several very real risks that either this entire action or substantial parts of it would be dismissed after a difficult hearing before this Court. The Trustee also made a motion in the bankruptcy court, which is adjourned pending resolution of this motion, that the instant action be stayed to protect the debtor's assets in the bankruptcy proceedings. Although Plaintiffs believed such a motion was without merit and opposed it, there is no guarantee this action would not be stayed until the adversary proceedings were resolved. Had such a stay been ordered, even had an appeal or other relief from such an order been taken, the insurance proceeds would have been exhausted by either a judgment or settlement in the Trustee's action in bankruptcy court or by defense costs in that action. Thus, Plaintiffs faced a very real risk that there would be no insurance proceeds with which to settle this case.

As discussed below, in light of these serious concerns, the proposed settlement of $6.5 million for the Class and SubClasses is a significant achievement.

## II. ARGUMENT

### A. THE SETTLEMENT IS FAIR AND REASONABLE

#### 1. Liability For the Portion of the Class Period Where the Damages Were Substantial Would Have Been Difficult to Establish

Plaintiff' counsel believed that the initial claims that were plead in the original complaint in this action would have survived a motion to dismiss and also have succeeded at trial. These claims were based on an alleged scheme orchestrated by defendant Filipowski by which, starting in April 2002, defendants, through various incentives, encouraged subscribers to the periodical service of RoweCom, a wholly owned subsidiary of divine, to prepay their subscriptions. (SAC paras 68-74). Although divine siphoned over $70 million in cash from the payments of these subscribers in order

- 3 -

to satisfy its increasingly cash-starved general operating needs, it failed to pay the publishers of the periodicals in violation of its publicly stated policy that it would do so. However, the total projected damages for these claims (including Exchange Act and Securities Act claims from April 1, 2002 to the end of the Class Period) were approximately only $13 million. During that same time period, the damages on behalf of the Subclasses for Securities Act violations were only approximately $8.3 million, since three of four acquisitions (and the most substantial ones in damages), eShare, Data Return and Delano, had already taken place by this time. Moreover, the damages for fraud under the Exchange Act for this allegation were at best estimated to be limited to $4.7 million based on the decline in the price of the stock at the end of the Class Period.

Between the beginning of the Class Period, September 17, 2001 and April 1, 2002, Plaintiffs' claims on behalf of certain Subclasses under the Securities Act (for its eShare, Data Return and Delano acquisitions) amounted to $72.2 million in estimated damages, or approximately 84% of Plaintiffs' total estimated damages. The claims of these Subclasses were based on statements contained in prospectuses for these three offerings which Plaintiffs alleged were false and misleading. In the prospectuses, divine described its overall growth strategy. Although Plaintiffs alleged that these statements were overly positive in tone, and thus, were false and misleading in light of internal memos being circulated at the time by divine executives which discussed problems with cash flow and in integrating divine's acquisitions, defendants argued in their motion to dismiss, and would have argued again at trial, that these statements about divine's strategy would only have been misleading if, in fact, divine at that time had "abandoned" this strategy or "had a different plan in mind." *See* Defendants' Memo in Support of Their Motion To Dismiss at page 9 (hereinafter "Defs' Memo"). In objectively assessing the strength of their claims, Plaintiffs were forced to recognize that these claims were lacking in any specifics which could be directly correlated to or

contradicted by other internal information known to defendants at the time.  Defendants' arguments that statements supporting these claims were the kind of "loosely optimistic descriptions of [the company's] plan for integration [of the acquisition candidate]…" seemed persuasive particularly because courts in this District have found these types of statements to not be actionable.  Defs' Memo at 9 citing *Fitzer v. Security Dynamics Technologies, Inc.*, 119 F. Supp. 2d, 12, 30 (D. Mass. 2000).  Furthermore, adding to Plaintiffs' misgivings about the case, this Court, at the hearing on Defendants' Motion To Dismiss, seemed to confirm Plaintiffs' counsels' apprehensions by the Court's frequent questions about whether Plaintiffs alleged any misstatements that were "literally false."  Transcript of Hearing of November 3, 2005 at 24-29.

