UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHARON BOBBITT, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | No. 04-12263-PBS |
| Plaintiff, | ) ) | JOINT DECLARATION OF PLAINTIFFS' COUNSEL IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPLICATION FOR AWARD OF ATTORNEY'S FEES AND EXPENSES |
| vs. | ) ) | |
| ANDREW J. FILIPOWSKI, et al., | ) ) | |
| Defendants. | ) ) ) | |
| JAMES F. HOWARD, Individually and On Behalf of All Others Similarly Situated, | ) ) | No. 06-11072-PBS |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| ANDREW J. FILIPOWSKI, et al., | ) ) | |
| Defendants. | ) ) ) | |

Howard T. Longman and David A. Rosenfeld, jointly declare as follows:

1.      Howard T. Longman of the law firm Stull, Stull & Brody and David A. Rosenfeld of the law firm Coughlin Stoia Geller Rudman & Robbins LLP, each firm a Lead Counsel for Lead Plaintiffs in the above-captioned action pending in this Court, submit this Joint Declaration in Support of the Motion for Final Approval of the Proposed Class Action Settlement.

2.      We each have personal knowledge of the matters set forth herein based on our active participation in all material aspects of the prosecution of this litigation.  If called upon, we could and would competently testify that the following facts are true and correct.

3.      Lead Plaintiffs have entered into an Amended Stipulation of Settlement with Defendants, dated March 20, 2008 (the "Stipulation"), which provides for the payment of $6,300,000 by the Defendants to the Class (the "Settlement").  The Settlement, if approved, will resolve all claims asserted by the plaintiffs in this litigation against the Defendants.

4.      This Joint Declaration sets forth the nature of the claims asserted, the principal proceedings to date, the legal services provided by Lead Counsel, the Settlement negotiations, and also demonstrates why the Settlement and Plan of Allocation, as set forth in the Notice of Pendency and Proposed Settlement of Class Action, Motion for Attorney Fees and Settlement Fairness Hearing ("Settlement Notice") and herein, are fair and in the best interests of the Class, and why the application for attorneys' fees and reimbursement of expenses is reasonable and should be approved by the Court.

## PRELIMINARY STATEMENT

5.      This case was carefully investigated and has been vigorously litigated since its commencement in May 2003, more than five years ago.  Plaintiffs' Counsel undertook an extensive investigation of the underlying facts, which included a review of divine's regulatory filings and reports, securities analysts' reports and advisories about the Company, the complaint filed by the

Examiner and two Trustees[1] in the related bankruptcy proceeding in the United States Bankruptcy Court for the District of Massachusetts, press releases and other public statements issued by the Company as well as interviews with former employees of divine, Inc. ("divine" or the "Company"). Plaintiffs also consulted extensively with experts on the issue of damages and loss causation. Plaintiffs' investigation allowed them to carefully assess the risks they would face in continuing to litigate the case through summary judgment and trial.

6.      After filing two consolidated complaints and briefing two rounds of motions to dismiss (to account for the differences in Circuit law after the action was transferred from the Northern District of Illinois to this Court), and before the Court issued any ruling, the parties engaged in two comprehensive mediation sessions before the Honorable Layn Phillips (Ret.), United States District Court Judge for the Western District of Oklahoma, where the parties met face-to-face, made presentations regarding the claims and defenses thereto and negotiated about possible settlement terms.  In January 2006, a settlement of $6,500,000 plus interest was reached to resolve all claims against defendants. One of the conditions of such settlement was the approval by the Bankruptcy Court of the use of the director's and officer's liability insurance policy proceeds to fund the settlement.  Although the United States Bankruptcy Court granted such approval on March 16, 2007, the Trustees in Bankruptcy immediately filed an appeal of the Court's ruling.  Lead Plaintiffs

---

[1]      The Examiner, Stewart Grossman, filed a complaint in the action captioned *In re Enivid, Inc. Stewart Grossman Examiner of In re Enivid v. Filipowski, et al.*, Case No. 03-011472-JNF, while the trustees, James B. Boles and Christopher J. Panos, filed complaints in the respective actions captioned *James B. Boles, Liquidation Trust Representative of the Envid, Inc. Liquidation Trust v. Andrew Filipowski, et al.,* Adv. Pro. No. 04-1439-JNF (the "Boles Action") and *Christopher J. Panos, Trustee of the RoweCom Liquidating Trust v. Jude M.* Sullivan, Adv. Pro. No. 05-01019-JNF (the "Panos Action") (collectively, the "Trustees").

subsequently agreed to reduce the settlement amount by $200,000 to $6,300,000 in exchange for the

Trustees' agreement to withdraw their appeal of the bankruptcy court's order.

7.     The proposed $6,300,000 Settlement is a notable achievement derived from the

substantial efforts of Lead Counsel who zealously litigated this case under the circumstances of this

litigation, and is eminently fair, reasonable and adequate based on the numerous impediments to

recovery, the legal hurdles and risks involved in proving liability and damages, as well as the further

risk, delay and expense had this case continued to trial against the Defendants. Lead Plaintiffs and

Defendants do not agree on the average amount of damages per share that would be recoverable if

Plaintiffs were to have prevailed on each claim asserted. Perhaps not surprisingly, Defendants do

not believe that Plaintiffs would have prevailed at all. Indeed, Defendants continue to assert that the

Class suffered little or no damages as a result of the securities law violations that are alleged in the

Second Consolidated Class Action Complaint (the "SC"). In light of such adamant opposition, a

recovery of $6,300,000, derived solely as a result of Lead Counsel's efforts, represents a highly

successful result, particularly in light of divine's bankruptcy and the limited resources for recovery at

the time of the settlement negotiations.

8.     The Settlement was negotiated on all sides by experienced counsel with a firm

understanding of the strengths and weaknesses of their clients' respective claims and defenses. The

Settlement confers a substantial and immediate benefit to the Class while eliminating the risk of little

or no recovery against Defendants. Lead Counsel respectfully submit that, under these

circumstances, the Settlement is in the best interests of the Class and should be approved as fair,

reasonable and adequate. The Court should also approve the Plan of Allocation of settlement

proceeds and award attorneys' fees in the amount of 30% of the Settlement Fund, plus expenses

incurred in the prosecution of this litigation of $451,283.94, which have been advanced by Lead

Counsel in connection with this litigation, plus interest thereon, as a result of Lead Counsel's considerable efforts in creating this substantial and extraordinary benefit on behalf of the Class.

9.     The Class appears to overwhelmingly approve the Settlement.  Pursuant to the Court's Amended Order Preliminarily Approving Settlement and Providing for Notice, entered April 16, 2008 (the "Notice Order"), the Settlement Notice was mailed to over 29,000 Class Members. Additionally, a Summary Notice of Settlement was published in *Investor's Business Daily* on May 6, 2008 (the "Summary Notice").  The Summary Notice apprised Class Members of their right to object to the Settlement, the Plan of Allocation or to Lead Counsel's application for attorneys' fees of 33% of the total Settlement Fund and reimbursement of expenses of up to $425,000.00.  The time within which to file objections to the proposed settlement expired on June 2, 2008.  No objections to the settlement were filed and there have been only three exclusions, only one of which is arguably valid.