Although many of the internal statements, particularly memoranda between then-Chief Executive Officer Paul Humenansky and defendant Andrew Filipowski, made it clear that divine was having problems with its cash flow and in integrating acquisitions, defendants would have argued at trial that these problems are the type of challenges most companies routinely face and at best allege mismanagement.  Moreover, to state a claim under Section 11 of the Securities Act, plaintiffs must point to *affirmative* statements which were are false and misleading, 15 U.S.C. Sect. 77k(a).  "The proposition that silence, absent a duty to disclose, cannot be actionably misleading is a fixture in federal securities law."  *Shaw v. Digital Equipment*, 82 F.3d 1194, 2002 (1st Circ. 1996).

Plaintiffs also relied on certain other statements that Defendants made as false and misleading such as: "divine is **positioned** to deliver enterprise solutions . . .", "We are **committed** to reducing our cash burns . . . .", "We at divine are very **proud** to be recognized . . ." (emphasis supplied) (Second Amended Complaint ("SAC") paras. 54, 86, 93, 98, and 118.)  Although the flavor of these statements was unduly optimistic in light of various pessimistic internal contemporaneous memoranda, the vagueness of these statements would have made it unlikely that

- 5 -

they even would have gotten to a jury, since courts in this jurisdiction have found identical statements to be non-actionable.  *See* Defs" Memo at pp. 20-21 citing *Orton v. Paramedic*, 344 F. Supp. 2d 290, 301-02 (D. Mass. 2004); *In Re Boston Technology Securities Litigation*, 8 F. Supp.2d 43, 68 (D. Mass. 1998); and *Van Ormer v. Aspen Technology*, 145 F. Supp.2d 101, 107 (D. Mass. 2000).  Although Plaintiffs would have argued that all of these cases were distinguishable, it was not desirable to predicate securities claims on what can only be objectively categorized as general optimistic statements or corporate puffery.

In addition, there were also various statements which Plaintiffs alleged were false and misleading during the Class Period, but these were made after April 1, 2002 when the damages, as discussed above, were greatly diminished.  For instance, Plaintiffs argued that statements, contained in divine's Form 10-Qs, for the periods ending June 30, 2002 and September 30, 2002, misleadingly expressed a "belief" that cash generated from operations would be sufficient to fund divine's operations (SAC paras. 112-118).  Plaintiffs thus alleged that defendants knowingly made these statements without any basis since many of the internal memos sent by CEO Humenansky and/or Chief Financial Officer Michael Cullinane to defendant Filipowski decried divine's cash shortages.  Aside from the problem that damages during this latter part of the class period are severely limited, it was likely in Plaintiffs view that these particular 10(b) claims would have been held to a strict standard requiring proof at trial of **actual knowledge** of the material falsity of these statements, since, as defendants argued in their Memo, they fell within the Safe Harbor for Forward Looking Statements, 15 U.S.C. Section 78u-5(c)(i) (Exchange Act) and 15 U.S.C. Section 77z-2(c)(i) (Securities Act).  In addition, there were numerous "cautionary" statements accompanying these statements and thus the statements may have not have been actionable at all if such cautionary

statements were "meaningful." Defs' Memo at 14-15 citing *Greebel v. FTP Software*, 194 F.3d 185, 201 (1st Cir. 1999).

In sum, although Plaintiffs believed that they would have successfully opposed defendants' motion to dismiss the SAC, this was by no means assured, particularly given this Court's comments and apparent misgivings about the strength of some of the statements. Although it was Plaintiffs' belief that at least part of the SAC would have survived defendants' motion, Plaintiffs could have then found themselves in a significantly more disadvantageous negotiating position, particularly because the claims in the portion of the Class Period that contained the bulk of Plaintiffs' estimated damages would not have been on the table in negotiations.

### 2. Plaintiffs Faced the Substantial Risk That All of their Securities Act Claims Would Be Dismissed Because of Statute of Limitations Defenses

In addition, the defendants argued in their motion to dismiss (See Defs' Memo at 13-14) and would have likely done so on summary judgment and/or at trial, that Plaintiffs' Section 11 claims (which contained the bulk of plaintiffs' estimated damages) were barred under the statute of limitations because they were brought more that one year after Plaintiffs were put on "inquiry notice" of wrongdoing by the significant drop in divine shares that occurred on or before May 23, 2002. Plaintiffs' original complaint in this action alleged only Exchange Act claims and it was not until July 28, 2003 that one of the Plaintiffs brought a Securities Act claim. Although Plaintiffs had substantial legal arguments that they were not put on inquiry notice until after July 28, 2002, there was, in Plaintiffs' judgment, a substantial risk that **all** of the Securities Act claims could be lost.