10.     Lead Counsel have litigated this case for five (5) years on a wholly-contingent basis. The fee application for 30% of the total recovery of the Settlement Fund is fair, reasonable and adequate and warrants Court approval.  This fee request is well within the range of fees typically awarded in actions of this type and is wholly justified in light of the benefits obtained, the substantial risks undertaken, the financial condition of divine, and the quality, nature and extent of the services rendered, as more fully set forth in the Memorandum of Points and Authorities in Support of Plaintiffs' Counsel's Application for an Award of Attorney Fees and Expenses, submitted herewith.

11.     In sum, the Settlement is the product of hard-fought litigation and protracted arm's-length negotiation and takes into consideration the risks specific to this case and the Settling Parties. Lead Counsel respectfully submit that, under these circumstances, the Settlement is in the best interests of the Class and should be approved as fair, reasonable and adequate.

- 4 -

12.     Following is a description of the principal proceedings in this matter and the major legal services provided by Lead Counsel, the negotiations of the Settlement, the terms of the Settlement, an explanation as to why the Settlement and the Plan of Allocation are fair and in the best interests of the Class, and the reasonableness of Lead Counsel's fee and expense reimbursement request.

## STATEMENT OF FACTS

13.     divine was founded in 1999 as an Internet-holding company engaged in business-to-business e-commerce through a community of associated companies. ¶16.[2]  In February 2001, divine announced that it was refocusing its business in order to become a major player in the "extended enterprise space" —which the Company generally described as providing enterprise Web solutions. ¶18. The Company then began a major acquisition campaign in which it acquired companies which presumably fit into the Company's strategy.  During fiscal years 2001 and 2002, divine completed more than 20 acquisitions and in virtually all instances it used its common stock as currency for such acquisitions. ¶¶20-22.  This growth-by-acquisition strategy, and divine's ability to effectively integrate acquired businesses and cross-sell these products, is how divine attempted to attract investors to support its stock price.

14.     As detailed in the Complaint, however, in contradiction to statements made by Defendants, the Company's business strategy was in shambles. ¶23.  Additionally, Defendants never disclosed to investors the true purpose behind its acquisition strategy – to acquire companies which had cash to fund divine's operations, irrespective of the financial performance or prospects of those companies.  ¶¶38-39.  On October 30, 2001, Jude Sullivan, divine's General Counsel, wrote a memo

---

[2]     "¶" are references to paragraphs in the SC.

to defendants Filipowski and Cullinane and others stating "the cliff notes version is that RoweCom's [divine's subsidiary] financial position has deteriorated to a much worse position than any of us were aware of. . . ." Sullivan went on to say that the cash burn situation was much worse than anticipated and that RoweCom would need a $30 million capital contribution "even before reaching the cash/flow management issues" that the business presented. ¶32.

15.    Even though Defendants were well aware of divine's weak financial position and desperate need for cash, they nevertheless misrepresented divine's financial condition to investors. For example, on November 12, 2001, in announcing divine's 3rd quarter results, defendant Cullinane stated that "With $176 million cash and cash equivalents, at September 30, we believe we have adequate resources to fund divine and execute our business plan until we achieve our profitability target in the last half of 2002." ¶42. This statement was false because defendants knew that the Company was burning cash at an alarming rate and that cash flow projections were down to $60-90 million despite internal projections of revenue of $150 million and decreasing revenues. In fact, by January, 2002, Humanensky told defendant Filipowski that "PSO"[3] revenues were going down EVERY week." ¶48.(emphasis in original memo).

16.    Additionally, Defendants never disclosed to investors that its acquisition strategy was a failure. Indeed, the SC details the problems attendant to the Company's acquisition strategy based upon internal Company documents and the accounts of numerous former employees of divine. ¶¶24-29. Even from the start, top Company executives had a very pessimistic view of divine's prospects in connection with its growth-by-acquisition strategy and the Company's financial position was in dire straits. ¶¶25-26. These undisclosed adverse factors continued to materially erode

---

[3]    Divine was divided into three segments: Divine Professional Services ("PSO"), Divine Software Services ("SSO"), and Divine Managed Services ("DMS").

divine's financial condition and eventually forced the Company to file for bankruptcy and liquidate its assets in an attempt to pay its debts. ¶¶141,143.

17.    Arguably, Defendants' worst offense, however, involved its RoweCom subsidiary, whose business was providing institutions, such as public libraries, with subscriptions to periodicals.[4] ¶¶68-74. In order to generate cash for divine's operations, Defendants orchestrated a scheme whereby RoweCom customers pre-paid for periodical subscriptions ostensibly because they would receive a discount from RoweCom for doing so. In this regard, from April 2002 to November 2002, RoweCom collected more than $70 million. Those monies, however, were not used by RoweCom to pay for periodical subscriptions, as RoweCom's customers expected and as RoweCom had traditionally done. Instead, the monies were utilized by divine for its ongoing operations because divine was unable to secure other traditional means of financing. When the time came for RoweCom to pay publishers for the periodicals they had ordered, neither RoweCom nor divine had the funds to make such payments. Thus, in essence, divine used RoweCom to help it generate sorely-needed capital knowing or recklessly disregarding the fact that it would be unable to satisfy RoweCom's obligations to the publishers and its customers when the time came. ¶74.

18.    Unfortunately, the strongest aspect of Plaintiffs' claims against Defendants resulted in relatively little damages to class members. Although divine siphoned over $70 million in cash from payments made by RoweCom's customers, the total projected damages for these claims from April

---

[4]    The benefit to RoweCom's customers of utilizing RoweCom's services was that a library might have hundreds or even thousands of subscriptions to different periodicals. By using RoweCom, the library customer would only have to write one check to RoweCom who would then handle all of the dealings with the publishers. RoweCom would require payment from the customer for the subscription and also charge the customer a variable service charge that was a percentage of the overall subscription. RoweCom was then responsible for ensuring that the publisher received payment.

1, 2002 to the end of the Class Period were approximately only $13 million. This includes damages of approximately $8.3 million to the sub-classes of investors who allege violations of the Securities Act of 1933 (the "Securities Act"), and damages for fraud under the Securities Exchange Act of 1934 (the "Exchange Act") of approximately $4.7 million.

19.     On January 17, 2003, the first details emerged of divine's scheme to defraud RoweCom customers in an article appearing in the *Chicago Tribune*. ¶136. On January 27, 2003, divine announced that it had signed a letter of intent for the sale of RoweCom's business and announced on February 6, 2003 that a final purchase agreement had been signed. ¶¶138-139.

20.     Finally, on February 18, 2003, divine announced that, despite "efforts over the past several months to minimize operating expenses and various liabilities," its board of directors determined that it would consider filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code. As a result of this announcement, divine's stock price, which had already declined to $0.35 per share, lost another 65% of its value. On February 25, 2003, divine announced that it and several of its subsidiaries would in fact file for bankruptcy protection under Chapter 11. ¶¶141-143.