### 3. Plaintiffs Obtained a Reasonable Percentage of the Remaining Insurance Policy Proceeds

The competing claims to divine's directors' and officers' wasting liability insurance policy proceeds by both the proposed class and several of the Company's and its subsidiary's creditors

make it unlikely that the Class would recover any greater proportion of the remaining 19 or so million dollars available to satisfy all claims. For example, the Rowe Com Trustee has valued its claim against Rowe Com's director, defendant Sullivan, at $73 million – the amount by which he allowed divine to transfer Rowe Com's cash to other subsidiaries. Another action was brought by the committee of divine's unsecured creditors against divine's management alleging breaches of fiduciary duties of due care, good faith and loyalty as directors and officers of divine.

The defendants in each of the Trustee's actions (and in this action if it does not settle) intend to defend themselves against the claims brought against them, and indemnification agreements between divine and its officers and directors require that defense costs and judgments be paid from the available insurance policies. Therefore, each day those actions and the shareholder action continue, funds available to satisfy judgment diminish. Therefore, obtaining $6.5 million of those proceeds now ensures its availability for the Class.

### 4. The Settlement Is Within the Range of Reasonableness When Considered In Light of Maximum Estimated Provable Damages

The parties to this action have divergent views with respect to the provable damages suffered by the Class in this action. Plaintiffs allege that as a result of the statistically significant decline in divine's stock price which occurred with each partial disclosure of troubles facing the Company, using a "plaintiff's style" damage model, maximum provable damages for claims under Section 11 of the Securities Act and under Section 10(b) of the Exchange Act could exceed $80 million. Not surprisingly, defendants' calculation of damages (which, of course, they vigorously deny) results in a number significantly lower than $80 million.

Defendants have consistently argued that §10(b) damages are limited by the fact that divine consistently and explicitly warned of the troubles it was having, as evidenced by the fact that the Company's stock had already declined by more than 90% prior to the start of the Class Period, and

- 8 -

also steadily declined throughout the Class Period, notwithstanding a 1 for 25 reverse stock split. The defendants maintain that even if the entire decline in divine's stock price was due to revelation of the alleged securities law violation, the maximum provable Section 10(b) damages are limited to no more than $6 million. With respect to Plaintiffs' Section 11 claims, defendants claim that the shares of the acquired companies were impaired at the time of their respective acquisition by divine, making the value of Plaintiffs' recessionary damages claim virtually worthless.

As the Court is aware, it is impossible to know in advance which side's damage calculations (and the experts who put them forth) will find favor with the fact finder. Therefore, a settlement of $6.5 million, at this point in time, eliminates the risk to the Class of a finding of damages below the amount of the settlement reached here.

### III.   CONCLUSION

For the foregoing reasons and for the reasons set forth in Plaintiffs' Memorandum In Support of Motion For Preliminary Approval of the Proposed Settlement, Plaintiffs' respectfully request that their motion be granted in full.

DATED:  July 21, 2006                          GILMAN AND PASTOR LLP
                                               DAVID PASTOR (BBO #391000)


                                                  /s/ David Pastor
                                               DAVID PASTOR

                                               Stonehill Corporate Center
                                               999 Broadway, Suite 500
                                               Saugus, MA  01906
                                               Tel.: 781/231-7850
                                               Fax:  781/231-7840

                                               *Liaison Counsel for Plaintiffs and the Class*

        LERACH COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
        SAMUEL H. RUDMAN
        DAVID A. ROSENFELD
        200 BROADHOLLOW ROAD
        MELVILLE, NY 11747
        TELEPHONE: 631/367-7100
        631/367-1173 (Fax)

        STULL STULL & BRODY
        Howard Longman
        6 East 45th Street
        New York, New York  10017
        Telephone:  212/687-7230
        212/490-2022 (fax)

        *Lead Counsel for Plaintiffs and the Class*