## PLAINTIFFS' PROSECUTION OF THE CASE

### The Filing of the Securities Litigation and Appointment of Lead Plaintiffs

21.     After divine's February 18, 2003 announcement, eight related class action complaints alleging violations of the Exchange Act were filed in the Northern District of Illinois against divine and certain of its officers and directors. The actions, which were ultimately consolidated into the low-numbered case, the action captioned *Bobbitt v. Filipowski, et al.*, Case No. 03-cv-03599 (the "Consolidated Action"), were assigned to the Honorable Samuel Der-Yeghiayan. In accordance with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), motions for lead plaintiff were filed on July 29, 2003 and, on August 19, 2003, Judge Der-Yeghiayan appointed James Tito

and Frank Waddell as Lead Plaintiffs and approved their selection of Cauley Geller Bowman and Rudman LLP[5] and Stull, Stull & Brody as Lead Counsel.

22.    In addition to the pending Consolidated Action before Judge Der-Yeghiayan, two cases were filed by investors in the Circuit Court of Cook County, Illinois, alleging violations of the Securities Act.  As described below, those two actions, *Howard v. Filipowski* and *Turner v. Filipowski*, were ultimately removed to federal court.  The *Turner* Action was consolidated with the Consolidated Action, while the *Howard* Action was first transferred to Bankruptcy Court and then came to this Court on June 20, 2006, after the Memorandum of Understanding had already been signed.

23.    Lead Plaintiffs continued their factual investigation, which resulted in the filing of a consolidated complaint on December 11, 2003 (the "First Consolidated Complaint").  In addition to alleging claims of fraud under the Exchange Act, the First Consolidated Complaint also alleged violations of the Securities Act on behalf of subclasses of investors who had received shares of divine in connection with divine's acquisition of companies of which they had been public shareholders.

24.    On December 26, 2004, two separate motions to dismiss were filed by Defendants Filipowski and Cullinane.  In support of their motions, Defendants argued that: (i) the claims under the Securities Act were barred by the statute of limitations; (ii) the fraud claims were not plead with the requisite particularity; (iii) the statements that were identified as materially false and misleading were non-actionable conclusions, puffery and predictions; (iv) in any event, the statements that were

---

[5]    Effective May 1, 2004, the law firm of Cauley Geller Bowman & Rudman LLP ceased to operate.  The attorneys handling this action from Cauley Geller Bowman & Rudman LLP are now with the law firm of Coughlin Stoia Geller Rudman and Robbins LLP.

identified as materially false and misleading were entitled to safe-harbor protection under the PSLRA because they were accompanied by meaningful cautionary language; (v) Plaintiffs failed to adequately plead scienter; and (vi) Plaintiffs have failed to adequately plead loss causation.

25.     On March 10, 2004, Lead Plaintiffs filed a memorandum in opposition to Defendants' motions in which they responded to each of the arguments raised by Defendants.  On March 31, 2004, defendant Cullinane filed a reply memorandum in further support of his motion.  On or about August 10, 2004, Lead Plaintiffs filed a notice of supplemental authority and provided Judge Der-Yeghiayan with a recent decision which supported its opposition to the motion to dismiss.

26.     By an Order entered on  the same day, Judge Der-Yeghiayan *sua sponte* directed the parties to brief the issue of whether the Consolidated Action should be transferred to the District of Massachusetts and related to the bankruptcy proceedings of divine which were pending in that district.  In the same Order, Judge Der-Yeghiayan also denied all pending motions as moot.

27.     On September 2, 2004, Plaintiffs and Defendants both filed memoranda in response to Judge Der-Yeghiayan's August 10, 2004 Order.  On September 22, 2004, Plaintiffs and Defendants filed responses to the competing memoranda.  By Order dated October 7, 2004, Judge Der-Yeghiayan transferred the Consolidated Action to this Court.  In addition to the Consolidated Action being transferred to this Court, the *Howard* and *Turner* Actions were also later transferred. By motion of the Lead Plaintiffs, the *Turner* Action was consolidated with the Consolidated Action; the *Howard* Action was first transferred to Bankruptcy Court and then came to this Court on June 20, 2006, after the Memorandum of Understanding had already been signed.

28.     At a status conference held before this Court on January 19, 2005, the parties and the Court agreed on a schedule for the filing of the SC and briefing on a motion to dismiss directed at the SC.

29.    The 90-page SC was filed on March 8, 2005 and included further details of Defendants' alleged wrongdoing.  On April 7, 2005, Defendants Cullinane and Filipowski filed a joint motion to dismiss the SC, raising arguments similar to the ones that were made in their earlier motions to dismiss, although the controlling law cited was now different.  On September 12, 2005, Lead Plaintiffs opposed Defendants' motion and filed a memorandum in opposition.

30.    Since the motion to dismiss now cited to First Circuit law, Lead Plaintiffs were required to extensively research the relevant arguments and respond to each one, applying different law than their prior memorandum.  Lead Plaintiffs argued, among other things, that their allegations: (i) included specific statements alleged to be false and misleading and the reasons why; (ii) sufficiently plead facts giving rise to a strong inference of scienter; (iii) adequately pled loss causation; (iv) and that Defendants' statements contained materially false and misleading statements and omitted material facts.  In addition, Plaintiffs argued that the SC also adequately alleged all of the elements of a Securities Act claim.  On October 31, 2005, Defendants filed a reply memorandum which generally responded to Lead Plaintiffs' opposition memoranda and re-asserted many of the arguments made in their motion to dismiss.

31.    On November 3, 2005, the parties presented their oral argument on Defendants' motion to dismiss.  Following the argument, the parties continued to attempt to negotiate a settlement of this action, as described more fully below.

32.    On March 15, 2006, at a status hearing before this Court, the parties advised the Court that they had reached an agreement in principle to settle the claims in the Consolidated Action. On March 16, 2006, this Court, without ruling on the merits of defendants' motions to dismiss, entered an Order denying defendants' motions to dismiss without prejudice.

**The Parties Engage In Two Mediation Sessions and
Lead Plaintiffs Reach Agreement with the Defendants**

33.    While motion practice was occurring, the parties engaged in a series of comprehensive mediation sessions where the parties met face-to-face, made presentations regarding the claims and defenses thereto and negotiated about possible settlement terms.

34.    On June 29, 2005, the parties participated in a face-to-face formal mediation with the assistance of Honorable Layn R. Phillips (Ret.), United States District Court Judge for the Western District of Oklahoma. The parties prepared and exchanged comprehensive mediation briefs and expended substantial efforts in connection with this mediation. The parties discussed: (i) the ability of Lead Plaintiffs to demonstrate defendants' liability; (ii) the risks of protracted litigation, particularly the ability of defendants to satisfy any judgment in light of divine's bankruptcy; (iii) the effect that the Trustee's claim in the bankruptcy action would have on the settlement; and (iv) the likelihood of proving damages. While Lead Plaintiffs made some progress with Defendants during this initial mediation session, the parties were unable to agree on terms of a settlement. Following this initial mediation, the parties continued to have discussions with Judge Philips via telephone in order to reach a settlement.

35.    On November 17, 2005, the Parties mediated in person with Judge Layn Philips for the second time and reached an initial settlement valued at $6,500,000. In reaching this settlement, the parties discussed, and Lead Counsel considered, the problems faced by plaintiffs with proceeding with the litigation, particularly: (i) the lack of actual materially false and misleading statements made by Defendants during the Class Period to which liability could attach; (ii) the significant problems in proving damages and loss causation for the Exchange Act claims because the stock was trading for pennies ($0.35) by the time of the disclosure of the truth at the end of the Class Period; and (iii) the limited (and wasting) amount of directors and officers insurance policies ("D&O Policies") available

- 12 -

to contribute to a settlement and the competition for this same limited source of funds with the Trustee in bankruptcy.

36.    On February 2, 2006, counsel executed a Memorandum of Understanding.  Papers in support of preliminary approval were filed with this Court and a hearing was held in connection therewith on June 23, 2006.  At this hearing, this Court requested additional briefing describing the benefits of the proposed settlement.  On July 21, 2006, Plaintiffs' counsel filed a Supplemental Memorandum in Support of Preliminary Approval of Proposed Settlement as requested by the Court.  On August 25, 2006, the Court entered an Order preliminarily approving the Settlement and providing for dissemination of Notice, conditional on approval in the bankruptcy court of the use of the proceeds from the D&O Policies to fund the class action settlement.

37.    After full briefing, Plaintiffs presented argument to the Bankruptcy Court on February 8, 2006 to argue why the Bankruptcy Court should approve the use of proceeds from the D&O Policies to fund the Settlement.  On March 16, 2007, the United States Bankruptcy Court for the District of Massachusetts entered an Order approving the use of proceeds of divine's D&O Policies to fund the Settlement.  Subsequently, the Trustees in bankruptcy appealed the order of the Bankruptcy Court.  After numerous discussions with the Trustees, Plaintiffs agreed to reduce the Settlement by $200,000 in exchange for the Trustees' agreement to withdraw their appeal of the order of the Bankruptcy Court.  Even though the major terms of the proposed Settlement had been reached and agreed upon, additional months were required to iron out the remaining terms of the Settlement and enter into the Amended Stipulation of Settlement.  Numerous drafts of the Amended Stipulation of Settlement and accompanying exhibits were circulated among the parties for comments over the course of many, many months until an agreed-to form of the Stipulation and exhibits were ultimately filed with the Court.

- 13 -

38.     Lead Counsel firmly believes that the compromise embodied in the Settlement represents an excellent recovery for the Class.  The proposed $6,300,000 will provide Class Members a benefit now and without risk of there being no recovery if the litigation continued against these defendants, especially given that divine was in bankruptcy and the settlement resources were extremely limited and wasting.

**Lead Counsel Engages Bankruptcy Counsel to Protect the Interests of the Class**

39.     This case was further complicated by divine's filing for bankruptcy protection.  To adequately monitor the related bankruptcy proceedings and to protect the interests of the Class, Lead Counsel retained the services of Lowenstein Sandler, P.C., a firm with a nationally recognized bankruptcy practice group that specializes in litigating matters in bankruptcy court related to securities class actions.

40.     As a result of Lead Counsel's decision to retain Lowenstein Sandler, the class was well-positioned to deal with issues relating to the relevant D&O Policies and the impact of an adversary proceeding filed on March 17, 2005 in the United States Bankruptcy Court for the District of Massachusetts by one of the trustees, James B. Boles, the Liquidating Trust Representative, against various individual defendants, including the individual defendants in the Consolidated Action. A similar adversary proceeding was filed by the Trustee in the Rowecom Chapter 11 case. The Trustees sought a recovery in their actions from the proceeds of the D&O Policies – the same source of funds that the Class was seeking to be paid from.

41.     In separately commenced adversary proceedings against Lead Plaintiffs, the Trustees thereafter sought to stay the Consolidated Action until the Trustees' actions could be resolved.  The Trustees argued that the proceeds of the director's and officer's liability policies were the property of the bankruptcy estate and that the estate had priority to these proceeds.  If such a stay had been granted, if would have effectively eliminated the source of recovery for Lead Plaintiffs and the class.

This issue was also of paramount concern since a similar stay had been granted by another court in another jurisdiction. Lead Plaintiffs' bankruptcy counsel were familiar with the issues raised by the adversary proceedings and, under the direction of Lead Counsel, drafted and filed papers in opposition to each application for a stay.

42.     In addition, Defendants required, and Lead Plaintiffs agreed, that a condition of any settlement was the obtaining of a final order from the Bankruptcy Court specifically approving of the use of the proceeds of the director's and officer's liability policies to fund a settlement, even though Lead Counsel believed that the policy proceeds were not property of the bankruptcy estate.

43.     The Trustees' initial motions seeking a stay were adjourned by consent of the parties. Lead Plaintiffs, with the assistance of bankruptcy counsel, and at the suggestion of the Bankruptcy Court, made a motion in the Bankruptcy Court seeking approval of the use of the insurance proceeds to fund the Settlement while the Trustees cross-moved for a stay of the Consolidated Action. After oral argument by bankruptcy counsel, Judge Feeney issued an order and opinion dated March 16, 2007, almost two years after the filing of the Trustees' adversary proceedings, approving of the use of the proceeds of the D&O Policies to fund the instant settlement and denying the Trustees' application for a stay.

44.     The Trustees appealed Judge Feeney's ruling to this Court. Even though Lead Plaintiffs reached an agreement with the Trustee after such ruling to reduce their settlement by $200,000 from $6.5 million to $6.3 million in the interests of moving the process forward and eliminating any risk associated with the appeal, the instant action was still inextricably bound up with the Trustees' adversary proceedings in Bankruptcy Court because the compromise agreement resolving the Trustees' appeal was conditioned on getting a final order by the Bankruptcy Court approving any settlement of the Trustee's action. Bankruptcy counsel continued to aid Lead Counsel

- 15 -

in monitoring and urging the parties in the Trustees' action to resolve all of their issues. Finally, on May 28, 2008, an order was entered by Judge Feeney approving of the Trustee's settlement and thus permitting the instant settlement to go forward to a final fairness hearing. Importantly, Lead Counsel worked closely with bankruptcy counsel in these proceedings, discussing strategy together and reviewing all submissions to the bankruptcy court prior to their filing.

## MAILING AND PUBLICATION OF NOTICE OF SETTLEMENT

45.    In the Notice Order, the Court set a schedule for mailing the Settlement Notice and the Proof of Claim and Release ("Proof of Claim") to Class Members who could be identified with reasonable effort, and for publishing the Summary Notice in *Investor's Business Daily*.

46.    Submitted herewith is the Declaration of Carole Sylvester of Gilardi & Co. LLC, the Claims Administrator, regarding: a) mailing of the Settlement Notice and the Proof of Claim, and b) publication of the Summary Notice, which attests that a total of more than 29,000 Settlement Notices have been mailed to Class Members, and that the Summary Notice was published in *Investor's Business Daily* on May 6, 2008.

47.    The Settlement Notice states that objections to any aspect of the Settlement, the Plan of Allocation or the application for attorneys' fees and reimbursement of expenses were to be filed by June 2, 2008. That date has now passed and we can represent that no objection by any Class Member has been received by Lead Counsel or been filed with the Court to any aspect of the Settlements or Plan of Allocation or request for attorneys' fees and expenses. There have been three exclusions filed. However, only one of those exclusions was filed an investor who purchased shares during the Class Period and that investor would not be entitled to any recovery in any event because their losses were trading losses and not attributable to any fraud.

## FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENTS

### The Settlement Was Fairly and Aggressively Negotiated By Counsel

48.     As set forth above, the terms of the Settlement were negotiated by the parties at arm's-length.  The Settlement was reached only after extensive protracted settlement negotiations with the substantial assistance of Judge Layn Philips.  Consistent with the Parties' hard-fought and aggressive litigation of this action, Lead Counsel spent countless hours investigating the allegations of wrongdoing and litigating Plaintiffs' claims, while at the same time pursuing settlement discussions.  Once settlement discussions commenced, it took many months for Lead Counsel to reach agreements with Defendants, and then additional months to document and present the final terms of the Settlement to the Court for approval.  The Settlement was also particularly difficult because of the considerable delays that arose as a result of the Settlement being conditional on various proceedings in the Bankruptcy Court, including the Order that was eventually obtained on March 16, 2007 approving the use of insurance proceeds to fund the Settlement and appeals therefrom, and approval by the Bankruptcy Court of the settlement obtained by the Trustees.

### Defendants' Denial of Wrongdoing and Liability Placed
### the Outcome of the Class Action in Significant Doubt

49.     Even though the Plaintiffs believe their claims are strong, they recognize and acknowledge the expense and length of time which would be consumed by continued proceedings, which would be necessary to prosecute the Consolidated Action against the Defendants through trial and appeals.  Lead Counsel has also taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as this Consolidated Action, as well as the difficulties and delays inherent in such litigation.  Lead Counsel are also mindful of the inherent problems of proof under, and possible defenses to, the securities law violations asserted in the Consolidated Action.  Further, Lead Counsel also considered Defendants' ability to pay, in light of the financial

circumstances of divine, and the ability to fund a settlement or satisfy a verdict from insurance proceeds, which have been used in part to defend this Action. The fact that there are limited sources of recovery due to divine's bankruptcy, clearly weighs in favor of settlement. Plaintiffs' recovery is limited by the Company's D&O Policies, which totaled $30,000,000. These policies were "wasting" policies and less than $19 million remained at the time of settlement. Significantly, there were two sets of claims competing for the remainder of this policy. One is the instant action and the other competing claim is that of the Trustee in the bankruptcy and adversary proceedings pursuant to Chapter 11 in the United States Bankruptcy Court in the District of Massachusetts, Eastern Division. The Trustee's demand at the time of the proposed Settlement far exceeded the amount of insurance proceeds that would remain if the instant settlement is approved. In addition, the Trustee made a motion in the bankruptcy court to stay the instant action in order to protect the debtor's assets during the bankruptcy proceeding. That motion had been adjourned pending resolution of the proposed Settlement, but if not for the Settlement, this action may have been stayed until the adversary proceedings were resolved and, as a result, the insurance proceeds would have been exhausted by either a judgment or settlement in the Trustee's action in bankruptcy court or by defense costs in that and this action.

50.     Defendants have denied and continue to deny each and all of the claims and contentions alleged by the Plaintiffs in the Consolidated Action. Defendants have expressly denied and continue to deny all charges of wrongdoing or liability against them arising out of any conduct, statements, acts or omissions alleged, or that could have been alleged, in the Consolidated Action. Defendants have also denied and continue to deny, *inter alia*, the allegations that Plaintiffs or the Class have suffered damages, that the price of divine common stock was artificially inflated by

reasons of alleged misrepresentations, non-disclosures or otherwise, and that the Plaintiffs or the Class were harmed by the conduct alleged in the SC.

51.    The determination of damages is a complicated and uncertain process, typically involving conflicting expert opinions. Factors which would be considered in the determination of damages include, among others: (i) whether any of the alleged misrepresentations caused the price of divine stock to be artificially inflated during the Class Period; (ii) whether the disclosure of truths regarding any alleged misrepresentations was related to the drop in the price of divine stock during or after the Class Period; (iii) the appropriate economic model for determining the amount by which divine stock was artificially inflated (if at all) during the Class Period; (iv) the effect of various market forces influencing the trading price of divine stock at various times during the Class Period; and (v) the extent to which external factors, such as general market and industry conditions, influenced the trading price of divine stock during the Class Period.

52.    Perhaps of greatest significance, the most difficult task for Plaintiffs would be to prove liability for the portion of the Class Period when divine shares were significantly and artificially inflated by the alleged wrongdoing. Plaintiffs' claims would be relatively easier to prove later in the Class Period, when divine shares were already far lower and, thus, far less artificially inflated. In light of the Supreme Court's decision in *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), defendants would have raised numerous arguments concerning the extent of Plaintiffs' recoverable damages which, if successful, would limit the size of Plaintiffs' claims to the $0.23 decline at the end of the Class Period.

53.    Specifically, one of Plaintiffs' biggest obstacles would have been proving liability for the portion of the Class Period when divine shares were trading at much higher levels. Plaintiffs'

claims would be relatively easier to prove later in the Class Period, when divine shares were already far lower and, thus, far less artificially inflated.

54.     These claims were based on an alleged scheme orchestrated by defendant Filipowski by which, starting in April 2002, Defendants, through various incentives, encouraged subscribers to the periodical service of RoweCom, a wholly owned subsidiary of divine, to prepay their subscriptions.  Although divine siphoned over $70 million in cash from the payments of these subscribers in order to satisfy its increasingly cash-starved general operating needs, it failed to pay the publishers of the periodicals in violation of its publicly stated policy that it would do so.  However, the total projected damages for these claims (including Exchange Act and Securities Act claims from April 1, 2002 to the end of the Class Period) were approximately only $13 million.  During that same time period, the damages on behalf of the SubClasses for Securities Act violations were only approximately $8.3 million, since three of four acquisitions (and the most substantial ones in damages), eShare, Data Return and Delano, had already taken place by this time.  Moreover, the damages for fraud under the Exchange Act for this allegation were at best estimated to be limited to $4.7 million based on the decline in the price of the stock at the end of the Class Period.

55.     Between the beginning of the Class Period, September 17, 2001 and April 1, 2002, Plaintiffs' claims on behalf of certain SubClasses under the Securities Act (for its eShare, Data Return and Delano acquisitions) amounted to approximately 84% of Plaintiffs' total estimated damages.  Those claims were based on broad statements contained in prospectuses for these three offerings which Plaintiffs alleged were false and misleading.  In the prospectuses, divine described its overall growth strategy.  Although Plaintiffs alleged that these statements were overly positive in tone, and thus, were false and misleading in light of internal memos being circulated at the time by divine executives which discussed problems with cash flow and in integrating divine's acquisitions,

defendants argued in their motion to dismiss, and would have argued again at trial, that these statements about divine's strategy would only have been misleading if, in fact, divine at that time had "abandoned" this strategy or "had a different plan in mind." *See* Defendants' Memo in Support of their Motion to Dismiss at page 9 (hereinafter "Defs.' Memo"). In objectively assessing the strength of their claims, Plaintiffs were forced to recognize that these claims were lacking in any specifics which could be directly correlated to or contradicted by other internal information known to Defendants at the time. Defendants' arguments that statements supporting these claims were the kind of "loosely optimistic descriptions of [the company's] plan for integration [of the acquisition candidate]…" seemed persuasive particularly because courts in this District have found these types of statements to not be actionable. *Fitzer v. Security Dynamics Technologies, Inc.*, 119 F. Supp. 2d, 12, 30 (D. Mass. 2000). Furthermore, adding to Plaintiffs' misgivings about the case, this Court, at the hearing on Defendants' Motion To Dismiss, seemed to confirm Plaintiffs' counsels' apprehensions by the Court's frequent questions about whether Plaintiffs alleged any misstatements that were "literally false." Transcript of Hearing of November 3, 2005 at 24-29.

56.    Although many of the internal statements, particularly memoranda between then-Chief Executive Officer Paul Humenansky and defendant Andrew Filipowski, made it clear that divine was having problems with its cash flow and in integrating acquisitions, defendants would have argued at trial that these problems are the type of challenges most companies routinely face and at best allege mismanagement. Moreover, to state a claim under Section 11 of the Securities Act, plaintiffs must point to *affirmative* statements which were are false and misleading, 15 U.S.C. Sect. 77k(a).

57.    Plaintiffs also relied on certain other statements that Defendants made as false and misleading such as: "divine is **positioned** to deliver enterprise solutions . . .", "We are **committed** to

reducing our cash burns . . . .", "We at divine are very **proud** to be recognized . . ." (emphasis supplied).  Although the flavor of these statements was unduly optimistic in light of various pessimistic internal contemporaneous memoranda, the vagueness of these statements would have made it unlikely that they even would have gotten to a jury, since courts in this jurisdiction have found identical statements to be non-actionable.  *See* Defs.' Memo at pp. 20-21 citing *Orton v. Paramedic*, 344 F. Supp. 2d 290, 301-02 (D. Mass. 2004); *In re Boston Tech. Sec. Litig.*, 8 F. Supp.2d 43, 68 (D. Mass. 1998); and *Van Ormer v. Aspen Technology*, 145 F. Supp.2d 101, 107 (D. Mass. 2000).  Although Plaintiffs would have argued that all of these cases were distinguishable, it was not desirable to predicate securities claims on what can only be objectively categorized as general optimistic statements or corporate puffery.

58.    In addition, there were also various statements which Plaintiffs alleged were false and misleading during the Class Period, but these were made after April 1, 2002 when the damages, as discussed above, were greatly diminished.  For instance, Plaintiffs argued that statements, contained in divine's Form 10-Qs, for the periods ending June 30, 2002 and September 30, 2002, misleadingly expressed a "belief" that cash generated from operations would be sufficient to fund divine's operations (SC ¶¶112-118).  Plaintiffs thus alleged that Defendants knowingly made these statements without any basis since many of the internal memos sent by CEO Humenansky and/or Chief Financial Officer Michael Cullinane to defendant Filipowski decried divine's cash shortages.  Aside from the problem that damages during this latter part of the class period are severely limited, it was likely in Plaintiffs view that these particular 10(b) claims would have been held to a strict standard requiring proof at trial of **actual knowledge** of the material falsity of these statements, since, as Defendants argued in their Memo, they fell within the Safe Harbor for Forward Looking Statements, 15 U.S.C. Section 78u-5(c)(i) (Exchange Act) and 15 U.S.C. Section 77z-2(c)(i)

(Securities Act). In addition, there were numerous "cautionary" statements accompanying these statements and thus the statements may have not have been actionable at all if such cautionary statements were "meaningful." Defs' Memo at 14-15 citing *Greebel v. FTP Software*, 194 F.3d 185, 201 (1st Cir. 1999).

59.    In sum, although Plaintiffs believed that they would have successfully opposed defendants' motion to dismiss the SC, this was by no means assured, particularly given this Court's comments and apparent misgivings about the strength of some of the statements. Although it was Plaintiffs' belief that at least part of the SC would have survived defendants' motion, Plaintiffs could have then found themselves in a significantly more disadvantageous negotiating position, particularly because the claims in the portion of the Class Period that contained the bulk of Plaintiffs' estimated damages would not have been on the table in negotiations.

### The Judgment of the Parties that the Settlement Is Fair and Reasonable Provides Additional Support for Approval of the Settlement

60.    Another factor in considering whether to approve class action settlements is the judgment of the parties that the settlement is fair and reasonable. As outlined above, the Settlement is the product of arm's-length negotiations, which included two face-to-face mediations, as well as several additional telephone conversations with the mediator, that took place over several months between adversaries with significant experience in securities class action litigation.

61.    Lead Counsel strongly believes that the Settlement represents an excellent resolution for the Class under the circumstances. As outlined above, the Settlement is fair, reasonable and adequate in all respects and should be approved by the Court.

### THE PLAN OF ALLOCATION

62.    Pursuant to the Summary Notice, and as set forth in the Settlement Notice, all Class Members who wish to participate in the distribution of the Settlement Fund must submit a proper

Proof of Claim form.  As provided in the Stipulation, after deducing all appropriate taxes, administrative costs, attorneys' fees and reimbursement of expenses, the Settlement Fund (the "Net Settlement Fund") shall be distributed among Class Members who submit valid Proof of Claim forms ("Authorized Claimant").  Lead Counsel devised the Plan of Allocation to adequately reflect the relative strengths and weaknesses of the Exchange Act and Securities Act claims and with regard to the prices at which divine shares were trading at the time of the various Section 11 offerings.  The Plan of Allocation also takes into account certain curative disclosures made by divine at the end and towards the end of the Class Period.

63.    The proposed Plan of Allocation provides:

An Authorized Claimant's "Recognized Loss" shall be calculated as follows:

(a)    Section 11 Claims:

(i)    For shares acquired pursuant to the Company's acquisition of eShare, the claim per share shall be the lesser of, i) $12.50 less the sales price per share or, ii) $12.50 less $0.03 ($12.47);

(ii)    For shares acquired pursuant to the Company's acquisition of Data Return, the claim per share shall be the lesser of, i) $21.00 less the sales price per share or, ii) $21.00 less $0.03 ($20.97);

(iii)    For shares acquired pursuant to the Company's acquisition of Delano, the claim per share shall be the lesser of, i) $3.19 less the sales price per share or, ii) $3.19 less $0.03 ($3.16);

(iv)    For shares acquired pursuant to the Company's acquisition of Viant, the claim per share shall be the lesser of, i) $2.65 less the sales price per share or, ii) $2.65 less $0.03 ($2.62);

(b)    Section 10b Claims:

- 24 -

(i)        For shares of Divine common stock purchased or otherwise acquired on September 17, 2001 through January 16, 2003, and sold prior to January 17, 2003, the claim per share is $0; sold from January 17, 2003 through January 28, 2003, the claim per share is the lesser of (1) the purchase price less the sales price, or (2) $0.09 (January 17, 2003 Price Decline) sold from January 29, 2003 through February 14, 2003, the claim per share is the lesser of (1) the purchase price less the sales price, or (2) $0.20 (January 17, 2003 and January 29, 2003 Price Declines) retained at the end of February 14, 2003, the claim per share is $0.43 (January 17, 2003, January 29, 2003 and February 18, 2003 Price Declines);

(ii)       For shares of Divine common stock purchased or otherwise acquired on January 17, 2003 through January 28, 2003, and sold prior to January 29, 2003, the claim per share is $0; sold from January 29, 2003 through February 14, 2003, the claim per share is the lesser of (i) the purchase price less the sales price, or (ii) $0.11 (January 29, 2003 Price Decline); retained at the end of February 14, 2003, the claim per share is $0.34 (January 29, 2003 and February 18, 2003 Price Declines);

(iii)      For shares of Divine common stock purchased or otherwise acquired on January 29, 2003 through February 14, 2003, and sold prior to February 15, 2003, the claim per share is $0; retained at the end of February 14, 2003, the claim per share is $0.23 (February 18, 2003 Price Decline).

## FACTORS TO BE CONSIDERED IN SUPPORT OF
## THE REQUESTED ATTORNEYS' FEE AWARD

64.      Despite working on this matter for more than five (5) years, Lead Counsel have not received any payment for their services in prosecuting this litigation, nor have they been reimbursed for their expenses incurred in the prosecution of this litigation.  The Notice provides that Lead Plaintiffs' counsel may apply for an award of attorneys' fees equal to 33% of the proceeds of the

Settlement, plus reimbursement of expenses of up to $425,000, which were incurred in the litigation, plus interest thereon.  As set forth in the Memorandum of Points and Authorities in Support of Plaintiffs' Counsel's Application for an Award of Attorney Fees and Expenses, Lead Counsel are requesting attorneys' fees of 30% of the Settlement, plus expenses of $451,283.94, plus interest earned thereon at the same rate that was earned on the Settlement Fund.  The requested fee award of 30% is well within the range of fees awarded by Courts in this District and in courts throughout the country.

65.     Lead Counsel achieved this excellent result for the Class at great risk and substantial expense to themselves.  They were unwavering in their dedication to the interests of the Class and their investment of the time and resources necessary to bring this litigation to a successful conclusion against Defendants.  Lead Counsel's compensation for the services rendered has always been wholly contingent.  The requested fee is reasonable based on the quality of Lead Counsel's work and the substantial benefit obtained for the Class.

66.     Lead Counsel's compensation for the services rendered was wholly contingent on their success.  Demonstrating Lead Counsel's tremendous commitment to this litigation, Lead Counsel devoted 2,870.08 hours litigating this Consolidated Action.  The expenses incurred in the prosecution of the litigation are set forth in the accompanying declarations from Lead Counsel, who contributed to the successful prosecution of the litigation.  Each firm requesting reimbursement of expenses has declared that the expenses are reflected in the books and records maintained by the firm, and are an accurate recordation of the expenses incurred.  In total, Lead Counsel have incurred reimbursable expenses in the amount of $451,283.94.  These costs and expenses have been reasonably incurred and should be approved by the Court.

**Extent of Litigation**

67.    As described above, this case was aggressively litigated and settled only after extensive protracted settlement negotiations, including two mediations with Judge Layn Phillips and conferences in person and by telephone.  This case settled after Lead Counsel thoroughly researched the law applicable to the Class' claims and Defendants' defenses, prepared and filed multiple fact-specific complaints specifying Defendants' alleged violations of the federal securities laws, twice opposed Defendants' motions to dismiss the complaints, worked closely with bankruptcy counsel to protect the interests of the Class in the related bankruptcy proceedings, engaged in two face-to-face mediation sessions with Judge Layn Phillips, and engaged in extensive settlement negotiations over many months with the Defendants.  In total, the  hours thus far devoted by Lead Counsel in litigating this action represent a total lodestar of $1,555,345.50.

**Standing and Expertise of Plaintiffs' Counsel**

68.    Lead Counsel are among the most experienced and skilled practitioners in the securities litigation field.  The attorneys at each of Lead Counsel's firms have years of experience litigating securities class actions, and have been involved in cases that have recovered hundreds of millions, if not billions, of dollars for shareholders.

**Standing and Caliber of Opposition Counsel**

69.    Defendants are represented by outstanding law firms, which spared no effort in the defense of their clients.  Defendants' counsel vigorously defended their clients, insisting that there was no basis for any liability and gave every indication that they were fully prepared to proceed with a formidable defense of the litigation if a settlement was not reached.  In the face of this opposition, Lead Counsel developed and presented their case so as to persuade defendants to settle the case on a basis favorable to the Class, under the circumstances.

**The Risks of Litigation and the Need to Ensure the Availability
of Competent Counsel in High-Risk, Contingent Securities Cases**

70.     This litigation was undertaken by Lead Counsel on a wholly-contingent basis.  From the outset, Lead Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel were obligated to assure that sufficient resources were dedicated to the prosecution of this litigation and that funds were available to compensate staff and the considerable costs which a case such as this entails.

71.     Because of the nature of a contingent practice in the area of securities litigation, where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also have to advance the expenses of the litigation.  With an average lag time of three to four years for the average case to conclude – *this case exceeded that by continuing for five years* – the financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis.

72.     The foregoing does not even take into consideration the possibility of no recovery.  As discussed above, from the outset, this litigation presented a number of unique risks and uncertainties which could have prevented any recovery whatsoever.  It is wrong to assume that a law firm handling complex contingent litigation such as this always wins.  Tens of thousands of hours have been expanded in losing efforts.  The factor labeled by the courts as "the risks of litigation" is not an empty phrase.

73.     There are numerous cases where plaintiffs' counsel in contingent cases, after the expenditure of thousands of hours, has received no compensation.  It is only the knowledge by defendants and their counsel that the leading members of the plaintiffs' securities bar are actually

prepared to, and will, force a resolution on the merits and go to trial, which permits meaningful settlements in actions such as this.

74.     There have been many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

75.     The many appellate decisions affirming summary judgments and directed verdicts for defendants show that surviving a motion to dismiss is no guaranty of recovery.  *See Shuster v. Symmetricom, Inc.*, 35 Fed. Appx. 705 (9th Cir. 2002); *Gross v. Nuveen Advisory Corp.*, 295 F.3d 738 (7th Cir. 2002); *In re Digi Int'l, Inc. Sec Litig.*, 14 Fed. Appx. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998); *Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997).  Moreover, even plaintiffs who succeed at trial may find their judgment overturned on appeal.  *See, e.g., Anixter v. Home-Stake Prod. Co.,* 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (*en banc*) (reversing plaintiffs' verdict for securities fraud and ordering entry of judgment for defendants); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (same).

76.     The foregoing refutes the argument that the commencement of a class action is a guarantee of a settlement and payment of a fee.  Indeed, the course of this litigation demonstrates the

fact that the mere filing of an action does not ensure that there will be any settlement or fee. Thus, there was a demonstrable risk that the Class and its counsel would receive nothing. It took hard and diligent work by skilled counsel to develop facts and theories which persuaded Defendants to enter into serious settlement negotiations. If defendants believe they will prevail, experience shows that they will litigate to the end. The risk factor is real.

77.     Losses such as those described above are exceedingly expensive. The fees that are awarded are used to cover enormous overhead expenses incurred during the course of the litigation and are taxed by federal, state and local authorities. Moreover, changes in the law through legislation or judicial decree can be catastrophic, frequently affecting contingent counsel's entire inventory of pending cases. These are real threats.

78.     Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. Vigorous private enforcement of the securities and corporation laws can only occur if the private plaintiffs can obtain parity in representation with that available to large institutional interests. If this important public policy is to be carried out, the courts should award fees which will adequately compensate private plaintiffs' counsel, taking into account the risks undertaken with a clear view of the economies of a securities class action. When we undertook to act for Plaintiffs in this matter, it was with the knowledge that we would spend many hours of hard work against some of the best defense lawyers in the United States with no assurance of ever obtaining any compensation for our efforts.

### Lead Counsels' Request for Reimbursement
### of Expenses is Reasonable and Should Be Approved

79.     Lead Counsel has submitted declarations setting forth the amounts of the expenses incurred over the course of the litigation. These declarations are filed herewith. These expenses

were necessarily incurred for the successful prosecution of this litigation and are reasonable in amount.

## CONCLUSION

80.      For the reasons set forth above and in the accompanying documents which include Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Final Approval of the Proposed Class Action Settlement and the Memorandum of Points and Authorities in Support of Plaintiffs' Counsel's Application for an Award of Attorney Fees and Expenses, we respectfully submit that: (a) the Settlement is fair, reasonable and adequate and should be finally approved; (b) the Plan of Allocation represents a fair method for the distribution of the Net Settlement Fund among Class Members and should also be approved; and (c) the application for attorneys' fees of 30% of the Settlement, and reimbursement of expenses of $451,283.94 should be granted.

We declare under penalty of perjury that the foregoing is true and correct.

Executed on June 17th, 2008.

_/s/ Howard T. Longman_____              _/s/ David A. Rosenfeld_____
HOWARD T. LONGMAN                    DAVID A. ROSENFELD

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 17, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 17, 2008.

s/ Ellen Gusikoff Stewart
ELLEN GUSIKOFF STEWART

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail: EllenG@csgrr.com

# Mailing Information for a Case 1:04-cv-12263-PBS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Bruce S. Barnett**
  bruce.barnett@dlapiper.com,janine.medina@dlapiper.com

- **Thomas David Brooks**
  tdbrooks@sperling-law.com

- **Joel G. Chefitz**
  jchefitz@mwe.com

- **Christopher J. Panos, Trustee of the Sabine, Inc. Liquidating Trust**
  jkoltun@craigmacauley.com

- **Joseph Edward Collins**
  joseph.collins@dlapiper.com

- **Mayeti Gametchu**
  mgametchu@wolfblock.com,mahall@wolfblock.com

- **Ellen Anne Gusikoff Stewart**
  elleng@csgrr.com,elleng@csgrr.com

- **James E. Hanlon , Jr**
  hanlonj@howrey.com

- **Howard T. Longman**
  tsvi@aol.com

- **Kevin J. O'Connor**
  koconnor@wolfblock.com,mahall@wolfblock.com

- **David Pastor**
  dpastor@gilmanpastor.com,rkaloutas@gilmanpastor.com,sdurgin@gilmanpastor.com

- **Stephanie R. Pratt**
  spratt@segalroitman.com,jstein@segalroitman.com

- **David A. Rosenfeld**
  drosenfeld@csgrr.com

- **Samuel H. Rudman**
  SRudman@csgrr.com

- **Anne R. Sills**

asills@segalroitman.com,sgillin@segalroitman.com,tsullivan@segalroitman.com

- **Bruce S. Sperling**
  bss@sperling-law.com

- **Mary T. Sullivan**
  msullivan@segalroitman.com,jstein@segalroitman.com,sgillin@segalroitman.com

- **Marc A. Topaz**
  ecf_filings@sbtklaw.com

- **Marc M. Umeda**
  notice@ruflaw.com,zimmer@ruflaw.com,umeda@ruflaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Guri Ademi
Ademi & O'Reilly
3620 East Layton
Cudahy, WI 53110

Shpetim Ademi
Ademi & O'Reilly
3620 East Layton
Cudahy, WI 53110

Celiza Patricia Braganca
Sperling & Slater
55 West Monroe Street
Suite 3200
Chicago, IL 60603

Michael A. Duffy
Kirkland &Ellis LLP
200 East Randolph Drive
Chicago, IL 60601

Eugene J. Frett
Sperling & Slater
55 West Monroe Street
Suite 3200
Chicago, IL 60603

John A.D. Gilmore
DLA Piper Rudnick Gray Cary US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA 02110-2600

John F. Hartmann
Kirkland & Ellis LLP
200 East Randolph Drive
```

Chicago, IL 60601

**Bruce C. Howard**
Law Offices of Robert D. Allison
122 South Michigan Avenue 1850
Chicago, IL 60603

**Douglas Warren Hyman**
Piper Rudnick LLP
203 North LaSalle Street
#1900
Chicago, IL 60601-1293

**Samuel Bayard Isaacson**
Piper Rudnick LLP
203 North LaSalle Street
#1900
Chicago, IL 60601-1293

**Daniel J. Lyne**
Hanify & King
Professional Corporation
One Beacon Street
Boston, MA 02108-3107

**Marvin Allen Miller**
Miller Faucher and Cafferty, LLP
30 North LaSalle Street
Suite 3200
Chicago, IL 60602

**Christopher B. Sanchez**
Miller Faucher and Cafferty, LLP
30 North LaSalle Street
Suite 3200
Chicago, IL 60602

**Patrick J. Sherlock**
Beigel, Schy, Lasky, Cohen, Rifkind & Hennessey
11 South LaSalle
Suite 1600
Chicago, IL 60606

**Jennifer Winter Sprengel**
Miller Faucher and Cafferty, LLP
30 North LaSalle Street
Suite 3200
Chicago, IL 60602

**Lawrence A. Wojcik**
Piper Rudnick Gray Cary US LLP
203 N. LaSalle
Suite 1800
Chicago, IL 60601-1293